1  PETER O. GLAESSNER, State Bar No. 93830
   pglaessner@aghwlaw.com
2  LORI A. SEBRANSKY, State Bar No. 125211
   lsebransky@aghwlaw.com
3  ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
   180 Montgomery Street, Suite 1200
4  San Francisco, CA 94104
   Telephone:    (415) 697-2000
5  Facsimile:    (415) 813-2045

6  Attorneys for Defendant
   SAN FRANCISCO BAY AREA RAPID TRANSIT
7  DISTRICT

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10  _____ DIVISION

11
    SAN FRANCISCO BAY AREA RAPID          Case No.
12  TRANSIT DISTRICT,
                                          **COMPLAINT FOR DECLARATORY**
13                Plaintiff,              **RELIEF, BREACH OF CONTRACT AND**
                                          **BREACH OF THE IMPLIED COVENANT OF**
14       v.                               **GOOD FAITH AND FAIR DEALING**

15  TRAVELERS PROPERTY CASUALTY           **DEMAND FOR JURY TRIAL**
    COMPANY OF AMERICA, a Connecticut
16  Corporation,

17                Defendants.

18

19

20       Plaintiff San Francisco Bay Area Rapid Transit District alleges as follows:

21                  **PARTIES, JURISDICTION AND VENUE**

22       1.    Plaintiff San Francisco Bay Area Rapid Transit District (BARTD) is a public

23  entity operating under the laws of the State of California.

24       2.    Upon information and belief, defendant Travelers Property Casualty Company of

25  America is a Connecticut corporation with its principal place of business in Hartford,

26  Connecticut.  Travelers is authorized to and conducts business in California as an insurer.

27       3.    This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332, since the matter

28  in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

40241.1

1      4.     Venue is proper in the United States District Court for the Northern District of

2  California pursuant to 28 U.S.C. §1391(a) and (c), since this action is brought in a district where

3  all parties do business. Additionally, a substantial part of the events giving rise to this claim

4  occurred within this District. The accident spawning the underlying action occurred within this

5  District, and that action was filed in Alameda County Superior Court.

6                    **THE UNDERLYING ACCIDENT AND LAWSUIT**

7      5.     This coverage dispute arises from a fatal accident that occurred on Saturday,

8  October 19, 2013 on the track between the Walnut Creek and Pleasant Hill BARTD stations. At

9  the time of the accident, BARTD was on strike. The only trains that were running were

10  inspection trains operated by BARTD management and trains being used to train management

11  staff as train operators. Christopher Sheppard, Manager of BARTD Track & Grounds, and

12  Laurence Daniels, a subconsultant to BARTD, were working on the track the afternoon of

13  October 19, 2013, when they were struck by a train and killed.

14      6.     Mr. Daniels, who owned his own company, Daniels Engineering, was a Contractor

15  for Anil Verma Associates. (As explained below, BARTD and Anil Verma had a contract for

16  services, including wayside support.) Mr. Daniels had worked in the industry for over 40 years,

17  and had extensive experience working wayside on BARTD and other transit systems. He was

18  trained on and informed about BARTD's "Simple Approval" procedure, which is a safety

19  procedure used to authorize access to trackways. Under this procedure, personnel seeking to

20  perform an inspection near the tracks must confirm the inspection with the Operations Control

21  Center. Once they have permission to work at the desired location, they are individually

22  responsible for their own protection; they do not interfere with main line track operations, and

23  they are cautioned to expect the movement of trains and on-rail vehicles at any time, on any track,

24  in any direction. They must be positioned appropriately, and a "lookout" or "watchperson" is

25  required so the workers are alerted to any unexpected train traffic in time to avoid an accident.

26      7.     On the afternoon of the accident, Mr. Sheppard requested Simple Approval so he

27  and Mr. Daniels could work on the track. The Operations Control Center confirmed the Simple

28  Approval, and broadcast a message that there were persons on the track at their location between

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

COMPLAINT
CASE NO.:

40241.1

1    the Walnut Creek and the Pleasant Hill stations.

2        8.    While Mr. Daniels and Mr. Sheppard were working wayside, Train 963 was en

3    route from Orinda to Concord. As the train neared their location, Mr. Daniels and Mr. Sheppard

4    did not follow the above-referenced Simple Approval procedures, thereby causing the subject

5    accident.

6        9.    On May 16, 2014, Mr. Daniels' family members filed a wrongful death action

7    against BARTD, styled *Amber Daniels, et. al. v. Bay Area Rapid Transit District*, Alameda

8    County Superior Court No. RG14725711. Plaintiffs' complaint asserts a single cause of action

9    for wrongful death. Plaintiffs essentially allege that BARTD negligently failed to protect Mr.

10   Daniels while working on tracks during rail car movement. A true and correct copy of the

11   *Daniels* complaint is attached as Exhibit A.

12       10.    On October 8, 2014, BARTD filed a cross-complaint against Anil Verma

13   Associates, Inc. (the Company Mr. Daniels subcontracted with) for declaratory relief, and implied

14   and express indemnity and contribution. A first amended cross-complaint subsequently was filed

15   on January 15, 2015. The cross-complaint is based on Mr. Daniels' alleged violation of the

16   Simple Approval procedures, and on Anil Verna's express contractual obligations under its

17   contract with BARTD, as set forth below. A true and correct copy of the BARTD first amended

18   cross-complaint is attached as Exhibit B.

19       **THE CONTRACT BETWEEN BARTD AND ANIL VERMA ASSOCIATES**

20       11.    At the time of the accident, Mr. Daniels was working as a subconsultant under the

21   BARTD-Anil Verma Professional Service Agreement (No. 6M8043). A true and correct copy of

22   relevant portions of this contract is attached as Exhibit C. Among other things, this Agreement

23   requires that Anil Verma name BARTD as an additional insured under Anil Verma's insurance

24   policy, and specifies that such coverage will be primary:

25       6.0 <u>INSURANCE</u>

26       D.    <u>Insurance Provided by Consultant</u>

27       1.    <u>Commercial General Liability Insurance</u>

28

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

3

COMPLAINT
CASE NO.:

40241.1

a.   Coverage shall include:

(4)   **Broad Form Contractual Liability, expressly including liability assumed under the Agreement;**

b.   Such insurance shall include the following endorsements, copies of which shall be provided to the District:

(1)   **Inclusion of the District...as an additional insured** as respects [AVA's] operations under this Agreement;

(2)   Stipulation that **the insurance is primary insurance** and that no insurance or self-insurance of the District will be called upon to contribute to a loss.  [Our emphasis.]

12.   Anil Verma also contractually agreed to indemnify BARTD:

8.0   INDEMNIFICATION.

Consultant [Anil Verma]...shall **defend, indemnify and hold harmless BART**...from all claims, demands, suits, loss, damages, injury and liability, direct or indirect (including reasonable attorney's fees and any and all costs and expenses in connection therewith), incurred **by reason of any act, or failure to act, of [Anil Verma],** its officers, agents, employees and **subconsultants**...under or in connection with this agreement; and [AVA] agrees at its own cost, expense and risk to defend any and all claims, actions, suits or other legal proceedings brought or instituted against BART...arising out of [AVA's] services, and to pay and satisfy any resulting judgments.  [Our emphasis.]

13.  As cited above, the Anil Verma-BARTD Professional Services Agreement (in section 6.0) requires that Anil Verma's insurance cover its contractual indemnity obligation to BARTD assumed in section 8.0.

14.   Pursuant to these contractual obligations, BARTD tendered its defense and indemnity to Anil Verma on February 18, 2014.  Anil Verma has not directly responded to this tender.  A true and correct copy of BARTD's tender letter (without exhibits) is attached as Exhibit D.

/ / /

COMPLAINT
CASE NO.:

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

40241.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

## THE TRAVELERS POLICY

15.     Consistent with the Anil Verma-BARTD Professional Services Agreement, Travelers provided commercial general liability insurance to Anil Verma, which was in effect at the time of the accident. BARTD has requested a complete copy of the policy from Travelers several times. Although BARTD, as an additional insured, has a right to a copy of the policy, Travelers has failed or refused to provide it. Nevertheless, based on the Certificate of Insurance and attached policy forms, on BARTD's correspondence with Travelers, and on standard general liability policy language, BARTD is informed and believes the Travelers policy contains the following relevant contractual provisions.

16.     First, BARTD is informed and believes the insuring agreement of the Travelers policy obligates Travelers to pay all sums an insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which the insurance applies. "Bodily injury" includes death.

17.     Second, BARTD is informed and believes the Travelers policy (and California law) obligates Travelers to defend an insured against any "suit" seeking damages potentially covered by the policy, even if the allegations of the suit are false or fraudulent.

18.     Third, BARTD is informed and believes the Travelers policy includes an Additional Insured Endorsement, which obligates Travelers to defend and indemnify BARTD with respect to its liability caused, in whole or in part, by the named insured's [Anil Verma's] acts or omissions. As an additional insured, BARTD has the same right to a defense that would be afforded to the named insured (and the same right to indemnification for claims covered under the additional insured endorsement).

19.     Fourth, BARTD is informed and believes the Travelers policy promises that the additional insured coverage provided under the Additional Insured Endorsement is primary where, as here, the named insured [Anil Verma] agrees in a contract or agreement requiring insurance [the Anil Verma–BARTD Professional Service Agreement] that the insurance provided for the additional insured [BARTD] would be primary.

///

COMPLAINT
CASE NO.:

40241.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

## THE TENDERS TO AND DENIALS BY TRAVELERS

20.     BARTD is informed and believes that Anil Verma forwarded BARTD's February 18, 2014 tender letter to Travelers. On February 24, 2014, BARTD spoke with Travelers about the Daniels' claim. Travelers sought additional information, including the contract between BARDT and Anil Verma. BARDT provided the additional documents to Travelers, as requested.

21.     On May 13, 2014, Travelers acknowledged that Cal-OSHA determined that neither Mr. Daniels nor Mr. Sheppard "was performing the duties of 'Watchperson,' as specified by the employer's 'Simple Approval' procedure, at the time of the incident." Nevertheless, Travelers stated "there are still unanswered questions regarding the facts of the accident and how our Insured [Anil Verma] was negligent in causing or contributing to the accident." Travelers concluded it was "currently not in a position to accept or reject BART's tender of their defense and indemnity of this claim." It specifically asked for information confirming that Daniels was working on behalf of Anil Verma at the time of the accident. A true and correct copy of Travelers' May 13, 2014 letter is attached as Exhibit E.

22.     On May 23, 2014, BARTD sent to Travelers invoices Anil Verma had submitted to BARTD for Mr. Daniels' work under the Anil Verma-BARTD Professional Services Agreement, including an invoice for work performed on the day of the accident. Having provided the information Travelers requested, BARTD tendered its defense and indemnity once again.

23.     On June 5, 2014, Travelers responded by email, advising it still could not accept or reject BARTD's tender without more information proving a negligent act or omission by Mr. Daniels. Travelers posed a series of questions, such as: "Is there any written evidence to show that either AVA or Daniels was fully aware of all BART's safety procedures and requirements?" and "Did the train operator and his supervisor that was with him know that the men were working on the tracks?" A true and correct copy of Travelers' June 5, 2014 email is attached as Exhibit F.

24.     On June 27, 2014, BARTD advised Travelers that, while these questions ultimately might be important for liability or indemnity purposes, they do not affect Travelers' *defense* obligation, which is immediate, and which applies if there is a *mere potential* for coverage under the policy, as explained in *Buss v. Superior Court (Transamerica Ins. Co.)* (1997)

COMPLAINT
CASE NO.:

40241.1

1   16 Cal.4th 35, 46.  BARTD reminded Travelers that such potential exists because, among other

2   things, the available information indicated that Mr. Daniels was working on Anil Verma's behalf

3   at the time of the accident, that Mr. Daniels was not acting as a "watchperson" as required by

4   Simple Approval procedure, and that it certainly was *possible* that the accident was caused, in

5   whole or in part, by Mr. Daniel's failure to follow safety protocol.  Because defense fees and

6   costs were being incurred, BARTD requested that Travelers immediately provide a defense.  A

7   true and correct copy of BARTD's June 27, 2014 letter is attached as Exhibit G.

8          25.     On July 10, 2014, Travelers responded, again protesting that "there are still

9   unanswered questions regarding the facts of the accident and how our Insured was negligent in

10  causing or contributing to the accident."  Travelers refused to accept BARTD's tender, insisting it

11  could not do so unless the liability questions posed in its June 5, 2014 email were answered.  A

12  true and correct copy of Travelers' July 10, 2014 letter is attached as Exhibit H.

13         26.     On August 1, 2014, BARTD advised Travelers that the questions posed are

14  *liability* questions that will be investigated and answered during the course of the litigation, that

15  the questions themselves illustrate the possibility that Daniels might have some responsibility for

16  the accident, and that "unless Travelers can prove - right now - that there is *no possibility*

17  *whatsoever* that the accident was caused, in whole or in part, by Mr. Daniel's failure to follow

18  safety protocol...it must accept BART's tender of defense."  BARTD further advised that it was

19  considering its legal options, but was offering Travelers another opportunity to do the right thing

20  and accept BARTD's tender.  A true and correct copy of BARTD's August 1, 2014 letter is

21  attached as Exhibit I

22         27.     On August 26, 2014, Travelers again refused to accept BARTD's tender.

23  Travelers stated that BART is an additional insured "only with respect to liability."  In spite of the

24  Cal-OSHA determination that neither Daniels nor Sheppard were following "Watchman" safety

25  protocol, Travelers states that, "currently, all we have is speculation that Mr. Daniels knew that

26  the 'Simple Approval' procedure was in force and that he knew what those safety requirements

27  were."  Absent evidence *proving* Mr. Daniels' liability, Travelers concluded that "BARTD has

28  not met its burden of establishing that the insuring agreement (contained in the additional insured

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

COMPLAINT
CASE NO.:

40241.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1    endorsement) has been met." A true and correct copy of Travelers' August 26, 2014 letter is

2    attached as Exhibit J.

3         28.    Hoping to avoid the time and expense of coverage litigation, BARTD obtained

4    additional documentation indicating that Daniels knew or should have known the Simple

5    Approval process was in place. This information included portions of the BARTD Police

6    Department report, a copy of the BART "Simple Approval Form" for the work done on the day of

7    the accident, and a summary of the statement taken of the train operator, who noted both men had

8    their backs to the train. On September 8, 2014, BARTD sent this information to Travelers. A

9    true and correct copy of BARTD's September 8, 2014 letter (without exhibits) is attached as

10   Exhibit K.

11        29.    On September 25, 2014, Travelers advised that it had no duty to defend (or

12   indemnify) BARTD because, "based on all the documents and information that have been

13   provided, there has been no evidence submitted or discovered that indicated that our Insured, or

14   Mr. Daniels, was negligent in causing or contributing to the accident."    (Our emphasis.)

15   Although the cause of the accident is still being investigated by the National Transportation

16   Safety Board and Cal/OSHA, and still being litigated in the *Daniels* action, Travelers unilaterally

17   concluded that, "this appears to be nothing but a failure of communication on the part of BART,"

18   and advised it was declining BARTD's tender because it "does not believe there is any fault on

19   Mr. Daniel's [sic] or Anil Verma's part that caused the accident, or was in connection with their

20   work or operations." (Our emphasis.) A true and correct copy of Travelers' September 25, 2014

21   letter is attached as Exhibit L.

22        30.    With no other recourse, BARTD was forced to file this action to obtain the

23   benefits owed under the Travelers policy.

24                        **FIRST CLAIM FOR RELIEF**
                          **(Declaratory Relief -- Duty to Defend)**
25

26        31.    Plaintiff reincorporates by reference paragraphs 1 through 30.

27        32.    An actual and justiciable controversy has arisen and now exists between BARTD

28   and Travelers concerning their respective rights and obligations under the policy, in that BARTD

COMPLAINT
CASE NO.:

40241.1

1    maintains it is entitled to a defense in the *Daniels* action whereas Travelers claims it has no duty

2    to defend BARTD in that action.

3        33.    BARTD desires a judicial determination and declaration of its and Travelers'

4    respective rights and duties under the policy, specifically that BARTD's interpretation of the

5    policy is correct and that Travelers is obligated to defend it in the *Daniels* action.

6        WHEREFORE, plaintiff prays judgment as set forth below.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract)**

7

8        34.    Plaintiff reincorporates by reference paragraphs 1 through 30.

9        35.    BARTD has performed all conditions on its part to be performed under the policy.

10       36.    Travelers has a contractual duty to defend BARTD under the Travelers policy

11   because BARTD is an additional insured under the policy, and because the claims asserted

12   against BARTD in the *Daniels* action are potentially covered under the policy.

13       37.    Travelers has failed and refused to perform its obligations under the policy by

14   failing and refusing to provide BARTD with a defense in the *Daniels* action.

15       38.    As a direct and proximate result of Travelers' breach of its contractual duties to

16   BARTD, BARTD has suffered damage by having to retain counsel, at its own expense, to defend

17   it against the *Daniels* action, and by having to expend costs associated with that defense. Those

18   fees and costs are increasing on a daily basis.

19       WHEREFORE, plaintiff prays judgment as set forth below.

20

**THIRD CLAIM FOR RELIEF**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

21

22

23       39.    Plaintiff reincorporates by reference paragraphs 1 through 38.

24       40.    The insurance policy between BARTD and Travelers imposes upon Travelers the

25   duty to act fairly and in good faith toward BARTD in carrying out its responsibilities under the

26   policy.

27       41.    Travelers breached its obligation to act fairly and in good faith toward BARTD by

28   failing and refusing to defend it when BARTD first tendered its defense in January 2014, by

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

COMPLAINT
CASE NO.:

40241.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1 | failing and refusing to fully and properly investigate the claims asserted against BARTD, by

2 | failing and refusing to consider BARTD's interests equally with its own, by failing and refusing

3 | to provide a copy of its policy to BARTD as its additional insured, and by otherwise acting in

4 | complete disregard of BARTD's rights under the policy.

5 | 42.    As a direct and proximate result of Travelers' breach of the implied covenant of

6 | good faith and fair dealing, BARTD has suffered and continues to suffer economic damages.  The

7 | amount of those damages is escalating on a daily basis.

8 | 43.    As a further direct and proximate result of Travelers' breach of the implied

9 | covenant of good faith and fair dealing, BARTD has been required to retain counsel to prosecute

10 | this action in order to obtain the benefits owed under the Travelers policy.

11 | WHEREFORE, plaintiff prays judgment as set forth below.

12 | **PRAYER FOR RELIEF**

13 | WHEREFORE, plaintiff prays for judgment as follows:

14 | 1.    In connection with its First Claim for Relief:

15 |     a.    For a declaration that Travelers is obligated to defend BARTD in respect of

16 |         the *Daniels* action;

17 |     b.    For costs of suit incurred herein;

18 |     c.    For such other and further relief as to the court may seem proper.

19 | 2.    In connection with its Second Claim for Relief:

20 |     a.    For damages for breach of contract according to proof;

21 |     b.    For prejudgment interest;

22 |     c.    For costs of suit incurred herein;

23 |     d.    For such other and further relief as to the court may seem proper.

24 | 3.    In connection with its Third Claim for Relief:

25 |     a.    For damages for breach of the implied covenant of good faith and fair

26 |         dealing according to proof;

27 |     b.    For prejudgment interest;

28 |     c.    For reasonable attorneys' fees and costs incurred herein;

10

COMPLAINT
CASE NO.:

d.   For costs of suit incurred herein;

e.   For such other and further relief as to the court may seem proper.

Respectfully submitted,

Dated:  March 6, 2015                    ALLEN, GLAESSNER,
                                         HAZELWOOD & WERTH, LLP

By:  /s/ Lori A. Sebransky
                                         PETER O. GLAESSNER
                                         LORI A. SEBRANSKY
                                         Attorneys for Defendant
                                         SAN FRANCISCO BAY AREA RAPID
                                         TRANSIT DISTRICT

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands trial by jury in this action.

Respectfully submitted,

Dated:  March 6, 2015                    ALLEN, GLAESSNER,
                                         HAZELWOOD & WERTH, LLP

By:  /s/ Lori A. Sebransky
                                         PETER O. GLAESSNER
                                         LORI A. SEBRANSKY
                                         Attorneys for Plaintiff
                                         SAN FRANCISCO BAY AREA RAPID
                                         TRANSIT DISTRICT

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

11

COMPLAINT
CASE NO.:

40241.1

# Exhibit A

FILED BY FAX
ALAMEDA COUNTY

May 16, 2014

CLERK OF
THE SUPERIOR COURT
By Burt Moskaira, Deputy

CASE NUMBER:
RG14725711

1   Elizabeth L. Riles, Esq. CBN 197411
    Karine Bohbot, Esq. CBN 197298
2   BOHBOT & RILES, LLP
    1814 Franklin Street, Suite 800
3   Oakland, CA 94612
    (510) 273-3111
4   (510) 273-8922
    eriles@strikebacklaw.com
5

6   Markus B. Willoughby, Esq. CBN 197478
7   WILLOUGHBY LAW FIRM
    1814 Franklin Street, Suite 800
8   Oakland, California 94612
    Telephone: (510) 451-2777
9   Facsimile: (415) 835-1050
10  markus@willoughbyfirm.com

11

12  Attorneys for Plaintiffs

13
                IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
14
                              -UNLIMITED JURISDICTION-
15
                        IN AND FOR THE COUNTY OF ALAMEDA
16

17  AMBER DANIELS, SARAH DANIELS and )   CASE NO.
18  CHARLES O. McCOMISH as personal )
    representative to the Estate of Laurence E. )
19  Daniels                                    )   COMPLAINT FOR DAMAGES
                                               )
20                      Plaintiffs,            )
                                               )
21                                             )   1.  Wrongful Death
    vs.                                        )
22                                             )
    BAY AREA RAPID TRANSIT DISTRICT and )
23  DOES 1-25, inclusive,                      )
                                               )
24                      Defendants.            )   Jury Trial Requested and Jury Fees
25                                             )   Posted Herewith

26
27      Plaintiffs AMBER DANIELS, SARAH DANIELS AND CHARLES O McCOMISH as

28  personal representative, (collectively "Plaintiffs") and based upon information and belief, allege

    as follows:

                                           1
                              COMPLAINT FOR DAMAGES

## PRELIMINARY ALLEGATIONS

1    At all times herein mentioned, Plaintiff AMBER DANIELS is and was a resident of Oakland, County of Alameda, State of California.

2    At all times herein mentioned, Plaintiff SARAH DANIELS was a resident of Orangevale, County of Sacramento, State of California.

3    At all times herein mentioned, Plaintiff CHARLES O. McCOMISH is and was a resident of Citrus Heights, County of Sacramento, State of California and the personal representative as well as the Administrator of the Estate of Laurence E. Daniels, currently pending in the Probate Department of the Alameda County Superior Court, County of Alameda.

4    Upon information and belief, Plaintiffs allege that at all times mentioned, defendant BAY AREA RAPID TRANSIT DISTRICT (hereinafter "BART"), is a California Corporation which owns and operates a special state governmental rapid transportation company commonly known as BART, in the State of California, which operates in 9 Districts including the Counties of Alameda, San Francisco, San Mateo, Contra Costa, and which has its principal place of business at 300 Lakeside Drive, Oakland, Alameda County, State of California.

5    That defendants DOES 1 through 25, inclusive, are sued herein under fictitious names because their true names, involvement, and capacities, whether individual, associate, corporate or governmental, are not now known to plaintiffs; plaintiffs are informed and believe and upon such information and belief allege that each of the said defendants are negligent or responsible in some manner for the events herein alleged, either as owners, controllers, manufacturers, suppliers, sellers, distributors, engineers, safety regulators, supervisors, attendants, operators, managers, mechanics, or otherwise, and said defendants negligently acted or failed to act in one or more of said occupations or businesses, which negligence proximately caused the death and damages hereinafter set forth.  Plaintiffs are uncertain as to the manner or function of said defendants, whether as owners, controllers, manufacturers, suppliers, sellers, distributors, engineers, safety regulators, supervisors, attendants, operators, managers, mechanics, or otherwise, and plaintiff will ask leave to amend this Complaint to insert same herein when such names, capacities, functions, occupations and businesses of said defendants have been more fully ascertained.

COMPLAINT FOR DAMAGES

1      6      Plaintiffs are informed and believe and upon such information and belief allege that,

2  at all times herein mentioned, defendants, including those sued by fictitious names, acted as the

3  agents, servants, employees and/or representatives of each of their co-defendants, acted within the

4  course and scope of said agency, employment and/or representation and acted with the knowledge,

5  consent, approval and/or ratification of their co-defendants.

6                          **VENUE AND JURISDICTION**

7      7      Plaintiffs, on information and belief, re-allege and incorporate by reference each

8  and every allegation of paragraphs 1 thru 6 of this Complaint, inclusive, as if fully set forth here.

9      8      Venue in Alameda County is proper because the defendant, BART has its

10  principal place of business in Oakland, California, County of Alameda.

11     9      The subject matter of this action is properly heard in this Unlimited Jurisdiction

12  Superior Court as the action herein incorporated has an amount in controversy which exceeds the

13  jurisdictional minimum of Twenty Five Thousand Dollars ($25,000.00).

14     10     Plaintiffs have exhausted all remedies they are required to exhaust before bringing

15  this action.     Specifically, Plaintiffs brought claims with BART pursuant to California

16  Government Code §910 *et seq.*

17                    **FIRST CAUSE OF ACTION – WRONGFUL DEATH**

18                          (Against all defendants)

19     11     Plaintiffs, on information and belief, re-allege and incorporate by reference each

20  and every allegation of paragraphs 1 thru 10 of this Complaint, inclusive, as if fully set forth

21  here.

22     12     Plaintiffs are informed and believe and thereupon allege that at all times mentioned,

23  plaintiffs' decedent, Laurence E. Daniels, was doing business as Daniels Railroad Engineering,

24  Incorporated, and it was within this context that on or about October 19, 2013, during an

25  employment strike, he was retained as an independent contractor working by, through and for

26  Defendant BART to provide inspection of rail tracks with BART employee Christopher Sheppard.

27     13     Plaintiffs are informed and believe and thereupon allege that on or about October 19,

28  2013, Defendant BART negligently and carelessly employed the "Simple Approval" safety

1  approach which is supposed to be used when workers are performing inspections or maintenance on

2  rail tracks where trains are moving at less than full speed. "Simple Approval" is an oral

3  authorization for access to track ways (or other restricted areas) where no protective measures

4  are provided by Defendant BART in areas where trains are not driving at full speed.

5          14      Plaintiffs are informed and believe and thereupon allege that on or about October

6  19, 2013, Defendant BART knew or should have known that "Simple Approval" was a

7  dangerous and hazardous system that failed to safeguard personnel working on tracks during

8  railcar movement as at least three other BART employee deaths had previously occurred as a

9  direct result of "Simple Approval." Despite these prior deaths, Defendant BART failed and/or

10  refused to remedy this dangerous, hazardous and outdated system.

11          15      Plaintiffs are informed and believe and thereupon allege that on or about October

12  19, 2013, Defendant BART negligently failed to issue or competently alert train 963 of a "Work

13  Order" for work being performed by Plaintiffs' decedent, Laurence E. Daniels between track

14  markers c40 and c50. Defendant BART was negligent and failed to protect plaintiffs' decedent

15  from high speed train movement by stopping, slowing down or re-routing train 963.

16          16      Plaintiffs are informed and believe and thereupon allege that on or about October 19,

17  2013, the following occurred: For some time prior to 1:53 p.m. on said date, BART employee,

18  Christopher Sheppard obtained "Simple Approval" for himself and Plaintiffs' decedent, Laurence E.

19  Daniels, to inspect a dip in the railroad track between track markers c40 and c50; BART dispatch

20  confirmed the locations of Sheppard and Daniels immediately and accurately, but then Defendant's

21  automated message was negligently transmitted to all current train operators indicating that there

22  were no workers on the tracks; a human dispatch operator corrected the automated message and

23  reported that there were workers on the tracks between track markers c40 and c50; and an incorrect

24  and negligently issued work order received by train 963, indicated that workers were performing

25  work or inspection of the tracks between c53 and c54, some 3 miles away from Plaintiffs' decedent.

26          17      Plaintiffs are informed and believe and thereupon allege that on or about October 19,

27  2013, at approximately 1:53 p.m., BART was involved in a labor strike, with most of its trains idle

28  for commuters and most of the experienced train operators not working; that Train 963, however,

COMPLAINT FOR DAMAGES

1   was being negligently operated by an inexperienced and not properly trained operator-in-training
2   while in automatic mode at approximately 70 miles per hour, full speed, without direct supervision;
3   and that the trainer who was supposed to be supervising the inexperienced operator-in-training was
4   negligently and recklessly seated in the passenger area with three other BART employees and
5   another trainee, instead of maintaining his proper position next to the operator-in-training in the
6   Control Cab of train 963.

7         18      Plaintiffs are informed and believe and thereupon allege that on October 19, 2013, at
8   approximately 1:53 p.m., train 963 was being negligently operated by an inexperienced and
9   unqualified operator-in-training, who was unsupervised and who had incorrect information with
10  regard to the existence and location of workers on the tracks while operating the railcar at full speed
11  on automatic pilot; that without warning to Plaintiffs' decedent by Defendant BART employees that
12  a train was coming down the track in a work area at full speed during the labor strike, and without
13  the sounding of a horn or alarm, while Plaintiffs' decedent was performing a vital track inspection at
14  the request and invitation of Defendant BART, train 963 did negligently hit Plaintiffs' decedent,
15  Laurence E. Daniels, at approximately 70 miles an hour and causing his death, all to the damage of
16  plaintiffs.

17        19      Plaintiffs are informed and believe and thereupon allege that at all times and places
18  mentioned herein, Defendants carelessly and negligently instructed, directed, advised, educated,
19  supervised, informed and protected Plaintiffs' decedent, Laurence E. Daniels. Defendants, and each
20  of them, carelessly and negligently instructed, directed, supervised, advised, educated and informed
21  all of the employees of Defendant BART, who were involved in the death of Laurence E. Daniels,
22  all to plaintiffs' general damage.

23        20      Plaintiffs are informed and believe and thereupon allege that during all times
24  relevant to this Complaint, defendants, and each of them, their agents, employees and
25  representatives acted carelessly, negligently and recklessly with respect to Laurence E. Daniels,
26  causing economic loss and death.

27        21      Plaintiffs are informed and believe and thereupon allege that Laurence E. Daniels
28  died as the direct and proximate result of the careless, negligent and/or reckless neglect of

1  defendants and each of them.  Accordingly, plaintiffs AMBER DANIELS and SARAH DANIELS
2  suffered the loss of love, comfort and society of Laurence E. Daniels as a result of the negligent and
3  other bad acts of defendants and each of them.

4      22     Plaintiffs are informed and believe and thereupon allege that as a further direct and
5  proximate result of said negligence, acts, omissions and conduct of defendants, and each of them,
6  and of said injuries caused, the Estate of Laurence Daniels has lost income and other financial
7  advantages in an amount not now known to them.

8      23     Plaintiffs are informed and believe and thereupon allege that as a further direct and
9  proximate result of said negligence, acts, omissions and conduct of defendants, and each of them,
10  and of said injuries caused, plaintiffs have incurred expenses, including end of life expenses, in an
11  amount not now known to them.

12      WHEREFORE, plaintiffs pray for judgment against the defendants, and each of them, as set
13  forth below.

14  <div align="center">**PRAYER FOR RELIEF**</div>

15      WHEREFORE, Plaintiffs seek judgment against Defendants BART and DOES 1-25,
16  inclusive, and each of them, as follows:

17      1.    For Plaintiffs, all actual, consequential and incidental losses according to proof;
18      2.    For Plaintiffs AMBER DANIELS and SARAH DANIELS, general damages
19  according to proof;
20      3.    For costs of suit incurred herein;
21      4.    For pre judgment interest pursuant to Civil Code Section 3291; and
22      5.    For such other and further relief as the Court may deem proper and just.

25  DATED: May 16, 2013

By: Elizabeth L. Riles, Esq.
Markus B. Willoughby
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES

PLAINTIFFS HEREWITH DEMAND A TRIAL BY JURY AND SUBMIT THE
APPROPRIATE JURY FEES WITH THIS COMPLAINT.

DATED: May 16, 2014

By:

Elizabeth L. Riles, Esq.
Markus B. Willoughby, Esq.
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES

Exhibit B

MARK F. HAZELWOOD, State Bar No. 136521
mhazelwood@aghwlaw.com
DALE L. ALLEN, JR., State Bar No. 145279
dallen@aghwlaw.com
KIMBERLY Y. CHIN, State Bar No. 271333
kchin@aghwlaw.com
ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:    (415) 697-2000
Facsimile:     (415) 813-2045

Attorneys for Defendant/Cross-Complainant
SAN FRANCISCO BAY AREA RAPID TRANSIT
DISTRICT erroneously sued as BAY AREA RAPID
TRANSIT DISTRICT

**ENDORSED
FILED
ALAMEDA COUNTY**

JAN 1 5 2015

CLERK OF THE SUPERIOR COURT

Anita Dhir

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

AMBER DANIELS, SARAH DANIELS
and CHARLES O. McCOMISH as
personal representative to the Estate of
Laurence E. Daniels,

Plaintiffs,

v.

BAY AREA RAPID TRANSIT
DISTRICT and DOES 1-25, inclusive,

Defendants.

SAN FRANCISCO BAY AREA RAPID
TRANSIT DISTRICT,

Cross-Complainant,

v.

ANIL VERMA ASSOCIATES, INC. and
ROES 1-25,

Cross-Defendants.

Case No.: RG14725711

ASSIGNED FOR ALL PURPOSES TO Judge Gail
Brewster Bereola DEPARTMENT 19

**AMENDED CROSS-COMPLAINT FOR
DECLARATORY RELIEF AND IMPLIED
AND EXPRESS INDEMNITY AND
CONTRIBUTION**

Cross-complainant San Francisco Bay Area Rapid Transit District (hereinafter "cross-

*(sidebar)* ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1
AMENDED CROSS-COMPLAINT FOR DECLARATORY RELIEF AND IMPLIED AND EXPRESS
INDEMNITY AND CONTRIBUTION

37605.1

complainant'") alleges as follows:

## FIRST CAUSE OF ACTION

### (Equitable Indemnity)

1.  At all times mentioned herein, cross-complainant was and now is a public entity operating under the laws of the State of California.

2.  Cross-complainant is informed and believes, and thereon alleges, that cross-defendants were and now are corporations or other business entities authorized to do and doing business under the laws of the State of California.

3.  The true name and capacities, whether individual, corporate, associate, government, or otherwise, of cross-defendants ROE 1 through ROE 25, inclusive, are unknown to cross-complainant, who therefore sues said cross-defendants by such fictitious names pursuant to Section 474 of the California Code of Civil Procedure and prays leave of court to amend this cross-complaint to set forth their true names and capacities when the same have been ascertained.

4.  At all times mentioned herein, each cross-defendant was the agent, servant, and employee of all remaining cross-defendants and at all times mentioned herein was acting within the course and scope of this agency and employment.

5.  Cross-complainant is informed and believes, and thereon alleges, that each of the cross-defendants ROE 1 through ROE 25, inclusive, is negligently responsible or strictly liable in some manner for the events and happenings herein alleged and that such negligence legally caused the injuries and damages herein set forth. Cross-complainant is uncertain as to the manner or function of said cross-defendants, and cross-complainant prays leave to amend this cross-complaint when the same has been ascertained.

6.  Plaintiffs filed their complaint herein seeking damages for injuries allegedly sustained on October 19, 2013, as detailed in plaintiffs' complaint filed in the within action. Said complaint is hereby referred to and incorporated herein for the limited purpose of setting forth the nature of the claim of the plaintiff against the defendants.

7.  Cross-complainant herein denies that it is in any way responsible for the events or happenings or damages mentioned in the complaint of this action. However, if cross-complainant

2

AMENDED CROSS-COMPLAINT FOR DECLARATORY RELIEF AND IMPLIED AND EXPRESS
INDEMNITY AND CONTRIBUTION

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

37605.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1   is held responsible to any party in this action for any of the matters alleged in the complaint, then

2   it is entitled to indemnity from cross-defendants, and each of them, from any loss they may

3   sustain in this matter, including all costs, attorneys' fees, and/or judgment which might be

4   rendered against them, in that cross-complainant's liability would be based either on their passive

5   or secondary negligent conduct and would arise as a legal result of the primary and active

6   negligence of the cross-defendants herein, and each of them.

7       8.      Cross-complainant has incurred costs, expenses, and attorneys' fees in the

8   investigation and defense of this action, and additional costs, expenses, and attorneys' fees will

9   necessarily be incurred in the future.  Cross-complainant may suffer liabilities herein for the acts

10  or the failure to act of the cross-defendants, and each of them, as aforesaid.  Cross-complainant

11  prays leave of court upon ascertainment of said costs, expenses, and attorneys' fees, and of such

12  possible liabilities, to amend this cross-complaint to allege the correct amounts or facts thereof.

13      9.      An actual controversy arises and now exists between cross-complainant and cross-

14  defendants, and each of them, concerning their respective rights and duties.  Cross-complainant

15  contends, and cross-defendants deny, that in the event cross-complainant herein are subjected to

16  liability to any party to this action, cross-complainant will be entitled to be indemnified by cross-

17  defendants for the full amount of any loss suffered or judgment paid by cross-complainant to any

18  such party for such costs, reasonable attorneys' fees, and other expenses which have been and in

19  the future may be incurred in cross-complainant's conduct of the defense of this action.

20      10.     Adjudication of this cross-complaint in conjunction with plaintiff's action herein

21  will prevent a multiplicity of trials and will be in the furtherance of the interests of justice and

22  expedition of the business of the above-entitled court.

23      WHEREFORE, cross-complainant prays for relief as hereinafter set forth:

24                          SECOND CAUSE OF ACTION

25                                  (Contribution)

26      11.     Cross-complainant incorporates herein by reference paragraphs 1 through 10 as

27  though fully set forth herein.

28

3

37605.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

12.     Cross-complainant incorporates by reference herein as though the same were set forth verbatim herein, plaintiffs' complaint for personal injuries in this action, and not by way of admission of any of the allegations contained herein, as each and every one of said allegations is specifically denied, but for the purpose of reference only.  Said complaint seeks damages and costs from cross-complainant.

13.     Should it be determined that cross-complainant herein are liable to the plaintiffs for the claims set forth in the complaint on file herein, such liability will be partially due to the negligence and fault of the cross-defendants, and each of them, in their actions which caused the events leading to the injuries of the plaintiffs, and cross-defendants will therefore be liable and bound to pay cross-complainant herein a portion of any and all damages which might be adjudged to be due and owing to plaintiffs from cross-complainant which corresponds to the portion of cross-defendants' respective fault.

### THIRD CAUSE OF ACTION

(Express Indemnity as to Cross-defendant Anil Verma Associates, Inc.)

14.     Cross-complainant incorporates herein by reference paragraphs 1 through 13 as though fully set forth herein.

15.     Cross-complainant and cross-defendant Anil Verma Associates, Inc. ("Anil Verma") entered into a written agreement whereby cross-defendant was to provide services for BARTD projects.  A copy of said agreement is attached as Exhibit "A" to this cross-complaint.

16.     Under the terms of the Agreement, cross-defendant Anil Verma was to obtain Commercial General Liability ("CGL") insurance naming cross-complainant BARTD as an additional insured.  CGL coverage was to include personal injury liability and independent contractor's liability (Section 6.0(d)).  Within the same agreement, Anil Verma agreed to defend, indemnify, and hold harmless BARTD from all claims, demands, suits, loss, damages, injury and liability, direct or indirect (including reasonable attorneys' fees, and any and all costs and expenses in connection therewith), incurred by reason of any act, or failure to act, of Anil Verma and its agents, employees and sub-consultants (Section 8.0).

17.     Cross-complainant is informed and believes, and hereby asserts that decedent

4

AMENDED CROSS-COMPLAINT FOR DECLARATORY RELIEF AND IMPLIED AND EXPRESS INDEMNITY AND CONTRIBUTION

37605.1

1   Laurence Daniels was working as a sub-consultant to Anil Verma in furtherance of its contract

2   with BARTD at the time of the subject accident. Further, cross-complainant alleges that Mr.

3   Daniels was negligent in performing his activities, working on or along the BARTD mainline

4   track system at the time of the accident. Specifically, Mr. Daniels did not follow the "Simple

5   Approval" procedure in which he was informed and trained. (See Exhibit "B" – Certificate of

6   Merit). For these reasons, Anil Verma is obligated to defend and indemnify BARTD.

7       18.    By this cross-complaint, cross-complainant makes written demand on cross-

8   defendant Anil Verma to defend the action brought by plaintiffs and hold cross-complainant

9   harmless from any and all expenses, costs of suit, legal fees, damages, judgments, or other claims

10  or awards which may be claimed or obtained against cross-complainant by plaintiffs.

11  Nevertheless, cross-defendant has refused to do so, and continues to refuse to do so, thereby

12  breaching its agreement with BARTD, making it necessary for cross-complainant to defend this

13  action, and it is defending this action at its own expense.

14      19.    Cross-complainant has incurred reasonable expenses for investigation and defense

15  costs herein, including filing fees, attorney's fees, process fees, and other related expenses, and

16  will incur further defense costs and expense in the future, the full amount of such costs and

17  expenses is not known to cross-complainant at this time, and cross-complainant will move to

18  amend this cross-complaint to state such amount when the same becomes known to it, or on proof

19  thereof.

20      20.    An actual controversy has arisen and now exists between cross-complainant and

21  cross-defendant in that:

22          a)    Cross-complainant contends that, by virtue of the written agreement, cross-

23  defendant is obligated to undertake the defense of the pending action on behalf of cross-

24  complainant, represent cross-complainant's interests in this action and to hold it harmless from

25  expenses, cost of suit, legal fees, damages, judgments, or other claims or awards which plaintiffs

26  may claim or obtain in this action, and to reimburse cross-complainant for the expenses and costs

27  previously incurred.

28

_ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP_
_180 Montgomery Street, Suite 1200_
_San Francisco, California 94104_

5

AMENDED CROSS-COMPLAINT FOR DECLARATORY RELIEF AND IMPLIED AND EXPRESS
INDEMNITY AND CONTRIBUTION

37605.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1          b)     Cross-defendant contends it is not obligated to defend or to represent cross-

2  complainant's interest in this action, to hold cross-complainant harmless from any and all

3  expenses, costs of suit, legal fees, damages, judgments, or other claims or awards which may be

4  claimed or obtained in this action against cross-complainant by plaintiffs, or to reimburse cross-

5  complainant for defense costs previously incurred.

6      21.    A judicial declaration is necessary and appropriate at this time under the

7  circumstances in order that cross-complainant may ascertain its right to defense and indemnity

8  against cross-defendant. A declaration of such rights in this action will prevent a multiplicity of

9  actions.

10                        FOURTH CAUSE OF ACTION

11                        (Declaratory Relief)

12     22.    Cross-complainant refers to the allegation of paragraphs 1 through 21 as though

13  set forth in full.

14     23.    Written demand was made, or by this instrument demand is hereby made on cross-

15  defendants, and each of them, to hold cross-complainant harmless from any and all expenses,

16  costs of suit, legal fees, damages, judgments or other claims or awards which might be claimed or

17  obtained against it by plaintiffs under their complaint on file herein, but said cross-defendants,

18  and each of them, refused to do so and it was necessary for cross-complainant to defend, and it is

19  defending, this action at its own expense.

20     24.    An actual controversy exists between cross-complainant herein and cross-

21  defendants, and each of them, in that the cross-defendants deny that they are obligated to defend,

22  indemnify and hold harmless cross-complainant.

23     25.    If the right of cross-complainant herein to be defended, indemnified and held

24  harmless by cross-defendants, and each of them, is not determined in this action, cross-

25  complainant will be required to file an additional action for that purpose and cross-complainant

26  and cross-defendants can avoid a multiplicity of suits and expenses only by the maintenance of

27  this cross-complaint for indemnity so that the rights, duties and obligations of all parties hereto

28  may be determined in this one action. Cross-complainant will be subject to an unreasonable

37605.1

1   burden and the risk of irreparable injury if the rights, duties and obligations of the parties are not

2   determined herein.

3       WHEREFORE, cross-complainant prays for relief as hereinafter set forth:

4       (1)   For judgment deciding that cross-complainant be entitled to be defended and

5           indemnified and be held harmless from all costs, judgments, expenses and

6           attorneys' fees in connection with the defense of plaintiffs' complaint brought

7           against cross-complainant herein.

8       (2)   For judgment deciding the rights and duties of cross-defendants, and each of them,

9           with respect to cross-complainant herein.

10       (3)   That the court declare that the cross-complainant be entitled to total or partial

11           indemnity from each of the cross-defendants, said total or partial indemnity to be

12           based on the comparative fault which the cross-defendants' (or their employees,

13           agents or sub-consultants) activities bear to the injuries found to have been

14           sustained by plaintiffs.

15       (4)   For costs of suit, attorneys' fees and expenses incurred or to be incurred in the

16           prosecution of this cross-complaint for indemnification.

17       (5)   In the event that the court determines that there is any sum due from cross-

18           complainant, the court find, determine and adjudge that such liability be that of

19           cross-defendants, and each of them.

20       (6)   For costs of suit incurred herein.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

AMENDED CROSS-COMPLAINT FOR DECLARATORY RELIEF AND IMPLIED AND EXPRESS
INDEMNITY AND CONTRIBUTION

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

37605.1

(7)    For such other and further relief as deemed by the court to be appropriate.

Dated: January 12, 2015

ALLEN, GLAESSNER,
HAZELWOOD & WERTH, LLP

By: _____
MARK F. HAZELWOOD
DALE L. ALLEN, JR.
KIMBERLY Y. CHIN
Attorneys for Defendant/Cross-Complainant
SAN FRANCISCO BAY AREA RAPID
TRANSIT DISTRICT erroneously sued as
BAY AREA RAPID TRANSIT DISTRICT

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

8

AMENDED CROSS-COMPLAINT FOR DECLARATORY RELIEF AND IMPLIED AND EXPRESS
INDEMNITY AND CONTRIBUTION

37605.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1    I am a resident of the State of California, over 18 years of age and not a party to the

2  within action. I am employed in the County of San Francisco; my business address is: 180

3  Montgomery Street, Suite 1200, San Francisco, California 94104. On January 13, 2015, I served

4  the within: AMENDED CROSS-COMPLAINT FOR DECLARATORY RELIEF AND

5  IMPLIED AND EXPRESS INDEMNITY AND CONTRIBUTION; SUMMONS ON

6  CROSS-COMPLAINT on all parties in this action, as addressed below, by causing a true copy

7  thereof to be distributed as follows:

8    SEE ATTACHED SERVICE LIST

9

10  ☒  **By United States Mail:**  I enclosed the document in a sealed envelope or package addressed to
the persons at the addresses listed above and placed the envelope/package for collection and mailing,
11   following our ordinary business practices. I am readily familiar with this business's practice for
collecting and processing documents for mailing. On the same day that the document is placed for
12   collection and mailing, it is deposited in the ordinary course of business with the United States Postal
Service, in a sealed envelope with postage fully prepaid. I am aware that on motion of the party served,
13   service is presumed invalid if postal cancellation date or postage meter date is more than one day after
the date of deposit for mailing an affidavit.
14
      I am a resident or employed in the county where the mailing occurred. The envelope or package was
15   placed in the mail at San Francisco, California.

16  ☐  **By Fax Transmission:**  Based on an agreement of the parties to accept service by fax
transmission, I faxed the documents to the persons at the fax numbers listed above. No error was
17   reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed
out, is attached.
18

19  ☐  **By Overnight Delivery:**  I enclosed the document(s) in an envelope or package provided by an
overnight delivery carrier and addressed to the persons listed above. I placed the envelope or package
20   for collection and overnight delivery at an office or a regularly utilized drop box of the overnight
delivery carrier.

21  ☐  **By E-Mail or Electronic Transmission:**  Based on a court order or an agreement of the
parties to accept service by email or electronic transmission, I caused the documents to be sent to the
22   persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the
transmission, any electronic message or other indication that the transmission was unsuccessful.
23

24  ☒  (*STATE*) I declare under penalty of perjury under the laws of the State of California
that the foregoing is true and correct.
25
      Executed on January 13, 2015, at San Francisco, California.

26

27                                   _Danielle Costes_
                                     Danielle Costes
28

                                        9

37605.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1

## SERVICE LIST

2

3   Elizabeth L. Riles                           Attorneys for Plaintiffs
    Bohbot & Riles                               Telephone:  (510) 273-3111
3   1814 Franklin Street, Suite 800              Facsimile:  (510) 273-8922
4   Oakland, CA 94612                            E-Mail:  eriles@strikebacklaw.com

5   Markus B. Willoughby                         Attorneys for Plaintiffs
    Willoughby Law Firm                          Telephone:  (510) 451-2777
6   1814 Franklin Street, Suite 800              Facsimile:  (510) 842-1496
    Oakland, CA 94612                            E-Mail:  markus@willoughbyfirm.com

7

8   Robert H. Stellwagen, Jr.                    Attorneys for Anil Verma & Associates
    Collins Collins Muir + Stewart LLP           Telephone:  (626) 243-1100
8   1999 Harrison Street, Suite 1700             Facsimile:  (626) 243-1111
9   Oakland, CA 94612                            E-Mail:  rstellwagen@ccmslaw.co

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

AMENDED CROSS-COMPLAINT FOR DECLARATORY RELIEF AND IMPLIED AND EXPRESS
INDEMNITY AND CONTRIBUTION

37605.1

# EXHIBIT "A"

AGREEMENT

Between

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

And

ANIL VERMA ASSOCIATES

TO PROVIDE

GENERAL ENGINEERING SERVICES

FOR

BART PROJECTS

BART AGREEMENT NO. 6M8043

2011

- CONFORMED -

AGREEMENT TABLE OF CONTENTS

ARTICLE PAGE

| | | |
|---|---|---|
| 1.0 | WORK TO BE PERFORMED | 6 |
| 1.1 | SCOPE OF SERVICES | 6 |
| 1.2 | PROJECT DIRECTION | 6 |
| 1.3 | WORK PLANS | 7 |
| 1.4 | MANAGEMENT PLAN AND PROCEDURES | 8 |
| 1.5 | PROJECT AND ORGANIZATIONAL PROCEDURES | 9 |
| 1.6 | PERSONNEL | 9 |
| 1.7 | FINANCIAL ADMINISTRATION | 10 |
| 2.0 | TIME OF PERFORMANCE AND DELAYS | 11 |
| 2.1 | TIME OF PERFORMANCE | 11 |
| 2.2 | DELAYS | 11 |
| 3.0 | COMPENSATION AND PAYMENT | 11 |
| 3.1 | COMPENSATION | 11 |
| 3.2 | DISALLOWED OR OTHERWISE NOT RECOGNIZED COSTS | 13 |
| 3.3 | METHOD OF PAYMENT | 14 |
| 3.4 | WITHHOLDING OF PAYMENT | 16 |
| 3.5 | COST-REIMBURSABLE WORK PLANS – COMPLETION OR TERM TYPE | 16 |
| 4.0 | CHANGES AND MODIFICATIONS | 17 |
| 4.1 | CHANGE ORDERS | 17 |
| 4.2 | CHANGE NOTICES | 17 |
| 4.3 | MODIFICATIONS | 18 |
| 5.0 | TERMINATION | 18 |
| 5.1 | TERMINATION FOR CONVENIENCE | 18 |
| 5.2 | TERMINATION FOR CAUSE | 18 |
| 5.3 | FORCE MAJEURE | 19 |
| 6.0 | INSURANCE | 19 |
| 7.0 | INDEPENDENT CONTRACTOR | 21 |
| 7.1 | CONFLICT OF INTEREST | 21 |
| 8.0 | INDEMNIFICATION | 21 |
| 9.0 | WARRANTY OF SERVICES, MATERIAL NONCOMPLIANCE BY CONSULTANT, RESPONSIBILITY FOR SERVICES AND DESIGN WITHIN FUNDING LIMITATIONS | 22 |
| 9.1 | WARRANTY OF SERVICES | 22 |
| 9.2 | MATERIAL NONCOMPLIANCE BY CONSULTANT | 22 |
| 9.3 | RESPONSIBILITY FOR SERVICES | 22 |
| 9.4 | DESIGN WITHIN FUNDING LIMITATIONS | 23 |
| 10.0 | DATA TO BE FURNISHED BY BART | 23 |
| 11.0 | OWNERSHIP OF WORK PRODUCTS | 24 |
| 11.1 | DOCUMENTS | 24 |
| 11.2 | ASSIGNMENT OF RIGHTS | 24 |
| 11.3 | WARRANTY OF WORK PRODUCT | 24 |
| 12.0 | PATENTS | 24 |
| 13.0 | MATTERS CONFIDENTIAL AND PRIVILEGED | 24 |
| 14.0 | SUBCONTRACTS | 25 |
| 15.0 | ASSIGNMENT OF AGREEMENT | 25 |
| 16.0 | RECORDS | 25 |
| 17.0 | AUDIT | 26 |
| 18.0 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA | 26 |
| 19.0 | NOTICES | 27 |
| 20.0 | NONDISCRIMINATION | 28 |
| 21.0 | DISADVANTAGED BUSINESS ENTERPRISE PARTICIPATION | 28 |

22.0   SITE SECURITY AND ACCESS..............................................................................28
23.0   LAWS AND REGULATIONS....................................................................................29
24.0   ADDITIONAL FUNDING AGREEMENT REQUIREMENTS .....................................29
25.0   CHOICE OF LAW....................................................................................................29
26.0   SEVERABILITY.......................................................................................................29
27.0   COVENANT AGAINST CONTINGENT FEES ..........................................................29
28.0   COVENANT AGAINST GRATUITIES........................................................................30
29.0   CAPTIONS...............................................................................................................30
30.0   BENEFIT OF AGREEMENT.....................................................................................30
31.0   ENTIRE AGREEMENT.............................................................................................30

## ATTACHMENTS

ATTACHMENT A:   SCOPE OF SERVICES

ATTACHMENT B:   KEY PERSONNEL LIST

ATTACHMENT C:   [NOT USED]

ATTACHMENT D:   PROJECT CONSULTANT TEAM

ATTACHMENT E:   STATE OF CALIFORNIA DEPARTMENT OF TRANSPORTATION
REQUIREMENTS

ATTACHMENT F:   DISADVANTAGED BUSINESS ENTERPRISE PARTICIPATION

ATTACHMENT G:   UNITED STATES DEPARTMENT OF TRANSPORTATION (DOT) FEDERAL
TRANSIT ADMINISTRATION (FTA) REQUIREMENTS

CONSULTING SERVICES

AGREEMENT NO. 6M8043

Between

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

And

ANIL VERMA ASSOCIATES

THIS AGREEMENT ("Agreement") is made and entered into this 15th day of September, 2011, by and between SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT ("BART" or "District"), a rapid transit district established pursuant to California Public Utilities Code, Section 28500 et seq., and _____ Anil Verma Associates ("CONSULTANT"), with offices at _____ 1970 Broadway, Suite 525, Oakland, CA 94612 .

## R E C I T A L S

This Agreement is made with reference to the following facts:

1.    BART proposes to obtain General Engineering Services for BART Projects ("Project");

2.    The services required for the Project cannot be performed satisfactorily by the officers and employees of BART;

3.    BART has applied for or received grants from the United States Department of Transportation, Federal Transit Administration and other Federal agencies to assist in financing portions of the Project; and,

4.    BART has applied for or received grants from the State of California, Department of Transportation and other State agencies to assist in financing portions of the Project; and,

5.    The parties hereto now wish to enter into this Agreement pursuant to which CONSULTANT will furnish professional services in connection with the Project as hereinafter provided.

\*    \*    \*

AGREEMENT

In consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.0   WORK TO BE PERFORMED

The parties agree that the work to be performed by the CONSULTANT under this Agreement shall be as hereinafter set forth in this Article 1.0;

1.1   SCOPE OF SERVICES

CONSULTANT's services are described in Attachment A, SCOPE OF SERVICES, incorporated herein and by this reference made a part hereof. CONSULTANT shall be responsible to perform or secure the performance of all requested services in their entirety subject to the prior written approval of Work Plan(s) ("WP") by Marvin Snow, BART's Group Manager, Project Controls for Transit System Development, ("Agreement Manager"), or a designated representative.

The Agreement Manager shall monitor CONSULTANT's performance with respect to compliance with the requirements of this Agreement.

This Agreement is not exclusive. BART expressly reserves the right to contract for performance of additional services such as those described herein through other consultants.

1.2   PROJECT DIRECTION

A.   Directions to CONSULTANT

The work to be performed by CONSULTANT under this Agreement shall be subject to the project direction of the Agreement Manager. As used herein, the term "project direction" shall include, but not be limited to, the following:

1.   Directions to CONSULTANT which redirect the Agreement effort, shift work emphasis between tasks, require pursuit of certain lines of inquiry, fill in details or otherwise provide project guidance to CONSULTANT in order to accomplish the services described in Attachment A, and in the WPs.

2.   Review and, where required, approvals by appropriate BART staff of drawings, specifications, or other products prepared by CONSULTANT or any of its subconsultants in the performance of its services.

B.   Professional Responsibility

Notwithstanding any other provision in this Agreement or in the WPs, the review and/or approval by BART, or any of its directors, officers, the Agreement Manager or its other employees or agents, of any drawings, specifications or other products or communications prepared by CONSULTANT or any of its subconsultants, or of any acts or failures to act by CONSULTANT or any of its subconsultants, shall not relieve CONSULTANT or any of its subconsultants of any professional responsibility for the services performed.

C.    Validity

For said project direction to be valid, it must be issued in writing and may not:

1.    Constitute an assignment of work outside the scope of the Agreement, including Attachment A, and the WPs; or

2.    Constitute a change as set forth in Article 4.0, CHANGES AND MODIFICATIONS, below; or

3.    Increase or decrease the compensation limits as set forth in Article 3.0, COMPENSATION AND PAYMENT, below; or

4.    Increase or decrease the time of performance for specified services as set forth in Article 2.0, TIME OF PERFORMANCE AND DELAYS, below; or

5.    Otherwise change any of the express terms or conditions of the Agreement.

1.3    WORK PLANS

CONSULTANT shall provide services to BART for the Projects as described in each WP subject to prior approval in accordance with the following procedures.

A.    Work Plan Proposal Request

BART will initiate a WP by transmitting to the CONSULTANT a Work Plan Proposal Request ("WPPR") that describes an initial task description and implementation schedule. BART will consider the following factors when selecting a CONSULTANT from which to request a WPP:  .

1.    Uniquely specialized experience;

2.    Performance and quality of deliverables under the Agreement;

3.    Current capacity to accomplish the Work in the required time; and,

4.    Rational distribution of Work among the CONSULTANTS.

B.    Work Plan Proposal

CONSULTANT will then prepare a detailed Work Plan Proposal ("WPP") and transmit it to BART within the time specified in the WPPR.  The WPP shall specify the following:

1.    Services to be performed by the CONSULTANT (see Article 1.1 above and Attachment A);

2.    Management Plan that includes a list of key personnel (see Article 1.4 below);

3.    Budget Plan including a detailed cost estimate and a cost-loaded schedule;

4.    Work Breakdown Structure;

5.    Schedule;

6.    List of subconsultants, their scope of work and estimated value of work;

7.   DBE participation (see generally Article 21.0, <u>DISADVANTAGED BUSINESS ENTERPRISE PARTICIPATION</u>, below);

8.   Work products (see Article 1.1 above and Attachment A); and

9.   WP project specific procedures (see Article 1.5, below).

C.   <u>WPP Evaluation</u>

BART will evaluate the WPP. In its discretion, BART may request CONSULTANT to revise and resubmit the WPP.

D.   <u>Acceptance of WPP</u>

BART will notify CONSULTANT in writing whether a WPP has been accepted. WPPs not accepted in writing shall be deemed rejected.

E.   <u>Rejection of WPP</u>

If a WPP or its revision is rejected, neither party shall have any rights or obligations arising out of the WPP or WPPR.

F.   <u>Acceptance of WP and Issuance of Purchase Order (PO)</u>

Each WP shall be placed into effect by the issuance of a unilateral PO to the CONSULTANT by BART upon acceptance of the WPP. The issuance of the unilateral PO by BART shall constitute a binding agreement for the CONSULTANT to perform all work described in the corresponding WP.

G.   <u>Redirection of WP</u>

BART reserves the right to terminate a WP and redirect the remainder of the work to another consultant or consultant(s).

H.   <u>Conflict of Interest</u>

Each WP shall incorporate the provisions of this Agreement by reference. A conflict of interest review will be performed by BART prior to issuing project direction under a WP.

1.4   <u>MANAGEMENT PLAN AND PROCEDURES</u>

A.   <u>Management Plan</u>

In response to a WPPR from BART, as a minimum, CONSULTANT shall submit with each WPP the following:

1.   A list of key personnel assigned as defined by Article 1.6 below.

2.   CONSULTANT's DBE participation, if applicable. All DBEs shall be certified by BART or possess DBE certification which BART recognizes prior to proposal submission.

CONSULTANT agrees not to make any substitution of subconsultants without prior approval of the Agreement Manager after a WPP has been accepted in writing by the Agreement Manager.

B.    Management Procedures

Apart from any specific WPs, CONSULTANT and those subconsultants at any tier that BART at its discretion may identify, shall develop, implement and maintain procedures, all subject to approval by the Agreement Manager, who gives direction as to the performance of the work by CONSULTANT or subconsultant personnel, including, but not limited to, performance of WPs.

The intention of the parties is for CONSULTANT or its subconsultants, to develop, implement and maintain clear, concise, and project specific procedures to give BART reasonable assurances that all charges for direct labor and other direct costs are relevant and necessary to accomplish the WP scope.

1.5    PROJECT AND ORGANIZATIONAL PROCEDURES

A.    Modification of Procedures

At the direction of the Agreement Manager, pursuant to a WP, CONSULTANT shall develop or modify previously proposed WP project specific procedures in accordance with a schedule and in a form approved by the Agreement Manager. Such procedures as developed or modified shall be specifically related to activities performed for the WP project and basic CONSULTANT functions including, but not limited to, the process of budgeting, invoicing, and submitting reports to BART hereunder. The intention of the parties is for CONSULTANT to develop, implement and maintain clear and concise WP project specific procedures.

B.    Additional Modifications

In addition to any specific WP project procedures as described immediately above, and apart from any specific WPs, BART may require CONSULTANT to revise its WP project procedures other than those set forth immediately above in Article 1.4 that are used throughout its organization if they conflict with the requirements of this Agreement.

1.6    PERSONNEL

A.    Key Personnel

CONSULTANT and BART agree that the personnel listed in Attachment B, KEY PERSONNEL LIST, incorporated herein and by this reference made a part hereof, shall be designated as key personnel. CONSULTANT shall also make every effort to insure that the key personnel maintain, at a minimum, eighty percent of their proportionate share of the estimated number of hours for a WP.

CONSULTANT shall not remove any such key personnel prior to the completion of his/her assignment under the Project without the prior written approval of the Agreement Manager, which approval will not be unreasonably withheld. CONSULTANT shall nominate a replacement individual to BART and shall not remove any individual from the Project until his/her replacement has been approved by the Agreement Manager.

B.    Notice of Temporary Assignment

CONSULTANT shall provide the Agreement Manager with written notice of the temporary assignment of any personnel to an individual WP Project.

C.    Removal of Personnel

BART's Agreement Manager reserves the right to direct removal of any CONSULTANT or subconsultant personnel assigned to the Project when in BART's opinion the individual's performance is unsatisfactory.

1.7    FINANCIAL ADMINISTRATION

Apart from any specific WPs, CONSULTANT and its subconsultants at any tier shall establish and maintain records pertaining to the fiscal activities of the Project.  CONSULTANT's and subconsultants' accounting systems shall conform to generally accepted accounting principles and the following requirements:

A.    Cost Breakdown

All such records shall provide, as a minimum, a breakdown of total costs charged to the Project, including properly executed payrolls, time records, invoices and vouchers.

B.    Labor Charging Procedures

For work performed on a basis other than fixed price, CONSULTANT and those subconsultants at any tier that BART at its discretion may require, shall develop, implement and maintain labor charging (i.e. time card, or payroll) procedures that meet the following criteria:

1.    All time records shall be in writing, recorded by the employee and verified by the immediate supervisor.   Such records shall (i) be complete, (ii) record all employee's activities, Project and non-Project related, within a given accounting period and (iii) identify by means of cost codes what activities were being performed.

2.    All charges for labor (direct/indirect or hourly as appropriate) by personnel for the Project shall be identifiable to the nearest half-hour.

C.    Cost Reimbursement Services

For those services performed on a cost reimbursable basis by CONSULTANT and those subconsultants at any tier that BART at its discretion may require, the following shall apply:

1.    For all indirect cost groupings, budgets shall be developed on an annual basis which coincides with the entity's fiscal year.

2.    The system of accounting shall as a minimum, (i) report on a quarterly basis, a comparison between the actual indirect costs incurred to that budgeted, and (ii) reconcile all compensation for direct costs including, but not limited to, payroll, inventory and accounts payable against incurred cost, as set forth in Article 3.1, COMPENSATION.

D. Approval of Procedures

>BART's Agreement Manager, (i) may approve existing procedures that meet these criteria as well as waive certain specific requirements of this Article (provided that such approvals or waivers are made in writing); or (ii) may require copies of any of this accounting material, records, reports or procedures.

## 2.0 TIME OF PERFORMANCE AND DELAYS

### 2.1 TIME OF PERFORMANCE

A. Performance of Scope of Service

>CONSULTANT's performance of Scope of Services as described in Attachment A shall commence upon receipt of a unilateral PO issued by BART's Manager, Contract Administration, and shall be completed within the number of calendar days or by the date specified in the corresponding WP, unless terminated earlier in accordance with Article 5.0, TERMINATION, or the limit on maximum compensation established in Article 3.1, COMPENSATION, of this Agreement.

B. Term of Agreement

>The term of this Agreement will be five (5) years from the date of execution of this Agreement subject to termination or the limit on maximum compensation as provided for in the Agreement. Any WP issued but not completed within the term of this Agreement shall be completed by the CONSULTANT within the number of calendar days or by the date specified in such WP. To the extent that a WP is not completed during the term of this Agreement, for purposes of that WP only, the term of this Agreement shall be extended without further amendment to this Agreement for the full WP completion date. This Agreement shall govern the CONSULTANT's and District's rights and obligations with respect to that WP to the same extent as if the WP were completed during the Agreement term.

### 2.2 DELAYS

Neither party hereto shall be considered in default in the performance of its obligations hereunder to the extent that the performance of any such obligation is prevented or delayed by unforeseen causes including acts of God, acts of the public enemy and governmental acts beyond the control and without fault or negligence of the affected party.

Each party hereto shall give notice promptly to the other of the nature and extent of any such circumstances claimed to delay, hinder or prevent performance of any obligations under this Agreement.

## 3.0 COMPENSATION AND PAYMENT

### 3.1 COMPENSATION

A. Basis

>The compensation for each WP performed under this Agreement will be on a fixed price basis, an incurred cost reimbursement basis plus a defined fee, or some combination

thereof. Such compensation will be allowable only to the extent that costs incurred or cost estimates included in negotiated, or otherwise established prices, are consistent with the Federal Cost Principles (Title 48, Code of Federal Regulations, Chapter 1, Part 31).

B. Requirements

Such compensation shall be further subject to the following requirements:

1. Conform with:

   a. the work to be performed pursuant to an accepted WP;

   b. any compensation limits or sublimits set forth in such WPs and this Agreement; and

   c. all other terms of this Agreement.

2. Be necessary in order to accomplish the work.

3. Be reasonable for the services to be performed or goods to be purchased in connection with the performance of services hereunder.

4. Be actual net costs or prices to the CONSULTANT or its subconsultants at any tier, (e.g. the cost or price less any refunds, rebates, or other items of value received by CONSULTANT or its subconsultants at any tier, that have the effect of reducing the cost or price actually incurred).

   As used herein, the term "costs" shall include the following:

   a. Those costs recorded by CONSULTANT that result, at the time of the request for reimbursement, from payment by cash, check, or other form of actual payment for items or services purchased directly for the work.

   b. When CONSULTANT is not delinquent in payment of costs of agreement performance in the ordinary course of business, costs incurred, but not necessarily paid, for:

      (1) Direct labor;
      (2) Other direct costs that are not subcontracted;
      (3) Indirect costs.

   c. The amount of reimbursement that has been paid by CONSULTANT for subcontracted services under similar cost standards.

5. Be for direct costs or prices incurred for work performed after the effective-date of this Agreement, and presented for payment within one hundred eighty days (180) days of the incurrence.

C. Rate Agreement

In addition to these requirements, the parties will negotiate in good faith and enter into a Provisional Cost Reimbursement and Rate Agreement ("Rate Agreement") on an annual or multi-year basis for the work to be performed for each CONSULTANT fiscal year(s). At the end of the annual or multi-year period, either party may request a rate adjustment, subject to negotiation between the parties and modification to the Rate Agreement. Should the parties fail to negotiate a new Rate Agreement, CONSULTANT agrees to

accept the provisions of the previous Rate Agreement, until such time as a new Rate Agreement is accepted. If neither party requests a rate adjustment, the rates contained herein shall remain in effect until completion of Agreement No. 6M8043.

D.   Notification

The CONSULTANT shall inform the Agreement Manager when total expenditures for <u>any</u> approved WPs exceed eighty percent (80%) of the maximum compensation for the WP, or when the total expenditures for <u>all</u> approved WPs exceed eighty percent (80%) of the maximum compensation for this Agreement.

E.   CONSULTANT Costs

All CONSULTANT costs associated with providing services that are identified in this Agreement as being apart and separate from any individual WP, are considered to be either indirect costs or a portion of the CONSULTANT fee, as the case may be.

F.   Compensation Limits

Subject only to changes made in conformance with Article 4.0, <u>CHANGES AND MODIFICATIONS</u>, below, it is expressly understood and agreed that:

1.   In no event shall CONSULTANT be compensated in an amount greater than the amount in an individual WP, for services performed under such WP and

2.   In no event will the total compensation and reimbursement for expenses, including applicable fixed fee, to be paid CONSULTANT for services described in Article 1.1, <u>SCOPE OF SERVICES</u>, above and services described in Attachment A hereto, exceed $20,000,000. However, there is no guaranteed minimum level of compensation.

G.   Cost Reimbursement/Fixed Price Services

For services performed by CONSULTANT on a cost reimbursable basis, CONSULTANT agrees to use its best efforts to perform its services within the limits of total compensation as set forth in Article 3.1.F. (above).

For services performed on a fixed price basis under a WP, CONSULTANT agrees to complete the specified services for the fixed price.

3.2   DISALLOWED OR OTHERWISE UNRECOGNIZED COSTS

CONSULTANT understands and agrees to the following:

A.   Waiver

Any compensation or reimbursement received under this Agreement does not constitute a final decision by the District as to the allowability of such compensation or reimbursement and does not constitute a waiver of any violation by CONSULTANT of the terms of this Agreement (including, but not limited to, requirements of the Agreement to be included in CONSULTANT's subcontracts).

B.    Final Determination

Unless approved otherwise by the Agreement Manager, the District will not make final determination about the allowability of compensation or reimbursement of cost received under this Agreement until an audit of this work performed under this Agreement has been completed.

C.    Notification

If the District determines that CONSULTANT or its subconsultant(s) is not entitled to either the compensation or reimbursement requested or received, the District will notify CONSULTANT stating the reasons therefor.

D.    Return of Funds

Completion of the work under this Agreement will not alter CONSULTANT's or its subconsultant(s)' obligation to return any funds due the District as a result of later refunds, corrections, or other transactions, nor alter the District's right to disallow or otherwise not recognize costs on the basis of a later audit or other review.

3.3    METHOD OF PAYMENT

A.    Monthly Invoices/Subconsultant Payment

Unless approved otherwise by the Agreement Manager, CONSULTANT's services shall be invoiced on a monthly basis and payment will be made within thirty (30) calendar days of receipt of an acceptable invoice with satisfactory backup documentation, approved by the Agreement Manager, provided a completed form W-9 is on file with BART Assistant Controller. As used herein, the term "invoice" shall include the CONSULTANT's bill or written request for payment under this Agreement for services performed.

A separate invoice shall be submitted for each WP implemented by the issuance of a PO in accordance with Article 1.3 F herein.

Unless otherwise approved in writing by the Agreement Manager, CONSULTANT shall, within ten (10) days after receipt of the payment by BART specified in this Agreement (but in no case more than thirty (30) calendar days from receipt of subconsultant invoice whether or not payment has been made by BART) pay to each of its immediate subconsultants (or their respective assignees), for satisfactory performance of its contract, the amounts to which each is entitled, after deducting any prior payments and any amounts due and payable to CONSULTANT by those subconsultants. Any delay or postponement of payment among the parties may take place only for good cause and with the District's prior written approval. If the CONSULTANT determines the work of the subconsultant to be unsatisfactory, the CONSULTANT must immediately notify in writing the Agreement Manager (and the Office of Civil Rights if the subconsultant is a DBE) and state the reasons therefor. Failure by CONSULTANT to comply with this requirement will be construed to be a breach of contract and may result in sanctions as specified in this Agreement.

In addition, the CONSULTANT must promptly return any retentions withheld to a subconsultant within thirty days after the subconsultant's work is satisfactorily completed.

B.   Invoice Procedures

CONSULTANT shall invoice for each WP in conformance with procedures approved by the Agreement Manager and the then current Rate Agreement.

1.   Such Invoices shall segregate current costs from other costs. Current costs are those costs which have been paid within the last sixty calendar days and not previously submitted to BART for reimbursement. Other costs shall include, but not be limited to, the following:

a.   Costs for which the District has requested additional justification for allowance;

b.   Costs which have been recorded by CONSULTANT in the current accounting period and not incurred as an obligation within the last ninety calendar days.

2.   Costs for individual labor shall be identified by activity and product in a manner consistent with that of the detailed cost estimate submitted with CONSULTANT's WPP.

3.   Notwithstanding the above, in no case shall CONSULTANT submit an invoice for costs which BART has disallowed or otherwise indicated that it will not recognize.

C.   Invoice Requirements

Invoices shall be, as a minimum, (i) mechanically accurate, (ii) substantially vouchered and properly supported and (iii) in compliance with the specific requirements of Article 1.7, FINANCIAL ADMINISTRATION above. Invoices must match PO line items. Invoices must also include both the Agreement number and the applicable WP PO number that corresponds to the invoice.

D.   Certification

CONSULTANT shall also certify, for each invoice, that (i) the hourly rates for direct labor, whether for CONSULTANT or its subconsultant(s), to be reimbursed under this Agreement are not in excess of the actual hourly rates in effect for CONSULTANT or subconsultant employees engaged in the performance of services under this Agreement at that time, and (ii) that such hourly rates are in conformance with the then current Rate Agreement.

E.   Fixed Fee

The fixed fee for CONSULTANT or any of its subconsultants shall be billed monthly on a percent complete basis as approved by the Agreement Manager.

BART in its sole discretion may make any of the remaining fixed fee payments due CONSULTANT, or any of its subconsultants, in full; or may withhold any amount up to one hundred percent thereof as BART may find appropriate, based on the progress of CONSULTANT and/or any of its subconsultants.

F.   Invoice Submittal Address

All Vendors shall submit a completed Form W-9 and all invoices directly to BART's Accounts Payable (AP) Department

Please submit all invoices to BART's Accounts Payable Department using one (1) of the following three (3) methods:

(1)   E-mail a PDF version of the invoice to: AP SUPPLIER@BART.gov. Please save the file name using your Company name – Invoice No.

(2)   Fax your invoice to: (510) 380-7635

(3)   Mail your invoice to:   San Francisco Bay Area Rapid Transit District
                             Accounts Payable Department – LKS-22
                             Subject: Invoice Submission
                             300 Lakeside Drive, 22nd Floor
                             Oakland, CA  94612

Invoices must include: Your invoice number; Agreement Number, BART's WP Purchase Order Number; and Billed Line Items that correspond with the Line Items on BART's WP Purchase Order.

Please direct questions regarding invoice submission to your BART Agreement representative or email your request to PurchaseOrders@bart.gov. Invoice submission samples can be viewed at www.bart.gov/bap.

G.   Taxpayer Identification Number

CONSULTANT represents that CONSULTANT's taxpayer identification number (TIN) is _____ evidenced by a completed Federal Form W-9 on file with the Assistant Controller on the date of execution of this Agreement. CONSULTANT agrees to file such tax forms as may be reasonably requested by BART to implement Internal Revenue Code Section 3406 and to accept as a part of any compensation due, any payments made by BART to the Internal Revenue Service pursuant to that Section.

H.   Electronic Payments

Effective July 1, 2011, CONSULTANTS who are interested in receiving electronic payments are to send an E-mail request to SUPPLIERINFO@BART.gov.

3.4   WITHHOLDING OF PAYMENT

BART reserves the right to withhold payment(s) otherwise due CONSULTANT in the event of CONSULTANT's material non-compliance with any of the provisions of this Agreement, including, but not limited to, the requirements imposed upon CONSULTANT in Article 6.0, INSURANCE; Article 8.0, INDEMNIFICATION; and Article 9.1, WARRANTY OF SERVICES, below. BART shall provide notice of withholding, and may continue the withholding until CONSULTANT has provided evidence of compliance which is acceptable to BART.

3.5   COST-REIMBURSABLE WORK PLANS – COMPLETION OR TERM TYPE

WPs negotiated on a cost-plus-fixed-fee basis will take one of two basic forms – completion or term (level of effort).

A.   Completion Form

The completion form describes the scope of work by stating a definite goal or target and specifying an end product. This form normally requires the CONSULTANT to complete and deliver the specified end product within the estimated cost, if possible, as a condition

for payment of the entire fixed fee. However, in the event the work cannot be completed within the estimated cost, the District may require more effort without increase in fee, provided the District increases the estimated cost.

B.  Term Form (Level of Effort)

The term form describes the scope of work in general terms and obligates the CONSULTANT to devote a specified level of effort for a stated time period. Under this form, if the performance is considered satisfactory by the District, the fixed fee is payable in accordance with the provisions herein.

1.  WPs that are term form will set forth the level of effort labor hours to be expended. It is understood and agreed that the rate of labor hour expenditure may fluctuate from month to month, provided such fluctuation does not result in the utilization of the total labor hours of effort prior to the expiration of the term of the WP. It is further understood and agreed that the number of hours of effort for any classification of labor may be utilized by the CONSULTANT in any other direct labor classification if necessary in the performance of the work.

2.  The District may direct the CONSULTANT to accelerate the average monthly rate of utilization of direct labor to such an extent that the total labor hours of effort specified in a WP would be utilized prior to the term thereof. Any such direction shall specify the degree of acceleration required and the revised term resulting therefrom.

3.  If the total number of labor hours of direct labor specified in a WP is not expended during the term of the WP, the District shall either (i) reduce the fixed fee of the WP proportionately to the labor hours unexpended in the approved WP, or (ii) subject to funding limitations, require the CONSULTANT to continue to perform the work until the total number of labor hours of direct labor specified shall have been expended.

Notwithstanding the provisions of subparagraph 3, above, no adjustment in the fixed fee shall be made provided that the CONSULTANT has delivered at least ninety (90) percent of the level of effort specified in a WP and has complied with any direction of the District pursuant to this Article.

4.0  CHANGES AND MODIFICATIONS

BART reserves the right to order changes to this Agreement, to be performed pursuant to this Agreement, as set forth below.

4.1  CHANGE ORDERS

A.  Services

BART reserves the right to order changes to this Agreement, including but not limited to, the services to be performed by CONSULTANT. All such changes shall be incorporated in written change orders duly executed by BART and CONSULTANT, which shall specify the changes ordered and the adjustment of compensation and completion time required therefor.

B.  Execution

Any such services added to the scope of this Agreement by a change order shall be executed under all applicable conditions of this Agreement. No claim for additional compensation or extension of time shall be recognized unless contained in a duly executed change order.

4.2 MODIFICATIONS

    A.   WP Modifications

        BART reserves the right to order modifications to the WPs, including but not limited to, the services to be performed by CONSULTANT pursuant to an accepted WP. All such modifications to a WP shall be implemented by the issuance of a modification to the corresponding PO, which shall specify the Work ordered and the adjustment of compensation and completion time required therefor.

    B.   Additional Compensation

        No claim for additional compensation or extension of time with respect to a WP shall be recognized unless contained in an accepted WP modification. The parties also understand and agree that CONSULTANT will not be reimbursed for costs incurred prior to the effective date of a PO unless otherwise approved by the Agreement Manager.

5.0   **TERMINATION**

5.1   TERMINATION FOR CONVENIENCE

    BART may, at any time prior to completion of the work under any WP or the work under this Agreement, terminate any such WP, or this Agreement whenever BART determines that such termination is in its best interest, by written notice to CONSULTANT. BART's written notice to CONSULTANT shall state in detail the extent of such termination with respect to WP, or this Agreement. Effective on receipt of such notice of termination from BART, no new work or obligation with respect to such WPs, or this Agreement will be undertaken by CONSULTANT unless so directed by BART in writing. Upon such termination, CONSULTANT shall submit an invoice or invoices to BART in amounts which represent the compensation specified herein for services actually performed to the date of such termination and for which CONSULTANT has not been previously compensated. Upon payment of the amount due, BART shall be under no further obligation to CONSULTANT, financial or otherwise, with respect to terminated WPs, or this Agreement if it is terminated.

5.2   TERMINATION FOR CAUSE

    If CONSULTANT should be in default and fails to remedy this default within five days after receipt from BART of notice of such default, BART may in its discretion terminate this Agreement or such portion thereof as BART determines is most directly affected by the default.

    The term "default" for purposes of this provision includes, but is not limited to, the performance of work in violation of the terms of this Agreement; abandonment, assignment or subletting of the Agreement without approval of BART; bankruptcy or appointment of a receiver for CONSULTANT's property; failure of CONSULTANT to perform the services or other required acts within the time specified for this Agreement or any extension thereof; refusal or failure to provide proper workmanship; failure to take effective steps to end a prolonged labor dispute; and the performance of this Agreement in bad faith.

    Upon BART's termination of this Agreement or any portion thereof for default by CONSULTANT, BART reserves the right to complete the work by whatever means it deems expedient and the expense of completing such work as well as any and all damages proximately caused by the default shall be charged to CONSULTANT.

5.3   FORCE MAJEURE

The performance of work under this Agreement may be terminated by BART, in its discretion, upon application therefor by CONSULTANT for unforeseen causes beyond the control and without the fault or negligence of CONSULTANT, including acts of God, acts of the public enemy, governmental acts, fires and epidemics if such causes irrevocably disrupt or render impossible CONSULTANT's performance hereunder. An "act of God" shall mean an earthquake, flood, cyclone, or other cataclysmic phenomenon of nature beyond the power of CONSULTANT to foresee or make preparation in defense against.

6.0   INSURANCE

At all times during the life of this Agreement to acceptance of the work covered by the Agreement, or as may be further required by the Agreement, CONSULTANT, at its own cost and expense, shall provide the insurance specified in this Article 6.0, unless otherwise approved in advance and in writing by the District's Department Manager, Insurance.

A.   Evidence Required

At or before execution of this Agreement and at such other times as the District may request, CONSULTANT shall provide the District with Certificate(s) of Insurance executed by an authorized representative of the insurer(s) evidencing the CONSULTANT's compliance with the insurance requirements in this Article 6.0. The Certificate(s) shall reference the District's Agreement Number and Title to which the Certificate relates. In addition, a copy of all required endorsements shall be included with and attached to the Certificate(s) of Insurance.

B.   Notice of Cancellation, Reduction or Material Change in Coverage
All policies shall be endorsed to provide the District with thirty (30) days prior written notice of any cancellation, reduction, or material change in coverage. Notices shall be sent to the Department Manager, Insurance, San Francisco Bay Area Rapid Transit District, P.O. Box 12688, Oakland, California, 94604-2688. The CONSULTANT shall annually submit to the District's Department Manager, Insurance, certifications confirming that the insurance required has been renewed and continues in place.

C.   Qualifying Insurers

Policies shall be issued by California admitted companies which hold a current policyholders alphabetic and financial size category rating of not less than A:VIII according to Best's Insurance Reports.

D.   Insurance Provided by CONSULTANT

1.   Commercial General Liability Insurance for bodily injury (including death) and property damage which provides limits of Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars ($5,000,000) annual general aggregate.

a.   Coverage shall include:

(1)   Premises and Operations;
(2)   Broad Form Property Damage;
(3)   Products and Completed Operations;
(4)   Broad Form Contractual liability, expressly including liability assumed under the Agreement;

       (5)    Personal Injury Liability;
       (6)    Independent Contractors Liability;
       (7)    Cross Liability and Severability of Interest.

b.    Such insurance shall include the following endorsements, copies of which shall be provided to the District:

       (1)    Inclusion of the District, its directors, officers, representatives, agents and employees as additional insured as respects to CONSULTANT's operations under this Agreement; and

       (2)    Stipulation that the insurance is primary insurance and that no insurance or self-insurance of the District will be called upon to contribute to a loss

2.    Automobile Liability Insurance for bodily injury (including death) and property damage which provides limits of liability of not less than One Million Dollars ($1,000,000) combined single limit per occurrence applicable for all owned, non-owned and hired vehicles.

3.    Workers' Compensation/Employers' Liability Insurance for Statutory Workers' Compensation and Employers' Liability Insurance for not less than One Million Dollars $1,000,000 per accident applicable to Employers' Liability coverage for all employees engaged in services or operations under this Agreement. The policy shall include Broad Form All States/Other States coverage. Coverage shall be specifically endorsed to include the insurer's waiver of subrogation in favor of the District, its directors, officers, representatives, agents and employees; a copy of which shall be provided to the District. Should any such work be subcontracted, CONSULTANT shall require each subconsultant of any tier to similarly comply with this Article 6.0, all in strict compliance with Federal and State law.

4.    Professional Liability Insurance for damages arising out of CONSULTANT's acts, errors or omissions. The policy shall provide a coverage limit of not less than Five Million Dollars ($5,000,000) per claim/aggregate as respects CONSULTANT's services provided under this Agreement. Such insurance shall be maintained for a period of not less than two (2) years following completion of services.

F.    Special Provisions

    1.    The foregoing requirements as to the types and limits of insurance coverage to be maintained by CONSULTANT, and any approval of said insurance by the District is not intended to and shall not in any manner limit or qualify the liabilities and obligations otherwise assumed by CONSULTANT pursuant to this Agreement including but not limited to the provisions concerning indemnification.

    2.    The District acknowledges that some insurance requirements contained in this article may be fulfilled by a funded self-insurance program of CONSULTANT. However, this shall not in any way limit liabilities assumed by CONSULTANT under this Agreement. Any self-insurance program must be approved in writing by the District.

    3.    Should any of the work under this Agreement be subcontracted, CONSULTANT may impose these requirements upon each of its subconsultant(s) of any tier at its own discretion.

4.    The District reserves the right to withhold payments to CONSULTANT in the event of material noncompliance with the insurance requirements of this Article 6.0.

5.    The District reserves the right to terminate this Agreement in the event of material noncompliance with the insurance requirements of this Article 6.0.

## 7.0    INDEPENDENT CONTRACTOR

CONSULTANT is an independent contractor and not an employee or agent of BART and has no authority to contract or enter into any other agreement in the name of BART. CONSULTANT has, and hereby retains, full control over the employment, direction, compensation and discharge of all persons employed by CONSULTANT who are assisting in the performance of services under this Agreement. CONSULTANT shall be fully responsible for all matters relating to the payment of its employees, including compliance with social security, withholding tax and all other laws and regulations governing such matters. CONSULTANT shall be responsible for its own acts and those of its agents and employees during the term of this Agreement.

In its capacity as an independent contractor, CONSULTANT shall comply with any and all BART operations rules and procedures which relate to the performance of its services on BART property. Prior to commencing services, the Agreement Manager may loan CONSULTANT a copy of the District's Operations Rules and Procedures which shall be returned upon the completion or termination of CONSULTANT's services hereunder.

## 7.1    CONFLICT OF INTEREST

CONSULTANT, its subconsultants and suppliers shall perform all work under this Agreement in conformance with all applicable statutes and regulations pertaining to conflicts of interest, including but not limited to, the financial reporting requirements and the conflict prohibitions of federal law (see, e.g., Federal Transit Administration Circular 4220.1F, Third Party Contracting Guidance) and California law (see, e.g., Government Code Section 1090 et seq., Government Code Section 87100 et seq. and Title 2, Division 6 of the California Code of Regulations).

When, in the judgment of BART, it is necessary in order to avoid any potential conflicts of interest,. CONSULTANT, its subconsultants and suppliers may be precluded from subsequently participating as a vendor or contractor on projects for which they are providing services under this Agreement.

## 8.0    INDEMNIFICATION

CONSULTANT to the extent permitted by law, shall defend, indemnify and hold harmless BART, its directors, officers, agents and employees from all claims, demands, suits, loss, damages, injury and liability, direct or indirect (including reasonable attorney's fees, and any and all costs and expenses in connection therewith), incurred by reason of any act, or failure to act, of CONSULTANT, its officers, agents, employees and subconsultants or any of them, under or in connection with this Agreement;.and CONSULTANT agrees at its own cost, expense and risk to defend any and all claims, actions, suits, or other legal proceedings brought or instituted against BART, its directors, officers, agents and employees, or any of them, arising out of CONSULTANT's services, and to pay and satisfy any resulting judgments.

Such indemnification includes without limitation any violation of proprietary rights, copyrights and rights of privacy, arising out of the publication, translation, reproduction, delivery, use or disposition of any data furnished under this Agreement.

9.0 WARRANTY OF SERVICES, MATERIAL NONCOMPLIANCE BY CONSULTANT, RESPONSIBILITY FOR SERVICES AND DESIGN WITHIN FUNDING LIMITATIONS

9.1 WARRANTY OF SERVICES

A. Warranty

CONSULTANT warrants that its consulting services will be performed in accordance with the standards imposed by law upon professional engineering service firms performing engineering services of a similar nature at the time such services are rendered. In addition CONSULTANT shall provide such specific warranties as may be set forth in individual WPs as agreed upon by the parties.

B. Re-performance

In the event that any services provided by CONSULTANT hereunder are deficient because of CONSULTANT's or a subconsultant's failure to perform said services in accordance with the warranty standards set forth above, BART shall report such deficiencies in writing to CONSULTANT within a reasonable time. BART thereafter shall have:

1. The right to have CONSULTANT re-perform such services at CONSULTANT's own expense, or

2. The right to have such services done by others and the costs thereof charged to and collected from CONSULTANT if, within thirty days after written notice to CONSULTANT requiring such reperformance, CONSULTANT fails to give evidence satisfactory to BART that it has undertaken such reperformance.

C. Re-performed Services

If CONSULTANT is required to correct or re-perform any services as provided in Article 9.1 B.1. (immediately above), any services corrected or re-performed by CONSULTANT shall be subject to this Article 9.1 to the same extent as work initially performed.

9.2 MATERIAL NONCOMPLIANCE BY CONSULTANT

BART reserves the right to withhold payments to CONSULTANT in the event of CONSULTANT's material noncompliance with Articles 8.0, INDEMNIFICATION, and 9.0, WARRANTY OF SERVICES, MATERIAL NONCOMPLIANCE BY CONSULTANT, RESPONSIBILITY FOR SERVICES AND DESIGN WITHIN FUNDING LIMITATIONS, above.

9.3 RESPONSIBILITY FOR SERVICES

The CONSULTANT shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the CONSULTANT under this Agreement. Neither BART's review, approval or acceptance of, nor payment for, the services required under this Agreement shall be construed to operate as a waiver of any rights under this Agreement. In the event that any services provided by CONSULTANT hereunder are deficient because of CONSULTANT's failure to perform said

services in accordance with such standards, BART shall report such deficiencies in writing to CONSULTANT within a reasonable time, not to exceed six months after the discovery thereof, but in no event later than the earlier of (a) five years after completion of all of the services hereunder, or (b) one year after completion of construction of all facilities to which services provided hereunder apply. BART thereafter shall have the rights set forth in Article 9.1, above If within thirty days after written notice to CONSULTANT requiring such reperformance, CONSULTANT fails to give evidence satisfactory to BART that it has undertaken such reperformance.

9.4     DESIGN WITHIN FUNDING LIMITATIONS

BART may designate additional requirements for certain services described in the WP, to be performed by CONSULTANT or any of its subconsultants, including but not limited to the following:

A.     Procedures; Redesign

The CONSULTANT shall accomplish the design services required under this Agreement so as to permit the award of a contract, using standard District procedures for the construction or renovation of the facilities designed, at a price that does not exceed the engineer's estimated construction contract price for the facilities as agreed to between BART and CONSULTANT. When bids or proposals for the construction contract are received that exceed the estimated price, the CONSULTANT shall perform such redesign and other services as are necessary to permit contract award within the funding limitation. These additional services shall be performed at no increase in the price of this Agreement or any Work Plan under which the design project was performed. However, the CONSULTANT shall not be required to perform such additional services at no cost to the District if the unfavorable bids or proposals are the result of conditions beyond CONSULTANT'S reasonable control.

B.     Notification to Agreement Manager

The CONSULTANT will promptly advise the District's Agreement Manager if it finds that the project being designed will exceed or is likely to exceed the funding limitations and it is unable to design a usable facility within these limitations. Upon receipt of such information, the Agreement Manager will review the CONSULTANT's revised estimate of construction cost. The District may, if it determines that the estimated construction contract price set forth in the Work Plan is so low that award of a construction contract not in excess of such estimate is improbable, authorize a change in the scope or materials as required to reduce the estimated construction cost to an amount within the estimated construction contract price set forth in the Work Plan, or the District may adjust such estimated construction contract price. When bids or proposals are not solicited or are unreasonably delayed, the District shall prepare an estimate of constructing the design submitted and such estimate shall be used in lieu of bids or proposals to determine compliance with the funding limitation.

10.0    DATA TO BE FURNISHED BY BART

All data, reports, surveys, studies, drawings, and any other documents and materials made available to CONSULTANT by BART for use by CONSULTANT in the performance of its services under this Agreement shall be made available for information only and shall be returned to BART at the completion or termination of this Agreement.

11.0   OWNERSHIP OF WORK PRODUCTS

11.1   DOCUMENTS

All drawings, designs, specifications, manuals, reports, studies, surveys, models, software (including source code), and any other documents, materials, data and products ("Work Products") prepared or assembled by CONSULTANT or obtained from others ("Subcontractors") by CONSULTANT in connection with the services under this Agreement shall be the property of BART; and copies shall be delivered to BART promptly upon the completion of the work or upon an earlier termination of this Agreement. CONSULTANT shall be responsible for the preservation of any and all Work Products prior to transmittal to BART; and CONSULTANT shall replace any such Work Products as are lost, destroyed or damaged while in its possession without additional cost to BART.

11.2   ASSIGNMENT OF RIGHTS

CONSULTANT hereby assigns to BART all rights, title and interest including, but not limited to, copyright, patent, trademark and trade dress rights, in and to the Work Products. CONSULTANT acknowledges BART's exclusive rights to reproduce, publish, display, create derivative works from, sell, transfer or otherwise exploit ("Use"), and permit others to Use all or any part of the Work Products, and to obtain and hold in its own name patents, copyright and/or trademark registrations for the Work Products. CONSULTANT shall provide all documentation, information and assistance reasonably required by BART to obtain such registrations or patents, or with respect to claims that third parties have infringed the Work Products.

11.3   WARRANTY OF WORK PRODUCT

CONSULTANT warrants and represents that the Work Products are original to CONSULTANT or its Subcontractors and shall not infringe the copyright, trademark, trade secret, privacy, publicity, patent or other intellectual property or proprietary rights of any third party; CONSULTANT will not attempt to license or transfer to any person or entity any interest in the Work Products; and CONSULTANT shall obtain from all Subcontractors written assignment of all rights, title and interest, including copyright and other intellectual property rights, in their contributions to the Work Products.

12.0   PATENTS

CONSULTANT agrees to communicate promptly to BART full particulars with respect to any and all improvements and inventions (whether or not patentable) conceived by it in connection with work performed by it hereunder. Subject to rights due to the United States Government under a grant of the FTA assisting the financing under this Agreement, such improvements and inventions shall become the property of BART and CONSULTANT agrees to assign to BART, upon BART's request, all of its right, title and interest in and to ideas and inventions and in and to any and all patents and applications for patents based thereon, including both United States and foreign patents and applications for patents. CONSULTANT further agrees, upon BART's request and at BART's expense, to execute such proper instruments and to perform such proper acts as may be deemed by BART necessary to evidence BART's title to said improvements and inventions, and to enable BART to obtain such patents and any continuations, reissues or extensions thereof.

13.0   MATTERS CONFIDENTIAL AND PRIVILEGED

All of the drawings, designs, specifications, manuals, reports, studies, surveys, models, or other data and products prepared or assembled by CONSULTANT, obtained from others by

CONSULTANT or made available to CONSULTANT by BART in connection with the services under this Agreement , shall be treated as confidential by CONSULTANT. At no time shall CONSULTANT use or disclose or make available, other than in the performance of CONSULTANT's services for BART, confidential information gained in the course of or by reason of CONSULTANT's retention by BART and/or performance of services for BART; nor shall CONSULTANT permit such use or disclosure, without prior written approval by BART. It is the intention of BART to preserve and make use of all applicable legal privileges, and CONSULTANT shall make all reasonable efforts to cooperate with BART in this regard.

Performance of work under this Agreement may require the District to disclose Security Sensitive Information ("SSI") or require access to locations designated as security sensitive. In addition to the requirements set forth above and prior to commencement of any work involving SSI, CONSULTANT agrees to execute a Consultant Non-Disclosure Agreement for Release of Security Sensitive Information ("NDA") and require applicable third parties who will need to access SSI to execute a Third Party Non-Disclosure Agreement for Release of Security Sensitive Information (Third Party NDA), which will be provided under separate cover by the District. In accordance with the NDA, and for purposes of services to be performed under this Agreement, confidential information shall include any documents designated as SSI.

## 14.0  SUBCONTRACTS

### A.  Approved Subcontracts

CONSULTANT shall use approved subconsultants as shown in Attachment D hereto and as listed in each WP. CONSULTANT shall not further subcontract all or any portion of its services under this Agreement or a WP, without the prior written approval of the Agreement Manager and any attempt to do so shall be void and unenforceable. Written approval by the Agreement Manager of use of a subconsultant for specified services in connection with one WP or project shall not constitute approval for any other purpose. In the event that CONSULTANT enters into one or more subcontracts pursuant to this Article, it is understood and agreed that the participating subconsultants shall be solely and directly responsible to CONSULTANT, and BART shall have no obligation to them.

### B.  Subcontract Provisions

CONSULTANT agrees that the requirements in Articles 1.4 B, 1.5, 1.6 C, 1.7, 3.1 A, 3.1 B, 3.2 and 4.0 through 31.0, inclusive, of this Agreement, will be included in every subcontract entered into relating to services under this Agreement. Upon request, the CONSULTANT shall provide BART with copies of all such subcontracts, with changes and amendments thereto.

## 15.0  ASSIGNMENT OF AGREEMENT

CONSULTANT shall not assign this Agreement, or any part thereof, without the prior express written consent of the Agreement Manager, and any attempt to do so shall be void and unenforceable.

## 16.0  RECORDS

CONSULTANT shall maintain full and adequate records to show the actual time devoted and the cost incurred by CONSULTANT with respect to the performance of services under this Agreement.

CONSULTANT and its subconsultants shall establish and maintain records pertaining to the fiscal activities of the Project. CONSULTANT's and subconsultants' accounting systems shall conform to generally accepted accounting principles and all records shall provide a breakdown of total costs charged to the Project, including properly executed payrolls, time records, invoices and vouchers.

17.0     <u>AUDIT</u>

CONSULTANT and its subconsultants shall permit BART and its authorized representatives to inspect, examine, make excerpts from, transcribe, and copy CONSULTANT's and subconsultant's books, work, documents, papers, materials, payrolls, records, accounts, and any and all data relevant to this Agreement at any reasonable time for the purpose of auditing and verifying statements, invoices or bills submitted by CONSULTANT pursuant to this Agreement, and shall provide such assistance as may be reasonably required in the course of such inspection including, but not limited to, the following:

A.     Audit Interviews

CONSULTANT shall arrange audit entrance and exit interviews in which CONSULTANT and/or its subconsultants and BART and/or its authorized representatives will participate.

B.     Accessing Documents

CONSULTANT's and its subconsultants' accounting divisions shall provide instruction to BART on accessing documents.

C.     Letter of Representation

CONSULTANT's management, or the management of a subconsultant, as well as the management of their appropriate units, will provide at BART's request a letter of representation concerning such matters as BART determines appropriate.

BART further reserves the right, for itself and its authorized representatives, to examine and re-examine said books, work, documents, papers, materials, payrolls, records, accounts and data during the three-year period following the final payment under this Agreement and until all pending matters are closed; and CONSULTANT and its subconsultants shall in no event dispose of, destroy, alter or mutilate said books, work, documents, papers, materials, payrolls, records, accounts and any and all data in any manner whatsoever for three years after the final payment under this Agreement, or until all pending matters are closed, whichever is later.

Pursuant to California Government Code Section 8546.7, the parties to this Agreement shall be subject to the examination and audit of the State Auditor, at the request of BART or as part of any audit of BART by the State Auditor, for a period of three (3) years after final payment under this Agreement. The examination and audit shall be confined to those matters connected with the performance of this Agreement, including, but not limited to, the cost of administering this Agreement.

18.0     PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA

If any price, including profit or fee, negotiated in connection with, or any reimbursement of cost including profit or fee, under this Agreement, any WP, modifications thereto, Rate Agreement or change order to this Agreement was increased because CONSULTANT furnished cost or pricing

data that were not complete, accurate, and current at such time as the price was determined, the price or cost shall be reduced accordingly and the Agreement, WPs, Rate Agreement(s), or change order(s) and any applicable invoice(s) shall be modified to reflect the reduction.

If BART determines that a price or cost reduction should be made, CONSULTANT agrees not to raise the following matters as a defense:

A.    Bargaining Position

       CONSULTANT was the sole source supplier or otherwise was in a superior bargaining position and thus the price would not have been modified even if accurate, complete and current costs or pricing data had been submitted;

B.    Cost and Pricing Data

       BART should have known that the cost or pricing data in issue were defective even though CONSULTANT took no affirmative action to bring the character of the data to the attention of BART;

C.    Item Cost

       The price was based on an agreement about the total cost of the work and there was no agreement about the cost of each item procured under the Agreement.


19.0   NOTICES

       Except for invoices submitted by CONSULTANT pursuant to Article 3.0, COMPENSATION AND PAYMENT, above, and insurance notices submitted pursuant to Article 6.0 B., Notice of Cancellation, Reduction or Material Change in Coverage, above, all notices required hereunder or other communications to either party by the other may be given by personal delivery, U.S. Mail, courier service (such as Federal Express) or facsimile transmission. Notices shall be effective upon receipt at the following addresses:

       To BART by US Mail:            San Francisco Bay Area Rapid Transit District
                                      P.O. Box 12688
                                      Oakland, California 94604-2688
                                      Attention:   Marvin Snow, Agreement Manager

       To BART by Personal            San Francisco Bay Area Rapid Transit District
       Delivery or Courier            300 Lakeside Drive, 21st Floor
       Service:                       Oakland, CA 94612
                                      Attention:   Marvin Snow, Agreement Manager

       To CONSULTANT:                 _Anil Verma Associates_
                                      Attention:
                                      Project Manager

       Facsimile Transmission:
       To BART:                       (510) 287-4808
       To CONSULTANT:                 (510) 535-2339


       Either party may change its address for notices by giving written notice of the new address as provided above.

20.0 NONDISCRIMINATION

The CONSULTANT or subconsultant shall not discriminate on the basis of race, color, national origin or sex in the performance of this Agreement. The CONSULTANT shall carry out applicable requirements of 49 CFR Part 26 in the award and administration of U.S. Department of Transportation-assisted contracts. Failure by the CONSULTANT to carry out these requirements is a material breach of this Agreement, which may result in the termination of this Agreement or such other remedy as the District deems appropriate.

In connection with the performance of services under this Agreement, CONSULTANT shall not, on the grounds of race, religious creed, color, national origin, ancestry, handicap, medical condition, marital status, sex, sexual orientation or age, discriminate or permit discrimination against any person or group of persons in any manner prohibited by Federal, State or local laws.

For purposes of this Article "sexual orientation" shall mean a preference for heterosexuality, homosexuality or bisexuality; or having a history of, or being identified with, any such preference.

21.0 DISADVANTAGED BUSINESS ENTERPRISE PARTICIPATION

The District is committed to carrying out all of the Disadvantaged Business Enterprise ("DBE") requirements of Title 49, Code of Federal Regulations Part 26, as amended from time to time. The procedures contained in the District's DBE Program will ensure that all contracts and procurements are administered without discrimination on the basis of race, color, sex or national origin, and that DBEs have an equal opportunity to compete for and participate in the performance of all agreements, contracts and subcontracts awarded by the District.

A. BART Policy

It is the policy of the District to ensure nondiscrimination on the basis of race, color, sex, ethnicity or national origin in the award and administration of Federally funded contracts. It is the intention of the District to create a level playing field on which DBEs can compete fairly for agreements, contracts and subcontracts, including but not limited to construction, procurement and Invitation for Bids ("IFBs") contracts, professional and technical services agreements and purchase orders.

B. DBE Participation: No Goal

Although there is no DBE participation goal for this Agreement, CONSULTANT is encouraged to take all steps necessary to provide an equal opportunity for DBEs to participate.

C. DBE Participation Requirements

In the event CONSULTANT utilizes DBE firms in the performance of work under this Agreement, see the requirements set forth in Attachment F, DISADVANTAGED BUSINESS ENTERPRISE PARTICIPATION, attached hereto and incorporated herein by this reference.

22.0 SITE SECURITY AND ACCESS

Prior to commencement of services, CONSULTANT shall comply with BART's site security requirements which include, but are not limited to, requiring photographic identification badges

and submitting names and dates of birth of all personnel, including subconsultants and suppliers of any tier, working on BART property or facilities. All badges shall be returned to BART at the completion of services hereunder. In the event CONSULTANT fails to comply with BART's site security requirements, CONSULTANT's personnel, including subconsultants and suppliers, may not be allowed on BART property or facilities. No extension of time for completion of services or additional compensation for delay claims shall be granted in the event such personnel are excluded from BART property or facilities.

## 23.0   LAWS AND REGULATIONS

CONSULTANT shall comply with any and all laws, statutes, ordinances, rules, regulations, and procedural requirements of any national, state or local government, and of any agency of such government, including BART, which relate to or in any manner affect the performance of this Agreement. This Agreement and any documents supplied hereunder are subject to public inspection of the California Public Records Act, California Government Code Section 6250 et seq., unless exempted by law.

A.   Federal Requirements

This Agreement may be funded in part under a grant from the United States Department of Transportation, Federal Transit Administration (FTA). Federal requirements are set forth in Attachment G, UNITED STATES DEPARTMENT OF TRANSPORTATION REQUIREMENTS, incorporated herein and by this reference made a part hereof.

B.   State Requirements

This Agreement may also be funded in part from a grant from the State of California through its Business, Transportation and Housing Agency, Department of Transportation (State). State requirements are set forth in Attachment E, STATE OF CALIFORNIA DEPARTMENT OF TRANSPORTATION REQUIREMENTS, incorporated herein and by this reference made a part hereof.

## 24.0   ADDITIONAL FUNDING AGREEMENT REQUIREMENTS

This Agreement is subject to any additional restrictions, limitations or conditions that may be required by any local, State or Federal funding agreements applicable to this Agreement.

## 25.0   CHOICE OF LAW

All questions pertaining to the validity and interpretation of this Agreement shall be determined in accordance with the laws of the State of California applicable to agreements made and to be performed within the State, without reference to conflicts of law principles.

## 26.0   SEVERABILITY

If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way.

## 27.0 COVENANT AGAINST CONTINGENT FEES

CONSULTANT warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by CONSULTANT for the purpose of securing business. For breach or violation of this warranty, BART will have the right to annul this Agreement without liability, or at its discretion, to deduct from the Agreement price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

## 28.0 COVENANT AGAINST GRATUITIES

CONSULTANT warrants that it will not and has not offered or given gratuities in the form of entertainment, gifts or otherwise, to any director, officer or employee of BART to secure favorable treatment in the awarding, amending or evaluating performance of the Agreement.

## 29.0 CAPTIONS

The captions of the Articles and paragraphs in this Agreement are for purposes of reference only, and shall not be construed to affect the meaning of any provision hereof.

## 30.0 BENEFIT OF AGREEMENT

This Agreement shall bind and benefit the parties hereto and their assignees, successors and permitted assigns.

## 31.0 ENTIRE AGREEMENT

This Agreement is the entire agreement of the parties, and supersedes and replaces all prior communications, written and oral, regarding the subject matter hereof. CONSULTANT represents that in entering into this Agreement, it has not relied on any previous representations, inducements, or understandings, written or oral, of any kind or nature.

[THIS SPACE LEFT INTETIONALLY BLANK]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first written above.

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT    (NAME OF CONSULTANT)

By General Manager
(or designee)

By (Signature)

Name
and
Title
                                        Print or Type

ATTACHMENT A

## SCOPE OF SERVICES

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

GENERAL ENGINEERING SERVICES FOR BART PROJECTS

SCOPE OF SERVICES

A.  GENERAL SCOPE OF SERVICES

CONSULTANT shall assist and advise the San Francisco Bay Area Rapid Transit District in engineering and procurement activities and related issues associated with BART projects. CONSULTANT shall manage and work in conjunction with other CONSULTANT team members and work in conjunction with BART staff to support BART projects. CONSULTANT shall maintain required professional and business licenses (See Standard Form 330) throughout the duration of the Agreement, as appropriate. Services provided herein shall comply with the latest edition of all applicable codes, ordinances, criteria, standards, regulations, and other laws unless otherwise specified by BART.  The CONSULTANT shall make maximum use of approved standard references in order to minimize unnecessarily voluminous or detailed specifications.  A list of areas in which the CONSULTANT may provide services includes, but is not necessarily limited to, the following:

1.  Facilities (Stations and Buildings)
    a.  Elevator/Escalator Additions, Modifications and Renovations
    b.  Fire Protection Modifications
    c.  Passenger Station Expansions, Modifications and Renovations
    d.  Security Systems
    e.  Transit Oriented Development including traffic engineering, landscape architecture, urban design and sustainability specialist

2.  Facilities (Yards and Shops)
    a.  Track and Yard Design and Construction
    b.  Shop Design and Construction -- new and redesign
    c.  Maintenance Shops, Warehouse/Logistics Facilities
    d.  Maintenance and Logistics System Design and Implementation

3.  Train Control Systems
    a.  Automatic Train Control Implementation and Renovation, including Communications-Based Train Control
    b.  Technology Development (e.g., Adaptive Diagnostic Systems, Broken Rail Detection, Vehicle Automatic Train Control)
    c.  Yard Control and Car Tracking

4.  Transit Power Systems
    a.  Essential Power
    b.  34.5kV and 1000V Traction Power Rehabilitation and Optimization
    c.  Technology Development (e.g., Superconducting Cables, Energy Storage Systems)
    d.  Cathodic Protection and Structural Coatings

5.  Controls and Communications
    a.  Central Control Facilities Modifications
    b.  Communications Addition, Modifications and Renovations (e.g., CCTV, Data Transmission Network, Destination Signs, Intercom, PA, Radio, Telephone)
    c.  Emergency Controls and Communications

        d.  Audio, video and touch based communication systems for transit wayfinding, realtime and patron services for transit facilities and revenue vehicles

6.  Mainline and Yard Infrastructure
    a.  Running Rail Modifications
    b.  Underground and Overhead Structure Repairs
    c.  Additional Storage Facilities

7.  Automatic Fare Collection
    a.  Project Planning and Development
    b.  Hardware and Software Modifications
    c.  Systems Engineering and Integration
    d.  Specialized Studies
    e.  System Capacity Analysis Studies

8.  Parking and Intermodal Access
    a.  ADA and Title 24 Access Upgrades
    b.  Garage and Parking Lot Expansions, Modifications and Renovations
    c.  Intermodal Facilities

9.  Computer Hardware and Software
    a.  Technology Development
    b.  Prototype Development
    c.  Safety Analyses and Safety Certification

10.  Rail Vehicle Support – Standard BART and eBART/DMU Equipment
    a.  Engineering Design and Maintenance Support
    b.  Procurement and Contract Support
    c.  Special Studies

## B.  TASKS TO SUPPORT GENERAL SCOPE OF SERVICES

It is anticipated that the services to support the General Scope of Services described above will be authorized and performed under the following general tasks areas:

### Task #1: Project Development

CONSULTANT shall provide project development services as requested by BART.  Areas of support include, but are not necessarily limited to, the following:

1.  Environmental studies and reports.
2.  Conceptual designs.
3.  Preliminary designs and construction schedules and phasing.
4.  Renderings/drawings.
5.  Agreements (memoranda of understanding).
6.  Research on codes, rules, regulations, analytical system studies/calculations and surveys, current industry standards and practices.
7.  Cost estimates.
8.  Project implementation plans.

### Task #2:  Engineering and Design Services

CONSULTANT shall provide multi-disciplinary engineering and design services to support the District's Capital Program and other District projects.  The engineering disciplines required under

this Agreement include, but are not limited to, the following: Architecture, Civil, Structural, Mechanical, Electrical, Traction and Station Power Engineering, Systems Engineering and Integration (including Train Control, Communications, and Computer applications), Surveying, Geotechnical, Software, Electronic, and Environmental.

Activities may include, but are not necessarily limited to, the following:

1. Engineering and Design Services

    a. Provide engineering design services, including conceptual, preliminary engineering, and final design.
    b. Perform required calculations, and analysis.
    c. Prepare specifications per BART requirements.
    d. Produce CADD drawings in the latest AutoCAD version per BART requirements.
    e. Prepare special studies and reports relative to proposed new facilities, modified facilities, systems, automatic fare collection, service improvements, station circulation, tunnel ventilation, train control, traction power simulations, communications, energy conservation, utilities and other studies as requested by the District.
    f. Provide multi-discipline cost estimating as required.

2. Project Management

    a. Develop project scope through meetings with the District Sponsor.
    b. Monitor and review project work products.
    c. Develop and review project work plan.
    d. Direct technical staff throughout all phases of a project.

3. Contract Bid Document Development

    a. Preparation of complete contract documents (including scope of work, general conditions, supplementary conditions, etc.).
    b. Preparation of solicitation documents (e.g. notice to bidders, invitation to bid, public advertisement, etc.).
    c. Preparation of addenda.
    d. Reproduction and distribution services.
    e. Supporting the District in conducting pre-bid meetings.
    f. Supporting the District in responding to questions in the bid process.
    g. Supporting the District in procurement proposal evaluation processes.

4. Production and Process Engineering Services (Industrial Engineering)

    a. Support of BART's Strategic Maintenance Program (SMP).
    b. Production engineering and Lean process development.
    c. Maintenance planning and reliability-centered maintenance.
    d. Support integration of maintenance, logistics, and supply chain strategies.

Task #3: Advanced Technologies

CONSULTANT shall provide engineering and design services for advanced technologies as requested by BART. Areas of support may include, but are not necessarily limited to, the following:

1. Software development for real-time control within engineering application environments.
2. Printed circuit board design, engineering, and prototyping.
3. Control system design and development.
4. Transducer application and development.
5. Computer simulation development and simulation based studies.
6. Engineering cost benefit analyses.
7. Smart card systems application and development.

## Task #4: Procurement Services

CONSULTANT shall assist the District in procurement related activities which may include, but are not necessarily limited to, the following:

1. Inspection.
2. Testing.
3. Alternate product selection.
4. Vendor evaluation.
5. Specification development.
6. Expediting support.

## Task #5: Computer Hardware and Software Support

CONSULTANT shall provide computer system network design and analysis, computer software design, internet access and utilization support including web page design and development as well as wireless messaging design and development, and AFC systems design and development services.

Areas of support include, but are not necessarily limited to, the following:

1. Network design and analysis of both WAN and LAN:
   a. Hardware engineering
   b. Electronic engineering
   c. Communications engineering
   d. Networking engineering
2. Systems engineering services, including software systems engineering (analysis, architecture, design, quality assurance and test).
3. Software application development, including project specific web page design.
4. Wireless communication technologies.
5. AFC technologies including smart card, magnetic encoding and credit/debit systems.
6. Support advancement of Business Advancement Plan (BAP) systems utilization for maintenance and logistics environments.
7. Document management system services.

## Task #6: Emergency Response

CONSULTANT shall provide experienced personnel to assist BART in the event of a rapid response or emergency requirement. The following areas of expertise are typical, but not all inclusive, of those required for rapid or emergency response:

1. Traction power restoration.
2. Computer systems recovery.
3. Structural repairs.
4. Failure analysis.
5. Accident investigation.
6. Media processing failure analysis.

## Task #7:  Post-Bid Services

CONSULTANT shall provide post-bid services which may include, but are not necessarily limited to, the following:

1. Bid Analysis Support

2. Design Support During Construction
   a. Shop drawing and design submittal review.
   b. Change notices/requests for information.
   c. Record drawings.
   d. Claims analysis and dispute resolution assistance.
   e. Differing site conditions.
   f. Preparation of change orders.
   g. Configuration control.
   h. Inspection and test support.

3. Contract Management
   a. Communications/meetings/record keeping.
   b. Contract cost and payments management.
   c. Contract schedule management.
   d. Technical support.
   e. Contract close-out support.

## Task #8:  Project Administration

1. Project Communications/Meetings/Record Keeping

   As required for individual projects, CONSULTANT shall maintain a communication tracking system, approved by BART, which identifies all formal communications between CONSULTANT and BART and select correspondence between CONSULTANT and its subconsultants.

   CONSULTANT shall be required to meet with BART staff periodically throughout the life of the project.

   CONSULTANT shall conduct, participate, document, and/or facilitate other meetings/presentations with affected parties as required.

2. Project Progress Reporting

   CONSULTANT shall prepare and submit to BART monthly progress reports and invoices that include financial and DBE participation data (if applicable) in a format jointly developed with BART. The report shall be submitted as an attachment to the invoice submittal. The report shall be submitted within ten days following the end of each month unless otherwise specified by BART. Reports shall detail and include, but not necessarily be limited to, the following subjects:

    a.  Progress (narrative detailing project status, achievements, DBE participation (if any)).
    b.  Schedule Date (critical activities and milestones (actual vs. planned) and comments on status and planned corrective actions, if applicable.
    c.  Financial Data (comments on status of project budget)
    d.  Critical Items (schedule and financial, if applicable)
    e.  Problem Areas (identify issues and concerns and discuss planned corrective action);
    f.  Other items as directed by BART.

3.   Project Scheduling and Cost Management

CONSULTANT shall develop resource loaded schedules with deliverables and milestones for individual projects, as requested by BART.

CONSULTANT shall coordinate with BART staff on project trend analysis and associated data.

CONSULTANT shall develop and implement a plan to manage subconsultants.

4.   Project Coordination with Other Agencies

CONSULTANT shall represent, coordinate or assist BART in its relationships with other agencies and utilities to provide the following services which may include, but are not necessarily limited to, the following:

    a.  Agreements (memoranda of understanding).
    b.  Design reviews.
    c.  Document preparation.
    d.  Environmental reviews.
    e.  Site reviews/tours.

Typical Agency interfaces include:

- Caltrans and other state agencies.
- Federal Transit Administration (FTA).
- Local counties and cities.
- Public Utilities Commission (PUC).
- Railroads.
- Utilities.

Task #9:  Agreement Administration

1.   Agreement Communications/Meetings/Record Keeping

CONSULTANT shall maintain a communication tracking system, approved by BART, which identifies all formal communications between CONSULTANT and BART and select correspondence between CONSULTANT and its subconsultants.

CONSULTANT shall be required to meet with BART staff periodically throughout the life of the Agreement.

2.   Agreement Progress Reporting

CONSULTANT shall prepare and submit to BART a monthly report summarizing the activities under the Agreement in a format jointly developed with BART. The report shall be submitted as an attachment to the invoice submittal.  The report shall be submitted within ten days following the end of each month unless otherwise specified by BART.

3.   Agreement Scheduling/Cost Management/Subconsultant Management

CONSULTANT shall coordinate with BART staff the scheduling of project work and resources.

CONSULTANT shall coordinate with BART staff on trend analysis and associated data.

CONSULTANT shall develop and implement a plan to manage subconsultants.

4.   Quality Control/Quality Assurance (QC/QA)

CONSULTANT shall provide a QC/QA Program to ensure the accuracy and quality of the work products performed for BART.  The level of this program is anticipated to vary relative to the services being provided.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

ATTACHMENT B

KEY PERSONNEL LIST

## ATTACHMENT B

## KEY PERSONNEL LIST

| NAME | POSITION |
|------|----------|
| Anil Verma | Principal-In-Charge |
| Vic Zikoor | Program Manager |
| MariaValdes | Project Controls |
| Rolando Barlaan | Deputy Project Manager |
| Joseph Rakow | Emergency Response/Failure Analysis |
| Maris Pelka | Task Manager – Facilities |
| Brian Larkin | Task Manager – Systems |
| Somesh Debnath | Facilities Yards & Shops |
| James Pun | Parking & Intermodal Access |
| Larry Daniels | Mainline & Yard Infrastructure |
| Steven Beebe | Train Control Systems |
| Bill Frandsen | Transit Power Systems |
| Phil Collins | Controls & Communications |
| Robert Murray | AFC/Computer Hardware/Software |
| John Kennedy | Rail Vehicle Support |

ATTACHMENT C

[NOT USED]

ATTACHMENT D

PROJECT CONSULTANT TEAM

ATTACHMENT D

PROJECT CONSULTANT TEAM

(To Be Completed After Award)

| Name, Address and Phone Nos. of All Firms Participating on the Project (Including Prime) and Subcontractors | Check if DBE | Nature of Participation | % of Project Work | Anticipated Dollar Value of Participation |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | TOTALS | | | |

## ATTACHMENT

## PROJECT CONSULTANT TEAM

(To Be Completed by Proposer Only)

| Name, Address and Phone Nos. of All Firms Participating on the Project (including Prime) and Subcontractors | Indicate if DBE Or MBE | Nature of Participation | % of Project Work | Anticipated Dollar Value of Participation |
|---|---|---|---|---|
| Anil Verma Associates, Inc.<br><br>1970 Broadway, Suite 525<br>Oakland, CA 94612<br>Tel: (510) 535-2537<br>Age of Firm: 26 yrs.<br>Annual Gross Receipts as of Last Tax Year: $7,927,152 | DBE | Lead for Facilities (Stations, Buildings, Yards, and Shops)., Parking and Intermodal Access | 41 | TBD |
| Acumen Building Enterprises, Inc.<br><br>1853 MacArthur Blvd.<br>Oakland, CA 94602<br>Tel: (510) 530-3029<br>Age of Firm: 17 yrs.<br>Annual Gross of Receipts as of Last Tax Year:$4,119,717.00 | DBE | Lead for Automatic Fare Collection | 5 | TBD |
| Arup North America, Ltd.<br><br>560 Mission Street, 7th Floor, San Francisco, CA 94105<br>Tel: (415) 957-9445<br>Age of Firm: 65 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $86 Million | No | Support for Facilities (Stations & Buildings), Rail Vehicle Support, Transit Power Systems, Rail Vehicle | 4 | TBD |
| Aura Management Consulting, LLC.<br><br>23 Altarinda Rd., Suite 101<br>Orinda, CA 94563<br>Tel: (510) 223-5605<br>Age of Firm: 8 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $697,135 | DBE | Support for Train Control Systems- Automatic Train Control | 2 | TBD |
| Biggs Cardosa Associates, Inc.<br><br>101 California St., Suite 875, San Francisco, CA 94111<br>Tel: (415) 391-1900<br>Age of Firm: 25 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $17 Million | No | Structural Engineering for Facilities & Infrastructure | 2 | TBD |

| | | | | |
|---|---|---|---|---|
| Booz Allen Hamilton<br><br>101 California St., Suite 3300, San Francisco, CA 94111<br>Tel: (415) 281-4960<br>Age of Firm: 97 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $5,123,000,000 | No | Lead for Controls and Communications/Computer Hardware and Software | 3 | TBD |
| Community Design + Architecture, inc.<br><br>350 Frank H. Ogawa Plz., 5th Floor, Oakland, CA 94612<br>Tel: (510) 839-4568<br>Age of Firm: 13 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $1,771,000 | No | Architecture, Urban Design, and Landscape Architecture and Design | 1 | TBD |
| Daniel Railroad Engineering<br><br>4222 Curragh Oaks Lane<br>Fair Oaks, CA 95628<br>Tel: (916) 965-9435<br>Age of Firm: 17 yrs (3 yr Incorporated)<br>Annual Gross of Receipts as of Last Tax Year: $326,000 | No | Lead for Mainline and Yard Infrastructure, Track | 2 | TBD |
| DKS Associates<br><br>1970 Broadway, Suite 740<br>Oakland, CA 94612<br>Tel: (510) 763-2061<br>Age of Firm: 31 yrs.<br>Annual Gross of Receipts as of Last Tax Year:$26,000,000 | No | Support for Mainline and Yard Infrastructure | 1 | TBD |
| Elcon Associates, Inc.<br><br>12670 NW Barnes Road<br>Portland, OR 97229<br>Tel: (503) 644-2490<br>Age of Firm:<br>Annual Gross of Receipts as of Last Tax Year: | No | Support for Transit Power Systems-Essential Power | 2 | TBD |
| Exponent Engineering & Scientific Consulting<br><br>149 Commonwealth Drive<br>Menlo Park, CA 94025<br>Tel: (650) 688-7316<br>Age of Firm: 44 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $249 Million | No | Lead for Emergency Response Task, Support for Train Control Systems, Technology Development Controls and Communication-Emergency Controls and Communications | 3 | TBD |

| Horten Lees Brogden<br><br>300 Brannan Street., Suite 212, San Francisco, CA 94107<br>Tel: (415) 348-8273<br>Age of Firm: 43 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $5,061,631 | DBE | Support for Facilities (Station and Buildings)-Lighting, Parking and Intermodal Access-Lighting, Vertical Transportation | 1 | TBD |
|---|---|---|---|---|
| Kate Keating Associates, Inc.<br><br>1045 Sansome Street, Suite 202, San Francisco, CA 94111<br>Tel: (415) 773-1000<br>Age of Firm: 21 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $2.2M | DBE | Support for Facilities (Station and Buildings)-Signage | 1 | TBD |
| Larkin & Associates<br><br>480 20th Avenue<br>San Francisco, CA 94121<br>Tel: (415) 810-7840<br>Age of Firm: 3 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $10,000 | No | Support for Design Coordination, Transit Power Systems, Mainline and Yard Infrastructure | 2 | TBD |
| Lea + Elliott<br><br>785 Market St., 12th Floor<br>San Francisco, CA 94103<br>Tel: (415) 905-6450<br>Age of Firm: 38 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $24,401,880 | No | Lead for Train Control Systems, Rail Vehicle Support-Standard BART and eBART/DMU Equipment, support for Controls and Communication | 6 | TBD |
| Lerch Bates Inc.<br><br>6160 Stoneridge Mall Rd., Suite 250, Pleasanton, CA 94588<br>Tel: (925) 600-0771<br>Age of Firm: 65 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $20,900,000 | No | Support for Facilities (Station and Buildings)-Vertical Transportation | 1 | TBD |
| LTK Engineering Services<br><br>100 West Butler Avenue<br>Ambler, PA 19002<br>Tel: (215) 542-0700<br>Age of Firm: 26 yrs.<br>Annual Gross of Receipts as of Last Tax Year: $50,934,595 | No | Facilities Stations, Shop & Yard, Train Control Systems, Transit Power systems, Control & Communications, Automatic Fare Collection Services | 3 | TBD |

| | | | | |
|---|---|---|---|---|
| Merrill Morris Partners<br><br>249 Front Street<br>San Francisco, CA 94111<br>Tel: (415) 291-8960<br>Age of Firm: 30 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $900,000.00 | DBE | Support for Facilities (Station and<br>Buildings-Parking and Intermodal<br>Access-Landscape | 1 | TBD |
| NBA Engineering, Inc.<br><br>897 Hyde St., 2nd Floor<br>San Francisco, CA 94109<br>Tel: (415) 202-0940<br>Age of Firm: 16 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $725,800 | DBE | Support for Facilities (Station Buildings,<br>Yards, and shops)-Fire Protection | 3 | TBD |
| Parikh Consultants, Inc.<br><br>1330 Broadway, suite 712<br>Oakland, CA 94612<br>Tel: (510) 452-8804<br>Age of Firm: 18 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $3.9 Million | DBE | Lead Geotechnical Engineering and<br>Materials Testing | 1 | TBD |
| Parsons<br><br>'50 Freemont St., Suite 1500<br>San Francisco, CA 94105<br>Phone Number: (415) 490-2463<br>Age of Firm: 29 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $852,309,000 | No | Support for Train Control Systems and<br>Transit Power Systems | 1 | TBD |
| QuEST Rail LLC<br><br>106 E. 224 Hwy.<br>Wellington, MO 64097<br>Tel: (816) 240-8426 x117<br>Age of Firm: 9 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $3.9 Million | No | Train Control Systems, Yard Control and<br>Tracking Support | 2 | TBD |
| RBF Consulting<br><br>500 Ygnacio Valley Road, Suite 270<br>Walnut Creek, CA 94686<br>Tel: (925) 906-1460<br>Age of Firm:  67 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year:102.6 Million | No | Lead Survey, Civil Engineering, & Traffic<br>Engineering, Facilities (Stations and<br>Buildings) Support | 1 | TBD |

| | | | | | |
|---|---|---|---|---|---|
| Simon & Associates<br><br>200 Brannan St., Suite 204<br>San Francisco, CA 94107<br>Tel: (415) 908-3757<br>Age of Firm: 17 Yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $836,034.75 | No | Support for Facilities (Station and Buildings)-Sustainability, Parking and Intermodal Access-Sustainability | 1 | | TBD |
| STRUCTUS, Inc.<br><br>160 Pine Street, Suite 300<br>San Francisco, CA 94111<br>Tel: (415) 999-1710<br>Age of Firm: 24 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $2,104,102 | DBE | Support for Facilities (Stations and Buildings | 3 | | TBD |
| Transportation Infrastructure Group<br><br>4690 Chabot Drive, Suite 226,<br>Pleasanton, CA 94588<br>Tel: (925) 416-150.<br>Age of Firm: 1yr<br>Annual Gross of Receipts as of Last<br>Tax Year: $50,000 | No | Support for Facilities (Stations and Buildings | 2 | | TBD |
| V& A Engineering<br><br>155 Grand Avenue, Suite 700,<br>Oakland, CA 94612<br>Tel: (510) 903-6600<br>Age of Firm: 32 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $6,088,161 | No | Corrosion Control Engineering, Cathodic Protection Structural Coating, and Stray Current Analysis | 1 | | JD |
| Wilson Ihrig & Associates, Inc.<br><br>5776 Broadway<br>Oakland, CA 94618<br>Tel: (510) 658-6719<br>Age of Firm: 44 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $3,179,494 | No | Support for Facilities (Station and Buildings)-Noise & Vibration | 1 | | TBD |
| W-Trans<br><br>490 Mendocino Avenue, Suite 201,<br>Santa Rosa, CA 95401<br>Tel: (707) 542-9500<br>Age of Firm: 16 yrs.<br>Annual Gross of Receipts as of Last<br>Tax Year: $1,638,576 | DBE | Support for Facilities (Stations and Buildings)-Traffic, Parking and Intermodal Access-Traffic | 3 | | TBD |
| | | Totals | 100% | | |

Anil Verma, AIA
Name of Authorized Officer of Proposer (Print or Type)

2011                    No. 6M8043

## ATTACHMENT E

### STATE OF CALIFORNIA
### DEPARTMENT OF TRANSPORTATION
### REQUIREMENTS

TABLE OF CONTENTS

Allowable Costs (See Article 3.0 of this Agreement)

Termination for Convenience (See Article 5.1 of this Agreement)

Termination for Cause (See Article 5.2 of this Agreement)

E.1       Fair Employment Practices

E.2       Audit, Inspection, Access to Records and Retention of Records

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## ATTACHMENT E

### STATE OF CALIFORNIA
### DEPARTMENT OF TRANSPORTATION
### REQUIREMENTS

E.1 Fair Employment Practices. In the performance of work under this Agreement, CONSULTANT and its subconsultants will not unlawfully discriminate, harass or allow harassment, against any employee or applicant for employment because of sex, race, color, ancestry, religious creed, national origin, physical disability (including HIV and AIDS), mental disability, medical condition (including cancer), age (over 40), marital status and denial of family care leave. [1] CONSULTANT and its subconsultants shall ensure that the evaluation and treatment of their employees and applicants for employment are free from such discrimination and harassment. CONSULTANT and its subconsultants shall comply with the provisions of the Fair Employment and Housing Act (Government Code, Section 12900 et seq.) and the applicable regulations promulgated thereunder (California Code of Regulations, Title 2, Section 7285.0 et seq.). The applicable regulations of the Fair Employment and Housing Commission implementing Government Code, Section 12900 (a-f), set forth in chapters of Division 4 of Title 2 of the California Code of Regulations are incorporated into this agreement by reference and made a part hereof as if set forth in full. CONSULTANT and its subconsultants shall give written notice of their obligations under this clause to labor organizations with which they have a collective bargaining or other agreement. CONSULTANT and its subconsultants shall include the nondiscrimination and compliance provisions of this clause in all subconsultant agreements to perform work under this agreement.

CONSULTANT and its subconsultants will permit access to all records of employment, employment advertisements, application forms, and other pertinent data and records by the State Fair Employment Practices and Housing Commission, or any other agency of the State of California designated by BART for the purpose of investigation to ascertain compliance with this Fair Employment Practices Section.

E.2 Audit, Inspection, Access to Records and Retention of Records. CONSULTANT and its subconsultants shall establish and maintain an accounting system and records that properly accumulate and segregate incurred costs by line item for the project. CONSULTANT and its subconsultants' accounting systems shall conform to generally accepted accounting principles (GAAP) and all records shall provide a breakdown of total costs charged to the Project, including properly executed payrolls, time records, invoices and vouchers as well as all accounting generated reports. CONSULTANT and its subconsultants shall permit representatives of the State and State Auditor to inspect, examine, make excerpts or transcribe CONSULTANT and its subconsultants' work, documents, papers, materials, payrolls, books, records, accounts, any and all data relevant to this Agreement at any reasonable time and to audit and verify statements, invoices or bills submitted by CONSULTANT and its subconsultants pursuant to this Agreement, and shall provide copies thereof upon request and shall provide such assistance as may be reasonably required in the course of such audit or inspection.

The State, its representatives and the State Auditor further reserve the right to examine, inspect, make copies, or excerpts of all work, documents, papers, materials, payrolls, books and accounts, and data pertaining to this Agreement and to inspect and re-examine said work, documents, papers, materials, payrolls, books, records, accounts and data during the life of the Agreement and for the three (3) year period following the final payment under this Agreement, and CONSULTANT and its subconsultants shall in no event dispose of, destroy, alter or mutilate said work, documents, papers, materials, payrolls, books, records, accounts and data in any

---

[1.] See State Government Code 12940 et seq. for further details.

manner whatsoever for three (3) years after final payment under this Agreement and all pending matters are closed.

Any costs for which CONSULTANT and its subconsultants has received payment that are determined by subsequent audit to be unallowable under the terms of this agreement may be required to be repaid to BART by the CONSULTANT and its subconsultants. Should CONSULTANT and its subconsultants fail to reimburse money due BART within 30 days of demand, or within such other period as may be agreed between the parties hereto, BART is authorized to withhold future payments due CONSULTANT and its subconsultants from any source.

The CONSULTANT agrees that the Contract Cost Principles and Procedures at least as restrictive as 48 CFR, Federal Acquisition Regulations System, Chapter 1, Part 31 et seq., shall be used to determine the allowability of individual items of costs.

The CONSULTANT agrees to comply with Federal procedures in accordance with 49 CFR, Part 18, Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments.

Any costs for which payments have been made to the CONSULTANT, which are determined by subsequent audit to be unallowable under 48 CFR, Federal Acquisition Regulations System, Chapter 1, Part 31 et seq., or 49 CFR, Part 18, Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments, are subject to repayment by CONSULTANT to BART.

Any subcontract entered into as a result of this Agreement shall contain all the provisions of this section.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

ATTACHMENT F

DISADVANTAGED BUSINESS

ENTERPRISE PARTICIPATION

ATTACHMENT F

DISADVANTAGED BUSINESS ENTERPRISE PARTICIPATION

A.   Definitions

   1.   Disadvantaged Business Enterprises (DBE)

      a.   "Disadvantaged Business Enterprise (DBE)" means a for-profit small business concern which is at least 51 percent owned by one or more socially and economically disadvantaged individuals, or, in the case of publicly-owned business, in which at least 51 percent of the stock of which is owned by one or more socially and economically disadvantaged individuals; and whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it and which meets the requirements of 49 CFR Part 26.

      b.   "Small business concern" means a small business as defined in Section 3 of the United States Small Business Act (15 USC Section 632) and the Small Business Administration regulations implementing it (13 CFR Part 121), whose average annual gross receipts for the previous three fiscal years do not exceed $19.75 million (as adjusted for inflation by the Secretary of DOT pursuant to 49 CFR Section 26.65(b)) .

      c.   "Socially and economically disadvantaged individuals" are presumed to include United States citizens (or lawfully admitted permanent residents) who are women, Black Americans, Hispanic Americans, Native Americans (including American Indians, Eskimos, Aleuts or Native Hawaiians), Asian-Pacific Americans, or Asian-Indian Americans, or any individuals found to be disadvantaged by the Small Business Administration pursuant to Section 8(a) of the United States Small Business Act (15 USC Section 637), or certified as socially and economically disadvantaged by the District pursuant to 49 CFR Part 26. An individual cannot be presumed or determined on a case-by-case basis to be economically disadvantaged if she/he has a personal net worth exceeding $750,000 (excluding the individual's ownership interest in the small business concern and his/her primary residence).

   2.   Resolution of Conflict Between Definitions - If there is a conflict between the above three definitions and the definitions of the California Unified Certification Program (CUCP) certification documents, the definitions in Section A.1 above shall prevail. A number of the firms listed in the CUCP DBE Database have been certified under prior DBE regulations. CONSULTANT may need to verify any such firm's continued eligibility under the current DBE regulations, 49 CFR Part 26.

B.   DBE Participation: No Goal. Although there is no DBE participation goal for this Agreement, CONSULTANT is encouraged to take all steps necessary to provide an equal opportunity for DBEs to participate.

C.   DBE Participation Requirements. The following provisions shall apply in the event the CONSULTANT utilizes DBE firms in the performance of work under this Agreement.

   1.   DBE Participation. DBE participation includes contracts (other than employee contracts) between DBEs and the CONSULTANT for any goods or services

specifically required for the completion of the work under the Agreement. Only the work actually performed by a DBE's own forces will be counted toward DBE participation. The cost of supplies and materials obtained by the DBE or equipment leased (except from the CONSULTANT or its affiliate) may also be counted. A DBE may participate as a CONSULTANT, first-tier subconsultant, joint venture partner with a CONSULTANT or first-tier subconsultant, vendor of material or supplies incorporated or expended in the work, or a supplier of other services such as shipping, transportation, testing, equipment rental, insurance services and other support services necessary to fulfill the requirements of this Agreement provided that such vendor or supplier contracts directly with the CONSULTANT. A DBE may be a subconsultant on more than one Agreement. Work that a DBE subcontracts to a non-DBE firm does not count toward DBE participation. The CONSULTANT assumes responsibility for accurately identifying the first-tier status of the DBE firms proposed.

2. <u>Joint Venture.</u> A DBE joint venture partner must be responsible for a clearly defined portion of the work to be performed in addition to satisfying requirements for ownership and control. Only that portion of the work that is performed solely by the DBE's own forces can be counted towards DBE participation.

3. <u>Function.</u> A DBE must perform a commercially useful function, i.e., must be responsible for the execution of a distinct element of work or services and must carry out its responsibility by actually performing, managing and supervising the work or services involved.

4. <u>Methodology for Determining Level of DBE Participation.</u> Only those DBEs that have been certified prior to proposal submission and which are listed in the Project Consultant Team Form (Attachment D to the Agreement as may be modified during the course of this Agreement) will be counted toward DBE participation. DBE participation will be counted as follows:

   a. If the Agreement is awarded to a DBE CONSULTANT, only the portion of work that is actually performed by the DBE CONSULTANT. If the Agreement is awarded to a joint venture, only the portion of the work that is actually performed by the DBE's own forces, or if the work is not clearly delineated between the DBE and the joint venture partner, the portion of the work equal to the DBE's percentage ownership interest in the joint venture will be counted.

   b. The dollar value of all DBE subcontracts for work or services under the Agreement.

   c. DBE participation will not be counted until the DBE firms have been paid.

   d. When a DBE subcontracts part of the work of its contract to another firm, the value of the subcontracted work may be counted toward DBE participation only if the DBE's subconsultant is itself a DBE. Work that a DBE subcontracts to a non-DBE firm does not count toward DBE participation.

D. <u>DBE Records</u>

CONSULTANT shall maintain records to verify DBE participation as set forth in this Agreement and as modified in any way during the course of the Agreement. Such records shall show the name and business address of each DBE participating in the Agreement and the total dollar amount actually paid each DBE and the date of payment. A report based on these records and certified to be correct by CONSULTANT shall be

submitted to the Agreement Manager with the monthly payment invoice. CONSULTANT shall include with the monthly report any other efforts made which are relevant to meeting the DBE participation, as applicable. CONSULTANT shall submit with the first monthly report copies of all DBE subcontracts and purchase orders that have been entered into or issued in connection with the Agreement and shall submit with subsequent monthly reports copies of any such additional subcontracts or purchase orders. The monthly report shall include copies of all invoices submitted by each DBE during the reporting period. The District will verify with each DBE the amount actually paid to the DBE. No invoice will be approved for payment unless the current report and all required attachments have been furnished. DBE participation will not be counted toward CONSULTANT's DBE achievement until the DBE has been paid. Upon completion of the Agreement, a summary of these records shall be prepared and certified to be correct by CONSULTANT or its authorized representative, and shall be furnished to the District's Office of Civil Rights.

E.     Change Orders

CONSULTANT is encouraged to make good faith efforts to obtain DBE participation in the performance of the services under any Change Orders that may be issued under this Agreement. As used in this Article, "good faith efforts" to be undertaken by a CONSULTANT in connection with Change Orders are those that, given all relevant circumstances, a CONSULTANT actively and aggressively seeking to obtain DBE participation would make.

F.     Substitution of DBE Subconsultants or Suppliers

Should substitution of any DBE subconsultant or supplier become necessary, CONSULTANT shall, in cooperation with the Office of Civil Rights and subject to the approval of the District, replace the affected DBE with another DBE or show that it made good faith efforts to do so. As used in this Section, "good faith efforts" undertaken by a CONSULTANT in connection with these Agreement period activities requires the CONSULTANT to follow the good faith efforts criteria specified in Section G below. CONSULTANT shall provide completed DBE certification documents for each new DBE.

G.     Good Faith Efforts Regarding Substitution of DBE Subconsultants and Suppliers

Good faith efforts regarding substitution of DBE subconsultants and suppliers are those that, given all relevant circumstances, a CONSULTANT would make to ensure that DBEs have an equal opportunity to compete for and participate in the performance of this Agreement. The CONSULTANT must show it took all necessary and reasonable steps to maintain DBE participation which by their scope, intensity and appropriateness to the objective, could reasonably be expected to engage a certified DBE to substitute for a DBE that has to be replaced. Only those efforts made prior to the District's determination of a failure to comply with the DBE participation requirements will be considered for evaluation of good faith efforts. The CONSULTANT assumes responsibility for being informed and complying with this Agreement's DBE requirements.

In determining whether good faith efforts have been made, the District will consider the quality, quantity, and intensity of the different kinds of efforts that the CONSULTANT has made. The efforts employed by the CONSULTANT should be those that one could reasonably expect a CONSULTANT to take if the CONSULTANT were actively and aggressively trying to engage a certified DBE firm to substitute for a DBE firm that has to be replaced. Specifically, and without limitation, the District will consider, on the basis of documentation timely submitted by the CONSULTANT, whether the actions listed below have been taken. The District considers each of the listed steps particularly significant in evaluating a CONSULTANT's good faith efforts.

1.   Advertisements.   The CONSULTANT shall have in place advertisements soliciting proposals from DBEs for substitution of DBE subconsultants. Advertisements shall be in place for a reasonable period of time to allow DBEs to respond.  Such advertisements shall refer only to proposals for the District's Agreement and shall specify the categories of work for which subcontracting opportunities exist.  The advertisements shall be placed in three or more paid daily or weekly minority focus publications or media.  The advertisements shall be in publications or media that can be reasonably expected to reach both women and minority DBE firms that are likely to submit a proposal to the CONSULTANT.

2.   Selecting Portions of the Work for Subcontracting.   The CONSULTANT is encouraged to identify portions of the work it is willing to have performed by subconsultants in order to facilitate DBE participation and increase the likelihood that if a substitution is necessary, replacement DBE firms will be engaged.  This includes, where appropriate, breaking out work items under this Agreement into economically feasible units, even when the CONSULTANT might otherwise prefer to perform these work items with its own forces.

3.   Letters.

   a.   A CONSULTANT shall solicit proposals for additional work needed for substitution of DBE subconsultants by mailing registered or certified letters to DBE firms qualified to perform those categories of work which are needed.  Solicitation letters shall be mailed with sufficient time to allow DBEs to respond.  A sufficient number of letters shall be mailed to appropriate certified DBE firms for each category of work sought to be subcontracted based on the DBEs listed in the CUCP database for the category sought.  As used herein, "appropriate" refers to those firms performing work related to the scope of work of this Agreement.

   b.   The letters to certified DBE firms shall:

      (1)   Clearly identify portions of the work which the CONSULTANT is willing to have performed by subconsultants.

      (2)   Offer assistance with regard to insurance requirements, where applicable, and/or financing (e.g. lines of credit), specifying the type of assistance that the CONSULTANT is offering. Assistance may include, but is not limited to:

         (a)   Contacting insurance companies on behalf of DBEs.

         (b)   Paying for the cost of the insurance.

         (c)   Waiving insurance requirements

         (d)   Referring DBEs to Business Development Centers or other resource agencies, which may assist DBEs in obtaining insurance, or lines of credit.

      (3)   Offer to make plans and specifications available to DBEs at reasonable hours for viewing, copying, or borrowing.

      (2)   Offer assistance in obtaining necessary equipment, supplies, materials or related assistance or services.

(3)   Offer pertinent information about the requirements of this Agreement in order to assist DBEs in responding to the solicitation.

c.   The CONSULTANT is encouraged to use the CUCP database as a source of DBEs for solicitation.   The CONSULTANT may review the names and addresses of firms certified under the CUCP on the following website: www.bart.gov. In addition to the use of the CUCP database, the CONSULTANT is encouraged to use the services of minority and women community organizations and/or suppliers' groups, in order to identify certified DBEs for work under the Agreement. A listing of such organizations is available from the District's Office of Civil Rights.

4.   Follow-Up of Initial Solicitations.   The CONSULTANT shall follow-up initial solicitations of DBE proposals after the mailing of the initial solicitation letters. The follow-up shall be conducted by someone familiar with the Agreement. Such follow-up activity shall be documented by telephone logs or other written documentation which shall provide, at a minimum, the following information:

a.   Type of contact, e.g., telephone call, visit, letter.

b.   Name and position of person who made contact on behalf of the CONSULTANT.

c.   Name and address of firm contacted.

d.   Name and position of person contacted, telephone number, and date of contact.

e.   The response from the firm contacted with regard to its interest in submitting a proposal.

f.   Follow-up, if any, to the assistance offered in the initial solicitation letter with regard to breakdown of work into economically feasible units, insurance, lines of credit, and plans and specifications.

g.   For each DBE contacted who declined to submit a proposal, the reason provided by the DBE for declining to submit a proposal. If the reason cited relates to financing or insurance, the CONSULTANT must provide documentation describing in detail the assistance offered by the CONSULTANT to the DBE.

H.   Documentation of Responses from Interested DBEs.   The CONSULTANT shall submit records of responses, proposals received from DBEs, which shall include, at a minimum, the following information:

1.   Names, positions, addresses and telephone numbers of all DBEs that responded to the CONSULTANT's solicitation.

2.   All responses (including requests for assistance or information), proposals received, and whether such responses or proposals were in writing or verbal. In the case of written responses, copies of such responses.

3.   The date each response was received by the CONSULTANT.

I.    Negotiating in Good Faith with Interested DBEs.

    1.    Negotiating in good faith with interested DBEs. The CONSULTANT is encouraged to make a portion of the work available to DBEs and to select those portions of the work consistent with the available DBEs so as to facilitate DBE participation.

    2.    Use of good business judgment.   A CONSULTANT using good business judgment shall consider a number of factors in negotiating with DBEs and should take a firm's price and capabilities into consideration.   However, the fact that there may be some additional costs involved in finding and using DBEs is not in itself sufficient reason for a CONSULTANT's failure to substitute a DBE firm with another certified DBE firm, as long as such costs are reasonable.  Also, the ability or desire of the CONSULTANT to perform the work of an Agreement with its own organization does not relieve the CONSULTANT of the responsibility to make good faith efforts. The CONSULTANT is not, however, required to accept higher quotes from DBEs if the price difference is excessive or unreasonable.

J.    Not Unreasonably Rejecting DBEs as Unqualified.   It is the CONSULTANT's responsibility not to reject DBEs as being unqualified without sound reasons based on a thorough investigation of their capabilities.   The DBE's standing with the industry, membership in specific groups, organizations, or associations and political or social affiliations (for example union vs. non-union employee status) are not legitimate causes for the rejection or non-solicitation of proposals in the CONSULTANT's efforts to substitute DBE firms with certified DBE firms.

K.    CONSULTANT's Evaluation of Interested DBEs.   The CONSULTANT shall submit documentation of its evaluation of proposals received from DBEs.  For each DBE that responded to the CONSULTANT's solicitation, the CONSULTANT shall document the following:

    1.    A summary of all communications and negotiations, if any, between the CONSULTANT and the DBE.

    2.    A description of the information provided regarding the plans and specifications and other Agreement requirements.

    3.    A description of specific assistance agreed to be provided by the CONSULTANT to the DBE with regard to obtaining lines of credit, insurance, and obtaining services.

    4.    If the proposal was rejected, the reasons for rejection. The District may deem that a CONSULTANT has not made good faith efforts if DBE proposals have been rejected without adequate reason. Price alone will not be considered to be an adequate reason for rejection unless each of the following factors has been met on the basis of documentation submitted.

        a.    The CONSULTANT contacted the DBE firm and ascertained that the DBE fully understood the scope of the work and did not include work beyond the scope and/or overhead items already covered by the District, e.g. insurance for general liability and workers' compensation if the Agreement is covered under the District's Owner-Controlled Insurance Program.

        b.    In view of all relevant circumstances, the DBE rejected for price alone was significantly higher than other proposals received for the work.

5. If the DBE's proposal was rejected for any reason, a copy of the DBE's proposal along with copies of all proposals received by non-DBE firms for the same or similar scope of work.

6. If a DBE was rejected as unqualified, a description of the investigation conducted by the CONSULTANT prior to reaching the conclusion that the DBE was unqualified.

7. If applicable, evidence as to why additional agreements could not be reached for DBEs to perform the work.

L. Other Efforts. The CONSULTANT shall include in any report regarding substitution of DBE firms submitted to the District any other efforts made to meet the DBE requirements that are not listed above.

M. Prompt Payment

CONSULTANT shall promptly pay any and all subconsultants in accordance with Article 3.3, METHOD OF PAYMENT, of the Agreement.

N. Noncompliance

Failure to comply with the above requirements or failure to maintain the level of DBE participation offered in the RFP and incorporated into this Agreement, shall be grounds, at the discretion of the District, for termination of this Agreement in whole or in part, or, for withholding payments due the CONSULTANT during the period of noncompliance.

O. DBE Participation Enforcement Procedures

1. Within five (5) working days of CONSULTANT receiving a notice from the District that it has failed to meet the DBE requirements, and has failed to demonstrate sufficient good faith efforts to do so, CONSULTANT may request a hearing on reconsideration of the District's recommendation. Such hearing will be held at the convenience of the District but no later than ten (10) business days after receipt of the request and in accordance with the Office of Civil Rights Hearing Procedures, copies of which are available upon request. At such hearing, the CONSULTANT shall bear the burden of demonstrating:

    a. Compliance with the DBE participation requirements and reporting obligations; or

    b. Compliance with applicable good faith effort requirements listed herein regarding substitution of DBE subconsultants made prior to the District's determination of deficiency that, given all relevant circumstances, could have been expected to result in meeting the DBE participation requirements; or

    c. Compliance with the applicable good faith requirements related to Change Orders made prior to the District's determination of a deficiency, that given all relevant circumstances, could have been expected to result in meeting the DBE requirements.

ATTACHMENT G

UNITED STATES DEPARTMENT OF TRANSPORTATION (DOT)

FEDERAL TRANSIT ADMINISTRATION (FTA)

REQUIREMENTS

ATTACHMENT G

UNITED STATES DEPARTMENT OF TRANSPORTATION (DOT)

FEDERAL TRANSIT ADMINISTRATION (FTA)

REQUIREMENTS

G1   General.   In performance of its obligations pursuant to this Agreement, the CONSULTANT agrees to comply with all applicable provisions of federal, state, and local law, regulations, and FTA directives.   The terms of the most recent amendment to any federal, state or local laws, regulations, FTA directives, and amendments to the grant or cooperative agreement providing funding for this Agreement that may be subsequently adopted, are applicable to the Agreement to the maximum extent feasible, unless the FTA provides otherwise in writing.   The Federal or State regulations set forth in this Agreement to be observed in the performance of the Agreement are subject to change, and such changed requirements will apply to this Agreement as required. CONSULTANT shall include in its Subcontracts, and require its subconsultants of every tier to include in their respective subcontracts, provisions incorporating the requirements of this Attachment.   CONSULTANT's failure to comply with these requirements shall constitute a material breach of this Agreement and may, in addition to other remedies, result in the withholding of progress payments to the CONSULTANT.

G2   False or Fraudulent Statements and Claims.   CONSULTANT shall comply with the following requirements:

(a)   The requirements of the Program Fraud Civil Remedies Act of 1986, as amended, 49 U.S.C. §§ 3801 et seq. and U.S. DOT regulations, "Program Fraud Civil Remedies," 49 C.F.R. Part 31, apply to CONSULTANT's actions pertaining to the Professional Services Agreement.   Accordingly, by signing the Professional Services Agreement CONSULTANT certifies or affirms the truthfulness and accuracy of any statement it has made, it makes, or it may make pertaining to the underlying Professional Services Agreement.   If CONSULTANT makes a false, fictitious, or fraudulent claim, statement, submission, or certification, the Federal Government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986, as amended, on CONSULTANT to the extent the Federal Government deems appropriate.

(b)   If CONSULTANT makes a false, fictitious, or fraudulent claim, statement, submission, or certification to the Federal Government in connection with an urbanized area formula project financed with Federal assistance authorized by 49 U.S.C. § 5307, the Government reserves the right to impose on CONSULTANT the penalties of 18 U.S.C. § 1001 and 49 U.S.C. § 5307(n)(1), to the extend the Federal Government deems appropriate.

G3   Exclusionary or Discriminatory Specifications.   Apart from inconsistent requirements imposed by Federal statute or regulations, CONSULTANT shall comply with the requirements of 49 U.S.C. § 5323(h)(2) by refraining from using any Federal assistance awarded by FTA to support procurements using exclusionary or discriminatory specifications.

G4   No Federal Government Obligations to Consultant and Third Parties.   Absent the Federal Government's express written consent, the Federal Government shall not be subject to any obligations or liabilities to CONSULTANT, or any other third party in connection with the performance of the Agreement.   Notwithstanding any concurrence provided by the Federal Government in or approval of any solicitation, contract, or subagreement, the Federal Government continues to have no obligations or liabilities to any party, including the CONSULTANT.

G5   Geographic Restrictions. CONSULTANT shall refrain from using state or local geographic preferences, except those expressly mandated or encouraged by Federal statute, and as permitted by BART.

G6   Reporting, Record Retention and Access. CONSULTANT shall comply with the following requirements:

     (a)   Record Retention. CONSULTANT shall, during the course of the Agreement and for three years after final payment, maintain intact and readily accessible all data, documents, reports, records, contracts, and supporting materials relating to the Agreement as BART may require.

     (b)   Access to Records. CONSULTANT shall permit BART, the Secretary of Transportation and the Comptroller General of the United States, or their authorized representatives, to inspect all Project work, materials, payrolls, and other data, and to audit the books, records, and accounts of CONSULTANT and its subconsultants pertaining to the Agreement. In accordance with 49 U.S.C. § 5325(a), CONSULTANT shall require each subconsultant to permit BART, the Secretary of Transportation and the Comptroller General of the United States, or their duly authorized representatives, to inspect all work, materials, payrolls, and other data and records involving that subconsultant agreement and to audit the books, records, and accounts involving that subconsultant agreement as it affects the Agreement.

G7   Debarment and Suspension. CONSULTANT shall comply with the following requirements:

     (a)   CONSULTANT shall comply with the requirements of Executive Orders Nos. 12549 and 12689, "Debarment and Suspension," 31 U.S.C. § 6101 note; and U.S. DOT regulations on Debarment and Suspension at 49 C.F.R. Part 29.

     (b)   CONSULTANT shall refrain from entering into any subconsultant agreement of any amount with a party included in the "U.S. General Services Administration's (U.S. GSA) List of Parties Excluded from Federal Procurement or Nonprocurement Programs," implementing Executive Orders Nos. 12549 and 12689, "Debarment and Suspension" and 49 C.F.R. Part 29. The list also includes the names of parties debarred, suspended, or otherwise excluded by agencies, and contractors declared ineligible for contract award under statutory or regulatory authority other than Executive Order Nos. 12549 and 12689.

     (c)   Before entering into any subagreement with a subconsultant, CONSULTANT shall obtain a debarment and suspension certification from each prospective subconsultant containing information about the debarment and suspension status and other specific information about the subconsultant and its "principals," as defined at 49 U.S.C. § 29.105(p). An example of the appropriate certification is contained in 49 C.F.R. Part 29, Appendix A.

     (d)   CONSULTANT shall require each subconsultant to refrain from awarding any subagreement of any amount (at any tier) to a debarred or suspended subconsultant, and to obtain a similar certification from any subconsultant (at any tier) seeking a subagreement exceeding $100,000. An example of the appropriate certification is contained in 49 C.F.R. Part 29, Appendix B.

G8   Buy America. CONSULTANT shall comply with 49 U.S.C. § 5323(j), FTA's Buy America regulations at 49 C.F.R. Part 661, and any amendments thereto, and any implementing guidance issued by FTA.

G9    Certification Regarding Lobbying. This Agreement is subject to the requirements of 31 U.S.C. Section 1352, as amended by the Lobbying Disclosure Act of 1995, P.L. 104-65 (to be codified at 2 U.S.C. Section 1601, et seq.) and U.S. DOT Regulations "New Restrictions on Lobbying" 49 C.F.R. Part 20. CONSULTANT shall require that the "Certification Regarding Lobbying" set out in Appendix A to those Regulations and in the Bid Form be executed by its Subconsultants or subsuppliers of any tier receiving an amount in excess of $100,000 under this Agreement and shall require such Subconsultants and subsuppliers to forward such certifications to CONSULTANT, and CONSULTANT shall forward such certifications and any disclosure forms to the District. CONSULTANT and Subconsultants of each tier certifies that it will not or has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any Federal department or agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any Federal contract, grant or any other award covered by 31 U.S.C. Section 1352. CONSULTANT and Subconsultants shall disclose the name of any registrant under the Lobbying Disclosure Act of 1995 who has made lobbying contacts on its behalf with non-federal funds with respect to that Federal contract, grant or award covered by 31 U.S.C. Section 1352. Such disclosures shall be forwarded from tier to tier to the District.

G10   Air Quality. CONSULTANT shall comply with the following requirements:

   (a)   CONSULTANT shall comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq. Specifically:

      (1)   CONSULTANT shall comply with applicable requirements of U.S. EPA regulations, "Conformity to State or Federal Implementation Plans of Transportation Plans, Programs, and Projects Developed, Funded or Approved Under Title 23 U.S.C. or the Federal Transit Act," 40 C.F.R. Part 51, Subpart T; and "Determining Conformity of Federal Actions to State or Federal Implementation Plans," 40 C.F.R. Part 93.

   (b)   CONSULTANT shall report and require each subconsultant at any tier to report any violation of these requirements resulting from any Agreement implementation activity of CONSULTANT or subconsultant to FTA and the appropriate U.S. EPA Regional Office.

G11   Clean Water. CONSULTANT shall comply with the following requirements:

   (a)   CONSULTANT shall comply with all applicable standards, orders, or regulations issued pursuant to the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251 et seq.

   (b)   CONSULTANT shall report and require each subconsultant at any tier to report any violation of these requirements resulting from any Project implementation activity of a subconsultant or itself to FTA and the appropriate U.S. EPA Regional Office.

G12   Disadvantaged Business Enterprise.   CONSULTANT shall take the following measures to facilitate participation by disadvantages business enterprises (DBE) in the Agreement:

   (a)   CONSULTANT shall comply with current U.S. DOT regulations on DBE participation in U.S DOT financial assistance programs, at 49 C.F.R. Part 26. CONSULTANT shall take all necessary and reasonable steps required by U.S. DOT regulations to ensure that eligible DBEs have an equal opportunity to

compete for and participate in subagreements financed with Federal assistance awarded by U.S. DOT.

(b) CONSULTANT shall not discriminate on the basis of race, color, national origin, or sex in the award and performance of a subagreement financed with Federal assistance derived from the U.S. DOT.

(c) CONSULTANT must promptly pay subconsultants for satisfactory performance of their contracts.

G13  Americans with Disabilities Act. CONSULTANT shall comply with all applicable requirements of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 et seq.; section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; 49 U.S.C. § 5301(d); and the following Federal regulations including any amendments thereto:

(a) U.S. DOT regulations, "Transportation Services for Individuals with Disabilities (ADA)," 49 C.F.R. Part 37;

(b) U.S. DOT regulations, "Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance," 49 C.F.R. Part 27;

(c) U.S. DOT regulations, "Americans with Disabilities (DA) Accessibility Specifications for Transportation Vehicles," 49 C.F.R. Part 38;

(d) U.S. DOT regulations, "Nondiscrimination on the basis of Disability in State and Local Government Services," 28 C.F.R. Part 35;

(e) U.S. Department of Justice (DOJ) regulations, "Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities," 28 C.F.R. Part 36;

(f) U.S. General Services Administration (GSA) regulations, "Accommodations for the Physically Handicapped," 41 C.F.R. Subpart 101-19;

(g) U.S. Equal Employment Opportunity Commission, "Regulations to implement the Equal Employment Provisions of the Americans with Disabilities Act," 29 C.F.R. Part 1630;

(h) U.S. Federal Communications Commission regulations, "Telecommunications Relay Services and Related Customer Premises Equipment for the Hearing and Speech Disabled," 47 C.F.R. Part 64, Subpart F;

(i) FTA regulations, "Transportation for Elderly and Handicapped Persons," 49 C.F.R. Part 609; and

(j) Any implementing requirements FTA may issue.

G14  Preference for Recycled Products. To the extent practicable and economically feasible, CONSULTANT shall use recycled products pursuant to U.S. Environmental Protection Agency (U.S. EPA) guidelines at 40 C.F.R. Parts 247-253, which implement section 6002 of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6962.

G15  Equal Employment Opportunity. CONSULTANT shall comply with the following equal employment opportunity (EEO) requirements:

(a) General Requirements. CONSULTANT shall not discriminate against any employee or applicant for employment because of race, color, creed, sex, disability, age, or national origin. CONSULTANT shall take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, creed, sex, disability, age, or national origin. Such action shall include, but not be limited to, the following employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. CONSULTANT shall also comply with any implementing requirements FTA may issue.

G16 Civil Rights. CONSULTANT shall comply with the following requirements:

(a) Compliance with Regulations. CONSULTANT shall comply and assure compliance by its subconsultants of any tier with all of the requirements of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, 49 U.S.C. § 5332, and with the Regulations relative to nondiscrimination in federally-assisted programs of the United States Department of Transportation (hereinafter called "DOT") Title 49, Code of Federal Regulations, Part 21, as they may be amended from time to time (hereinafter referred to as "Regulations"), which are herein incorporated by reference and made a part of this Agreement.

(b) Nondiscrimination. CONSULTANT, with regard to the work performed by it during this Agreement, shall not discriminate on the grounds of race, color, sex or national origin in the selection and retention of subconsultants, including procurement of materials and leases of equipment. CONSULTANT shall not participate either directly or indirectly in the discrimination prohibited by Section 21.5 of the Regulations, including employment practices when the Agreement covers a program set forth in Appendix B of the Regulations.

(c) Solicitations for Subcontracts, Including Procurement of Materials and Equipment. In all solicitations either by competitive bidding or negotiation made by CONSULTANT for work to be performed under a subcontract, including procurement of materials or leases of equipment, each potential subconsultant or supplier shall be notified by CONSULTANT of CONSULTANT's obligations under this Agreement and the Regulations relative to nondiscrimination on the grounds of race, color, sex or national origin,

(d) Information and Reports. CONSULTANT shall provide all information and reports required by the Regulations or directives issued pursuant thereto, and shall permit access to its books, records, accounts, other sources of information and its facilities as may be determined by BART or the Federal Transit Administration (hereinafter called "FTA") to be pertinent to ascertain compliance with such Regulations, orders and instructions. Where any information required of CONSULTANT is in the exclusive possession of another who fails or refuses to furnish this information, CONSULTANT shall so certify to BART, or FTA, as appropriate, and shall set forth what efforts it has made to obtain the information.

(e) Sanctions for Noncompliance. In the event of CONSULTANT's noncompliance with the nondiscrimination provisions of this Agreement, BART shall impose such Agreement sanctions as it or FTA may determine to be appropriate, including, but not limited to:

    (1) Withholding of payments to CONSULTANT under the Agreement until CONSULTANT complies, and/or

    (2) Cancellation, termination or suspension of the Agreement, in whole or in part.

(f) Incorporation of Provisions. CONSULTANT shall include the provisions of paragraphs (a) through (f) in every subcontract, including procurement of materials and leases of equipment, unless exempt by the Regulations, or directives issued pursuant thereto. CONSULTANT shall take such action with respect to any subcontract or procurement as BART or FTA may direct as a means of enforcing such provisions including sanctions for noncompliance, provided, however, that, in the event CONSULTANT becomes involved in, or is threatened with, litigation with a subconsultant or supplier as a result of such direction, CONSULTANT may request BART to enter into such litigation to protect the interests of BART and, in addition, CONSULTANT may request the United States to enter into such litigation to protect the interests of the United States.

G17 Employee Protection Requirements. CONSULTANT shall comply with section 102 of the Contract Work Hours and Safety Standards Act, as amended, 40 U.S.C. §§ 327 through 332, and shall ensure that the wages of every mechanic and laborer will be computed on the basis of a standard work week of 40 hours, and that each worker will be compensated for work exceeding the standard work week at a rate of not less than 1.5 times the basic rate of pay for all hours worked in excess of 40 hours in the work week. CONSULTANT shall comply with the determinations pertaining to these requirements that may be made in accordance with applicable U.S. Department of Labor (DOL) regulations, "Labor Standards Provisions Applicable to Contracts Governing Federally Financed and Assisted Construction (also Labor Standards Provisions Applicable to Nonconstruction Contracts Subject to the Contract Work Hours and Safety Standards Act)," 29 C.F.R. Part 5.

G18 Fair Labor Standards Requirements. CONSULTANT shall comply with the minimum wage and overtime provisions of the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 206 and 207, which apply to employees performing work under the Agreement.

G19 Seismic Safety. CONSULTANT shall comply with the requirements of U.S. DOT regulations applicable to seismic safety requirements for U.S. DOT assisted construction projects at 49 C.F.R. Part 41, (specifically, 49 C.F.R. Part 41.117), and any implementing guidance FTA may issue, to the acquisition of any new building and to additions to any existing building.

G20 Patent Rights.

(a) General. If any invention, improvement, or discovery of CONSULTANT or any of its subconsultants is conceived or first actually reduced to practice and paid for in the course of or under the Agreement, and that invention, improvement, or discovery is patentable under the laws of the United States of America or any foreign country, CONSULTANT shall notify BART immediately and provide a detailed report.

(b) Federal Rights. Unless the Federal Government later makes a contrary determination in writing, the rights and responsibilities of BART, CONSULTANT, subconsultant and the Federal Government pertaining to that invention, improvement, or discovery will be determined in accordance with applicable Federal laws, regulations, including any waiver thereof. Unless the Federal Government later makes a contrary determination in writing, CONSULTANT agrees that, irrespective of its status or the status of any subconsultant or any subconsultant at any tier, CONSULTANT shall transmit to FTA those rights due the Federal Government in any invention resulting from this Agreement and as further described in U.S. Department of Commerce regulations, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under

Government Grants, Contracts and Cooperative Agreements," 37 C.F.R. Part 401.

(c) Restrictions on Access to Patent Rights. Nothing contained in this section shall imply a license to the Government under any patent or be construed as affecting the scope of any license or other right otherwise granted to the Government under any patent.

G21 Federal Rights in Data and Copyrights:

(a) Definition. The term "subject data" used in this section means recorded information, whether or not copyrighted, that is delivered or specified to be delivered under the Agreement. The term includes graphic or pictorial delineation in media such as drawings or photographs; text in specifications or related performance or design-type documents; machine forms such as punched cards, magnetic tape, or computer memory printouts; and information retained in computer memory. Examples include, but are not limited to: computer software, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identifications, and related information. The term does not include financial reports, cost analyses, and similar information incidental to Project administration.

(b) Federal Restrictions. The following restrictions apply to all subject data first produced in the performance of this Agreement:

(1) . Except for its own internal use, the CONSULTANT may not publish or reproduce subject data in whole or in part, or in any manner or form, nor may the CONSULTANT authorize others to do so, without the written consent of the Government, until such time as the Government may have either released or approved the release of such data to the public.

(c) Federal Rights in Data and Copyrights. In accordance with 49 C.F.R. § 18.34 and 49 C.F.R. § 19.36, the Government reserves a royalty-free, non-exclusive and irrevocable license to reproduce, publish, or otherwise use, and to authorize others to use, for Federal Government purposes:

(1) Any subject data developed under a grant, or under cooperative agreement, or under a third party contract or subcontract, irrespective of whether or not a copyright has been obtained; and

(2) Any rights of copyright to which CONSULTANT purchases ownership with Federal assistance.

(d) Special Federal Rights. CONSULTANT understands and agrees that, in addition to the rights set forth in Article (c) above, FTA may make available to any FTA recipient, subrecipient, third party CONSULTANT, or third party Subconsultant, either FTA's license in the copyright to the subject data derived under this Agreement or a copy of the subject data first produced under this Agreement. In the event that the CONSULTANT is not completed for any reason whatsoever, all data developed under the Agreement shall become subject data as defined in Article (a) above and shall be delivered as the District or Government may direct. This Article (d), however, does not apply to adaptations of automatic data processing equipment or programs for the CONSULTANT's use.

(e) Hold Harmless. Unless prohibited by state law, the CONSULTANT agrees to indemnify, save, and hold harmless the district, the Government, its officers, agents, and employees acting within the scope of their official duties against any liability, including costs and expenses, resulting from any willful or intentional

violation by the CONSULTANT of proprietary rights, copyrights, or right of privacy, arising out of the publication, translation, reproduction, delivery, use, or disposition of any data furnished under this Agreement. The CONSULTANT shall not be required to indemnify the Federal Government for any such liability arising out of the wrongful acts of employees or agents of the Government.

(f)   Application to Material Incorporated into the Agreement. The requirements of Articles (b), (c) and (d) above do not apply to material furnished to the CONSULTANT by the Government and incorporated in the Work carried out under the Agreement; provided that such incorporated material is identified by the CONSULTANT at the time of delivery of such Work.

G22   Energy Conservation. CONSULTANT shall comply with the mandatory energy efficiency standards and policies within the applicable state energy conservation plans issued in compliance with the Energy Policy and Conservation Act, 42 U.S.C. § 6321 et seq.

G23   Metric System. To the extent required by U.S. DOT or FTA, CONSULTANT shall use the metric system of measurement in its Agreement, as may be required by 49 U.S.C. §§ 205a et seq.; Executive Order No. 12770, "Metric Usage in Federal Government Programs," 15 U.S.C. § 205a note; and other regulations, guidelines, and policies issued by U.S. DOT or FTA. To the extent practicable and feasible, CONSULTANT shall accept products and services with dimensions expressed in the metric system of measurement.

G24   Privacy.

(a)   CONSULTANT shall comply with, as assures the compliance of its employees with, the information restrictions and other applicable requirements of the Privacy Act of 1974, 5 U.S.C. § 552a. Among other things, CONSULTANT agrees to obtain the express consent of the Federal Government before CONSULTANT or its employees operate a system of records on behalf of the Federal Government. CONSULTANT understands that the requirements of the Privacy Act, including the civil and criminal penalties for violation of that Act, apply to those individuals involved, and that failure to comply with the terms of the Privacy Act may result in termination of the underlying Agreement.

(b)   CONSULTANT shall also include these requirements in each subagreement to administer any system of records on behalf of the Federal Government financed in whole or in part with Federal assistance provided by FTA.

G25   Support of Agreement Costs. All costs charged to the Agreement shall be supported by properly executed payrolls, time records, invoices, contracts or vouchers evidencing in proper detail the nature and propriety of the charges. The CONSULTANT shall permit the Government's authorized representatives to inspect all payrolls, records of personnel, invoices of materials and other relevant data and records, and to audit its books, records and accounts.

G26   Fly America. CONSULTANT shall comply with 49 U.S.C. 40118 (the "Fly America" Act) in accordance with the General Services Administration's regulations at 41 CFR Part 301-10, which provide that recipients and subrecipients of Federal funds and their CONSULTANTS are required to use U.S. Flag air carriers for U.S. Government-financed international air travel and transportation of their personal effects or property, to the extent such service is available, unless travel by foreign air carrier is a matter of necessity, as defined by the Fly America Act. The CONSULTANT shall submit, if a foreign air carrier was used, an appropriate certification or memorandum adequately explaining why service by a U.S. flag air carrier was not available or why it was necessary to use a foreign air carrier and shall, in any event, provide a certificate of compliance with the Fly America requirements. The CONSULTANT agrees to include

the requirements of this section in all subcontracts that may involve international air transportation.

G27   Environmental Protection.   CONSULTANT shall comply with the following requirements:

(a)   CONSULTANT shall comply with all applicable requirements of the National Environmental Policy Act of 1969, as amended, 42 U.S.C. §§ 4321 et seq. consistent with Executive Order No. 11514, as amended, "Protection and Enhancement of Environmental Quality," 42 U.S.C. § 4321 note; FTA statutory requirements on environmental matters at 49 U.S.C. § 5324(b); Council on Environmental Quality regulations on compliance with the National Environmental Policy Act of 1969, as amended, 40 C.F.R. Part 1500 et seq.; and joint FHWA/FTA regulations, "Environmental Impact and Related Procedures," 23 C.F.R. Part 771 and 49 C.F.R. Part 622.

(b)   CONSULTANT shall report and require each subconsultant at any tier to report any violation of these requirements resulting from any Contract activity of CONSULTANT or subconsultant to FTA and the appropriate U.S. EPA Regional Office.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

EXHIBIT "B"

MARK F. HAZELWOOD, State Bar No. 136521
mhazelwood@aghwlaw.com
DALE L. ALLEN, JR., State Bar No. 145279
dallen@aghwlaw.com
KIMBERLY Y. CHIN, State Bar No. 271333
kchin@aghwlaw.com
ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:    (415) 697-2000
Facsimile:    (415) 813-2045

Attorneys for Defendant/Cross-Complainant
SAN FRANCISCO BAY AREA RAPID TRANSIT
DISTRICT erroneously sued as BAY AREA RAPID
TRANSIT DISTRICT

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| AMBER DANIELS, SARAH DANIELS and CHARLES O. McCOMISH as personal representative to the Estate of Laurence E. Daniels,<br><br>Plaintiffs,<br><br>v.<br><br>BAY AREA RAPID TRANSIT DISTRICT and DOES 1-25, inclusive,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTION. | Case No.: RG14725711<br><br>ASSIGNED FOR ALL PURPOSES TO Judge Gail Brewster Bereola DEPARTMENT 19<br><br>CERTIFICATE OF MERIT IN SUPPORT OF CROSS-COMPLAINT OF DEFENDANT BAY AREA RAPID TRANSIT DISTRICT |

I, Mark F. Hazelwood, declare as follows:

1.      I am attorney at law duly licensed to practice before all courts of the State of California and am a partner with the law firm of Allen, Glaessner, Hazelwood & Werth, attorneys of records for Defendant and Cross-Complainant Bay Area Rapid Transit District in the above-referenced matter. If called upon to testify to the facts contained herein, I could testify competently thereto.

1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

37635.1

2.      I am the primary attorney for BARTD in this matter. I have reviewed the facts of the case and have consulted with and received an opinion from a professional engineer, who is licensed to practice in the State of California. This engineer is experienced in the operation of transit systems, such as BARTD.  Based on my understanding, I reasonably believe that the engineer is knowledgeable on the issues involved in this particular case.

3.      On the basis of this review by the engineering consultant, and based upon my entire review of this matter, I believe that there is a reasonable and meritorious cause for the filing of the cross-complaint against Anil Verma Associates. Specifically, the engineering consultant has concluded that decedent Laurence Daniels was negligent in the performance of his duties, when inspecting the tracks of the BARTD system at the time of the subject accident. Specifically, Mr. Daniels did not follow the "Simple Approval" procedure in which he was informed and trained. Mr. Daniels was working as a sub-consultant to Anil Verma Associates, in furtherance of Anil Verma's contract with BARTD, at the time of the subject accident.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 12th day of January 2015 at San Francisco, California.

MARK F. HAZELWOOD

CERTIFICATE OF MERIT IN SUPPORT OF CROSS-COMPLAINT OF DEFENDANT BAY AREA RAPID TRANSIT DISTRICT

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

37635.1

# Exhibit C

AGREEMENT

Between

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

And

ANIL VERMA ASSOCIATES

TO PROVIDE

GENERAL ENGINEERING SERVICES

FOR

BART PROJECTS

BART AGREEMENT NO. 6M8043

2011

- CONFORMED -

5.3   FORCE MAJEURE

The performance of work under this Agreement may be terminated by BART, in its discretion, upon application therefor by CONSULTANT for unforeseen causes beyond the control and without the fault or negligence of CONSULTANT, including acts of God, acts of the public enemy, governmental acts, fires and epidemics if such causes irrevocably disrupt or render impossible CONSULTANT's performance hereunder. An "act of God" shall mean an earthquake, flood, cyclone, or other cataclysmic phenomenon of nature beyond the power of CONSULTANT to foresee or make preparation in defense against.

6.0   INSURANCE

At all times during the life of this Agreement to acceptance of the work covered by the Agreement, or as may be further required by the Agreement, CONSULTANT, at its own cost and expense, shall provide the insurance specified in this Article 6.0, unless otherwise approved in advance and in writing by the District's Department Manager, Insurance.

A.   Evidence Required

At or before execution of this Agreement and at such other times as the District may request, CONSULTANT shall provide the District with Certificate(s) of Insurance executed by an authorized representative of the insurer(s) evidencing the CONSULTANT's compliance with the insurance requirements in this Article 6.0. The Certificate(s) shall reference the District's Agreement Number and Title to which the Certificate relates. In addition, a copy of all required endorsements shall be included with and attached to the Certificate(s) of Insurance.

B.   Notice of Cancellation, Reduction or Material Change in Coverage

All policies shall be endorsed to provide the District with thirty (30) days prior written notice of any cancellation, reduction, or material change in coverage. Notices shall be sent to the Department Manager, Insurance, San Francisco Bay Area Rapid Transit District, P.O. Box 12688, Oakland, California, 94604-2688. The CONSULTANT shall annually submit to the District's Department Manager, Insurance, certifications confirming that the insurance required has been renewed and continues in place.

C.   Qualifying Insurers

Policies shall be issued by California admitted companies which hold a current policyholders alphabetic and financial size category rating of not less than A:VIII according to Best's Insurance Reports.

D.   Insurance Provided by CONSULTANT

1.   Commercial General Liability Insurance for bodily injury (including death) and property damage which provides limits of Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars ($5,000,000) annual general aggregate.

a.   Coverage shall include:

(1)   Premises and Operations;
(2)   Broad Form Property Damage;
(3)   Products and Completed Operations;
(4)   Broad Form Contractual liability, expressly including liability assumed under the Agreement;

      (5)     Personal Injury Liability;
      (6)     Independent Contractors Liability;
      (7)     Cross Liability and Severability of Interest.

b.    Such insurance shall include the following endorsements, copies of which shall be provided to the District:

      (1)     Inclusion of the District, its directors, officers, representatives, agents and employees as additional insured as respects to CONSULTANT's operations under this Agreement; and

      (2)     Stipulation that the insurance is primary insurance and that no insurance or self-insurance of the District will be called upon to contribute to a loss

2.    Automobile Liability Insurance for bodily injury (including death) and property damage which provides limits of liability of not less than One Million Dollars ($1,000,000) combined single limit per occurrence applicable for all owned, non-owned and hired vehicles.

3.    Workers' Compensation/Employers' Liability Insurance for Statutory Workers' Compensation and Employers' Liability Insurance for not less than One Million Dollars $1,000,000 per accident applicable to Employers' Liability coverage for all employees engaged in services or operations under this Agreement. The policy shall include Broad Form All States/Other States coverage. Coverage shall be specifically endorsed to include the insurer's waiver of subrogation in favor of the District, its directors, officers, representatives, agents and employees; a copy of which shall be provided to the District. Should any such work be subcontracted, CONSULTANT shall require each subconsultant of any tier to similarly comply with this Article 6.0, all in strict compliance with Federal and State law.

4.    Professional Liability Insurance for damages arising out of CONSULTANT's acts, errors or omissions. The policy shall provide a coverage limit of not less than Five Million Dollars ($5,000,000) per claim/aggregate as respects CONSULTANT's services provided under this Agreement. Such insurance shall be maintained for a period of not less than two (2) years following completion of services.

F.    Special Provisions

    1.    The foregoing requirements as to the types and limits of insurance coverage to be maintained by CONSULTANT, and any approval of said insurance by the District is not intended to and shall not in any manner limit or qualify the liabilities and obligations otherwise assumed by CONSULTANT pursuant to this Agreement including but not limited to the provisions concerning indemnification.

    2.    The District acknowledges that some insurance requirements contained in this article may be fulfilled by a funded self-insurance program of CONSULTANT. However, this shall not in any way limit liabilities assumed by CONSULTANT under this Agreement. Any self-insurance program must be approved in writing by the District.

    3.    Should any of the work under this Agreement be subcontracted, CONSULTANT may impose these requirements upon each of its subconsultant(s) of any tier at its own discretion.

4.  The District reserves the right to withhold payments to CONSULTANT in the event of material noncompliance with the insurance requirements of this Article 6.0.

5.  The District reserves the right to terminate this Agreement in the event of material noncompliance with the insurance requirements of this Article 6.0.

## 7.0   INDEPENDENT CONTRACTOR

CONSULTANT is an independent contractor and not an employee or agent of BART and has no authority to contract or enter into any other agreement in the name of BART. CONSULTANT has, and hereby retains, full control over the employment, direction, compensation and discharge of all persons employed by CONSULTANT who are assisting in the performance of services under this Agreement. CONSULTANT shall be fully responsible for all matters relating to the payment of its employees, including compliance with social security, withholding tax and all other laws and regulations governing such matters. CONSULTANT shall be responsible for its own acts and those of its agents and employees during the term of this Agreement.

In its capacity as an independent contractor, CONSULTANT shall comply with any and all BART operations rules and procedures which relate to the performance of its services on BART property. Prior to commencing services, the Agreement Manager may loan CONSULTANT a copy of the District's Operations Rules and Procedures which shall be returned upon the completion or termination of CONSULTANT's services hereunder.

## 7.1   CONFLICT OF INTEREST

CONSULTANT, its subconsultants and suppliers shall perform all work under this Agreement in conformance with all applicable statutes and regulations pertaining to conflicts of interest, including but not limited to, the financial reporting requirements and the conflict prohibitions of federal law (see, e.g., Federal Transit Administration Circular 4220.1F, Third Party Contracting Guidance) and California law (see, e.g., Government Code Section 1090 et seq., Government Code Section 87100 et seq. and Title 2, Division 6 of the California Code of Regulations).

When, in the judgment of BART, it is necessary in order to avoid any potential conflicts of interest, CONSULTANT, its subconsultants and suppliers may be precluded from subsequently participating as a vendor or contractor on projects for which they are providing services under this Agreement.

## 8.0   INDEMNIFICATION

CONSULTANT to the extent permitted by law, shall defend, indemnify and hold harmless BART, its directors, officers, agents and employees from all claims, demands, suits, loss, damages, injury and liability, direct or indirect (including reasonable attorney's fees, and any and all costs and expenses in connection therewith), incurred by reason of any act, or failure to act, of CONSULTANT, its officers, agents, employees and subconsultants or any of them, under or in connection with this Agreement; and CONSULTANT agrees at its own cost, expense and risk to defend any and all claims, actions, suits, or other legal proceedings brought or instituted against BART, its directors, officers, agents and employees, or any of them, arising out of CONSULTANT's services, and to pay and satisfy any resulting judgments.

Such indemnification includes without limitation any violation of proprietary rights, copyrights and rights of privacy, arising out of the publication, translation, reproduction, delivery, use or disposition of any data furnished under this Agreement.

9.0 WARRANTY OF SERVICES, MATERIAL NONCOMPLIANCE BY CONSULTANT, RESPONSIBILITY FOR SERVICES AND DESIGN WITHIN FUNDING LIMITATIONS

9.1 WARRANTY OF SERVICES

    A.    Warranty

        CONSULTANT warrants that its consulting services will be performed in accordance with the standards imposed by law upon professional engineering service firms performing engineering services of a similar nature at the time such services are rendered. In addition CONSULTANT shall provide such specific warranties as may be set forth in individual WPs as agreed upon by the parties.

    B.    Re-performance

        In the event that any services provided by CONSULTANT hereunder are deficient because of CONSULTANT's or a subconsultant's failure to perform said services in accordance with the warranty standards set forth above, BART shall report such deficiencies in writing to CONSULTANT within a reasonable time. BART thereafter shall have:

        1.     The right to have CONSULTANT re-perform such services at CONSULTANT's own expense, or

        2.     The right to have such services done by others and the costs thereof charged to and collected from CONSULTANT if, within thirty days after written notice to CONSULTANT requiring such reperformance, CONSULTANT fails to give evidence satisfactory to BART that it has undertaken such reperformance.

    C.    Re-performed Services

        If CONSULTANT is required to correct or re-perform any services as provided in Article 9.1 B.1. (immediately above), any services corrected or re-performed by CONSULTANT shall be subject to this Article 9.1 to the same extent as work initially performed.

9.2 MATERIAL NONCOMPLIANCE BY CONSULTANT

    BART reserves the right to withhold payments to CONSULTANT in the event of CONSULTANT's material noncompliance with Articles 8.0, INDEMNIFICATION, and 9.0, WARRANTY OF SERVICES, MATERIAL NONCOMPLIANCE BY CONSULTANT, RESPONSIBILITY FOR SERVICES AND DESIGN WITHIN FUNDING LIMITATIONS, above.

9.3 RESPONSIBILITY FOR SERVICES

    The CONSULTANT shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the CONSULTANT under this Agreement. Neither BART's review, approval or acceptance of, nor payment for, the services required under this Agreement shall be construed to operate as a waiver of any rights under this Agreement. In the event that any services provided by CONSULTANT hereunder are deficient because of CONSULTANT's failure to perform said

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first written above.


SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT        (NAME OF CONSULTANT)


By General Manager
(or designee)                                        By (Signature)


                                                     Name
                                                     and
                                                     Title _Anil Verma_____
                                                             Print or Type


Agreement No. 6M8043
September 2011

Agreement for Consulting Services
Page 30 of 30

Exhibit D

# ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP

ATTORNEYS

180 Montgomery Street, Suite 1200
San Francisco, California 94104

Telephone (415) 697-2000
Facsimile (415) 813-2045
E-Mail mhazelwood@aghwlaw.com

Our File No.:
01752-00237

February 18, 2014

Anil Verma Associates
1970 Broadway, Suite 668
Oakland, CA 94612

Re:   Claim of Family of Laurence Daniels

Dear Gentlepersons:

The undersigned has been assigned to represent the San Francisco Bay Area Rapid Transit District (BART) with respect to a claim brought by the family of Laurence Daniels, who was killed during a tragic accident that occurred on October 19, 2013. At the time of the accident, Mr. Daniels was reportedly inspecting the condition of tracks between the Walnut Creek and Pleasant Hill BART stations.

It is our understanding that at the time of the accident, Mr. Daniels was working as a sub-contractor for your company under the BART-Anil Verma Professional Service Agreement – 6M8043, which included track inspection.

Under the terms of the Agreement, Anil Verma Associates was to obtain commercial general liability insurance naming BART as an additional insured. CGL coverage was to include personal injury liability and independent contractor's liability. (Section 6.0(d).) Within the same agreement, Anil Verma Associates agreed to defend, indemnify and hold harmless BART "from all claims, demands, suits, loss, damages, injury and liability, direct or indirect (including reasonable attorneys' fees, and any all costs and expenses in connection therewith), incurred by reason of any act, or failure to act," of Anil Verma Associates and its agents, employees, and sub-consultants. (Section 8.0) Enclosed with this letter is a complete copy of the Consulting Services Agreement Number 6M8043, as well as a Certificate of Liability Insurance naming BART as an additional insured. We also enclose the claim presented by the Daniels family to BART, which has now been rejected.

Based on the foregoing, BART hereby tenders defense and indemnity of this matter to Anil Verma Associates. We ask that you or your insurance company respond to this letter within the next ten days. Please be advised that if Anil Verma Associates fails to accept the tender of defense and indemnity, we will have no choice but to pursue legal action, which will include a claim for attorneys' fees and costs.

1895.1

Claim of Family of Laurence Daniels
February 18, 2014
Page 2

Thank you for your anticipated courtesy and cooperation.

Very truly yours,

ALLEN, GLAESSNER,
HAZELWOOD & WERTH, LLP

Mark F. Hazelwood

MFH/dc
cc:   Terri Hodges
      Steve Shatz
      Tom Lee, Esq.

1895.1

Exhibit E



Joe Tancredy
Sr. Technical Specialist
Travelers Property Casualty Company of
America
P.O. Box 8106
Walnut Creek, CA 94596-8106
Phone (925) 746-3983
Fax (877) 801-9679

May 13, 2014

Allen, Glaessner, Hazelwood & Werth, LLP
Mr. Mark F. Hazelwood
180 Montgomery St., Suite 1200
San Francisco, CA 94104

RE:   Case Name:        <u>Claim of Family of Laurence Daniels</u>
      Our Insured:       Anil Verma Associates, Inc.
      Your Clients:      San Francisco Bay Area Rapid Transit District (BART)
      Our Claim No.:     EXQ9767
      Your File No.:     01752-00237
      Claimant:          Amber Daniels
      Date of Loss:      10/19/2013

Dear Mr. Hazelwood:

In response to your client's tender regarding the above-captioned claim, we have reviewed the
documents and information that have been forwarded to date and discussed the matter with our
Insured. However, based on all the documents and information that have been provided, there
are still unanswered questions regarding the facts of the accident and how our Insured was
negligent in causing or contributing to the accident.

As you are aware, BART hired Anil Verma Associates to provide general engineering services
for various BART projects. Anil Verma then hired subcontractors to provide engineering
services, of which Daniels Railroad Engineering, Inc. was retained to provide his expertise on
BART's projects.

Our understanding of the 10/19/2013 BART train accident involving Laurence Daniels is mainly
based on news media and internet investigations, and OSHA citations levied against BART. Per
the information provided, Mr. Daniels and a BART employee were called out to inspect the
BART tracts in the Walnut Creek area due to complaints by BART train operators of a dip in the
tracks. Mr. Daniels and the BART employee were in the process of inspecting the tracks when
they were struck and killed by an out of service BART train while conducting a training course.

Page 2
Allen, Glaessner, Hazelwood & Werth, LLP
Mr. Mark F. Hazelwood

OSHA's investigation of the accident alleges that BART failed to:

1) Ensure that only qualified electrical workers were allowed to perform work or take any conducting object within an area where there is a hazard of contact with energized conductors

2) Effectively implement a Program with respect to the training provisions, in that the employer allowed employees, who had been given a new job assignment, to perform that job while having not completed the training. Moreover, employees that were assigned to be "Train Operators" on a regional rail rapid transit system were allowed to operate trains with inadequate supervision during an abbreviated training course.

3) Develop and institute controls to safeguard personnel during railcar movement. The employer allowed workers to conduct work on the railway tracks where trains were travelling in excess of sixty-five (65) miles-per-hour. Employer's control method, namely the "Simple Approval" procedure, does not safeguard personnel working on tracks during railcar movement. Provisions of the "Simple Approval" procedure that fail to safeguard employees include, but are not limited to, the employees being made responsible for their own safety and specifically not being notified of trains actively entering their work area. Furthermore, the requirement of the said procedure to post one of the employees working on the tracks as "Watchperson" to warn of oncoming rail traffic was not implemented.

The OSHA Citation also states:

The employees had no warning that a train moving at more than 65 miles-per-hour was on the C1 railway track approaching the location where they were working. And neither of the two track workers was performing the duties of "Watchperson", as specified by the employer's "Simple Approval" procedure, at the time of the incident.

Per our Insured, they had no knowledge of Mr. Daniels working the day of the accident and had no knowledge that anyone had called him out to inspect the tracks in Walnut Creek due to a suspected dip in the BART tracks. Thus, it appears that BART had contacted Mr. Daniels directly and requested that he inspect the tracks along with BART's employee. Therefore, at the time of the accident, Mr. Daniels was not working on Anil Verma's behalf and was under the direction, supervision and control of BART's management.

In regards to coverage under the Travelers Property Casualty Company of America ("Travelers") policy, it contains a "Professional Services" exclusion for Engineers, Architects or Surveyors which excludes "bodily injury" or "property damage" arising out of the rendering of or failure to render any "professional services", which includes job site safety.

Page 3
Allen, Glaessner, Hazelwood & Werth, LLP
Mr. Mark F. Hazelwood

In regards to the Blanket Additional Insured Endorsement, BART is an Additional Insured under the Travelers policy, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by the acts or omissions of Anil Verma Associates, or the acts or omissions of those acting on Anil Verma Associates' behalf. However, this Additional Insured insurance does not apply to the rendering of or failure to render any "professional services".

Based on the above, Travelers is currently not in a position to accept or reject BART's tender of their defense and indemnity of this claim. The information provided to date indicates that BART contacted Mr. Daniels directly and requested he perform an inspection of the BART tracks. Thus, Mr. Daniels was under BART's control and working under their policies and procedures. It also appears that BART was in control of the BART train that was being operated on the tracks during the time of Mr. Daniels and the BART employee's inspection. Thus, BART failed to warn the train operator that there were workers on the tracks and enforce its own safety procedures.

Since Anil Verma Associates was never made aware that Mr. Daniels was requested to inspect the BART tracks on the day of the accident, and was not apparently working on their behalf, we currently fail to see how Anil Verma Associates can be held liable for this accident. However, if you have any evidence to the contrary, please provide that information to us for further consideration regarding BART's tender.

This letter is not intended to express all the various bases upon which coverage may be denied. The failure of Travelers to set forth any basis other than that as outlined in this letter does not constitute a waiver by Travelers of any such defense. Should you have any questions about this letter or know of any other documents or information which you believe Travelers has failed to consider, which may impact our coverage opinion, please let us know at your earliest convenience

We are required under Section 2695.7(b)(3) of the California Fair Claims Regulations to provide this notice:

If you believe that your claim has been wrongfully denied or rejected, you have the right to have the California Department of Insurance review this matter. The Department is located at 300 S. Spring Street, Los Angeles, CA 90013. Their phone number is 1-800-927-4357.

If you have any questions or additional information for consideration, I may be contacted at (925) 746-3983.

Page 4
Allen, Glaessner, Hazelwood & Werth, LLP
Mr. Mark F. Hazelwood

Sincerely,
Travelers Property Casualty Company of America

Joe Tancredy
Sr. Technical Specialist
Phone (925) 746-3983
Fax (877) 801-9679

Cc:

Exhibit F

## Mark Hazelwood

| | |
|---|---|
| From: | Tancredy,Joseph E <JTANCRED@travelers.com> |
| Sent: | Thursday, June 05, 2014 4:46 PM |
| To: | Mark Hazelwood |
| Subject: | RE: BART Train Accident Involving Laurence Daniels on 10/19/2013, Travelers GL Claim # EXQ9767- |

Mark,

Thank you for providing the Complaint and invoices from Anil Verma Associates ("AVA") and Daniels Railroad Engineering.

In your correspondence of 5/23/2014, you noted that CAL-OSHA determined that neither Mr. Daniels, nor Mr. Shephard, "was performing the duties of 'Watchperson', as specified by the employer's 'Simple Approval' procedure, at the time of the incident. "  Therefore, you assume that there was a finding by Cal-OSHA of an act or omission on the part of Mr. Daniels.

However, more questions are raised in regards to the "Simple Approval" procedure that BART implemented to safeguard workers on the tracks.

1) Was AVA fully instructed in writing or orally on the "Simple Approval" process as well as all other safety procedures required by Bart?
2) Was Mr. Daniels fully instructed on BART's "Simple Approval" process and required safety procedures, in writing or orally?
3) Is there any written evidence to show that either AVA or Daniels was fully aware of all BART's safety procedures and requirements?
4) Was the "Simple Approval" process in place at the time of the accident?
5) If the "Simple Approval " process was in place, did the train operator and his supervisor that was with him know that the men were working on the tracks?

It appears there may have been a lack of communication and/or a breakdown of BART's "Simple Approval" safety procedures and we need more information to determine if AVA or Mr. Daniels had any responsibility for this.   Thus, we are still not in a position to accept or reject BART's tender of the claim.  We have tendered both AVA's and BART's tender of the claim to the insurance Agency for Daniel's Engineering and are awaiting a response from their Professional Liability and General Liability carriers.  We will await any additional information you might be able to provide regarding the above questions.

Regards,

Joe

Joe Tancredy | Sr. Technical Specialist | General Liability Travelers P.O. Box 8106 Walnut Creek, CA 94596-8106
W: (925) 746-3983  F: (877) 801-9679


If further assistance is required, please contact my manager at rsaccocc@travelers.com

-----Original Message-----

From: Mark Hazelwood [mailto:MHazelwood@aghwlaw.com]
Sent: Sunday, June 01, 2014 12:01 PM
To: Tancredy,Joseph E
Subject: RE: BART Train Accident Involving Laurence Daniels on 10/19/2013, Travelers GL Claim # EXQ9767-

Joe:

Attached is copy of complaint filed by Daniels' family.  I look forward to your response to my e-mail letter of May 23.
Thanks.


Mark


-----Original Message-----
From: Mark Hazelwood
Sent: Friday, May 23, 2014 10:47 AM
To: 'Tancredy,Joseph E'
Cc: 'Terri Hodges'
Subject: FW: BART Train Accident Involving Laurence Daniels on 10/19/2013, Travelers GL Claim # EXQ9767-

Mr. Tancredy:

We are in receipt of your letter dated May 13, 2014.  On page 2 of the letter, you state: "Per our insured, they had no
knowledge of Mr. Daniels working the day of the accident and had no knowledge that anyone had called him out to
inspect the tracks in Walnut Creek due to a suspected dip in the BART tracks."

In response, we previously forwarded you Anil Verma's Professional Service Agreement with BART, 6M8043.  As you
acknowledge, Mr. Daniels was a sub-consultant to Anil Verma under this Service Agreement.  One of the projects under
this subcontract was for "Wayside Support."  Chris Sheppard, who was the BART employee killed in the same accident
as Mr. Daniels, was the BART Project Manager for this work plan.  Mr. Daniels and Mr. Shephard were working together
when the accident occurred.

Please find attached Anil Verma's invoices submitted to BART for worked performed under agreement "6M8043 General
Engineering Services" for September 2013 and October 2013.  These invoices relate to Wayside Support.  The invoices
include work performed  on this work plan by Mr. Daniels.  In particular, please see invoice 6M8043 B.01-024, seeking
payment for work performed in October 2013.  Mr. Daniels worked 41 hours in October 2013 on this project. The last
date charged was the date of the accident.  Anil Verma billed for 26 hours of similar work by Mr. Daniels in September
2013.  Therefore, Anil Verma not only had knowledge that Mr. Daniels was working as a sub-consultant on this project,
they charged BART for his work.

You letter goes on to state that BART is an additional insured "only with respect to liability ...caused in whole, or in part,
by the acts of Anil Verma Associates, or the acts or omissions of those acting on Anil Verma's behalf." Clearly,  Mr.
Daniels was working as a sub-consultant on Anil Verma's behalf at the time of the accident.  Further,  as you set forth in
your letter, CAL-OSHA determined that neither Mr. Daniels, nor Mr. Shephard, "was performing the duties of
'Watchperson', as specified by the employer's 'Simple Approval' procedure, at the time of the incident. "  Therefore,
there has been a finding by Cal-OSHA of an act or omission on the part of Mr. Daniels.

For these reasons,  BART  once again tenders defense and indemnity to Anil Verma and to Travelers Insurance. We have
been advised that the complaint has now been filed in this matter.  We will forward a copy upon receipt.  Given that
litigation has ensued, we request an immediate response. Thank you.

Mark

This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.

TRVDiscDefault::1201

Exhibit G

# ALLEN, GLAESSNER, HAZELWOOD &WERTH, LLP

ATTORNEYS

180 Montgomery Street, Suite 1200
San Francisco, California 94104

Telephone (415) 697-2000
Facsimile (415) 813-2045
Direct (415) 697-3464
E-Mail: lsebransky@aghwlaw.com

Our File No.:
01752-50095-A

June 27, 2014

**VIA E-MAIL & U.S. MAIL**

Joe Tancredy
Sr. Technical Specialist
Travelers
P.O.Box 8106
Walnut Creek, CA  94596-8106

Re: ***Daniels v. Bay Area Rapid Transit District***

| | |
|---|---|
| Your Named Insured: | Anil Verma |
| Your Additional Insured: | BART |
| Your Claim No.: | EXQ9767 |

Dear Mr. Tancredy:

I work with Mark Hazelwood.  Because I specialize in insurance coverage, Mark asked that I review Travelers' obligations to defend and indemnify BART under the Travelers general liability policy.  As explained below, I believe Travelers has an immediate obligation to defend BART, and request that Travelers honor that contractual obligation.

First, we do not have a copy of the Travelers general liability policy, although BART is an additional insured under that policy.  We would appreciate your forwarding a certified copy of the policy as soon as possible.

Second, the contract between BART and Anil Verma Associates requires that AVA name BART as an additional insured under the Travelers policy, and specifies that Travelers' coverage will be primary:

6.0 INSURANCE

D.    Insurance Provided by Consultant

Joe Tancredy
RE: *Daniels v. BART*
June 27, 2014
Page 2

    1.    <u>Commercial General Liability Insurance</u>

        a.    Coverage shall include:

            (4)    **Broad Form Contractual Liability,
expressly including liability assumed under the
Agreement;**

        b.    Such insurance shall include the following
endorsements, copies of which shall be provided to the
District:

            (1)    **Inclusion of the District...as an additional
insured** as respects [AVA's] operations under this
Agreement;

            (2)    Stipulation that **the insurance is primary
insurance** and that no insurance or self-insurance of
the District will be called upon to contribute to a loss.
[Our emphasis.]

The Travelers policy contains a blanket additional insured endorsement
that extends additional insured status to BART under the above contract
provision. Additional insured coverage is afforded with respect to liability
caused, in whole or in part, by AVA's "acts or omissions or the acts or omissions
of those acting on [AVA's] behalf."

Under California law, an insurer must defend its insured (including its
additional insured) if there is a *mere potential* for coverage under the policy.
*Montrose Chemical Corp. v. Superior Court (Canadian Universal Ins. Co.)*
(1993) 6 Cal. 4th 287, 295. An insurer must defend the entire action if any single
claim could possibly be covered. *Buss v. Superior Court (Transamerica Ins. Co.)*
(1997) 16 Cal. 4th 35, 48. To avoid its defense obligation, National Union would
have to prove that plaintiff could "**by no conceivable theory raise a single
issue which could bring [the claims] within the policy coverage.**"
*Montrose, supra,* 6 Cal. 4th at 300 (original emphasis).

That is not possible here. Mr. Daniels was working on AVA's behalf (as a
sub-consultant) at the time of the accident. Cal-OSHA determined that neither
Mr. Daniels nor Mr. Shephard "was performing the duties of 'Watchperson,' as

16247.1

Joe Tancredy
RE: *Daniels v. BART*
June 27, 2014
Page 3

specified by the employer's 'Simple Approval' procedure...." It certainly is
"possible" that the accident was caused, in whole or in part, by Mr. Daniels'
failure to follow safety protocol. Given this possibility, Travelers must defend.

Your June 5, 2014 email to Mark raises various questions about BART's
"Simple Approval" procedure. While those questions are relevant to the parties'
liability, and Travelers' ultimate duty to indemnify, they do not affect Travelers'
defense obligation. As mentioned, proof of liability, causation or even additional
insured status is neither necessary nor relevant when determining a duty to
defend.

Third, we note that the policy's contractual liability coverage also would
trigger Travelers' defense (and indemnity) obligations, even if BART were not an
additional insured. AVA agreed to indemnify BART as follows:

8.0   INDEMNIFICATION.

Consultant [AVA]...shall defend, indemnify and hold harmless
BART...from all claims, demands, suits, loss, damages, injury and
liability, direct or indirect (including reasonable attorney's fees and
any and all costs and expenses in connection therewith), incurred
**by reason of any act, or failure to act, of [AVA],** its officers,
agents, employees and **subconsultants**...under or in connection
with this agreement; and [AVA] agrees at its own cost, expense and
risk to defend any and all claims, actions, suits or other legal
proceedings brought or instituted against BART...arising out of
[AVA's] services, and to pay and satisfy any resulting judgments.
[Our emphasis.]

Under California law, AVA's contractual defense obligation assumed in
Paragraph 8.0 is treated like a liability policy; it does not depend on ultimate
determinations of fault or causation. Instead, AVA (as indemnitor) is obligated
to defend BART (as indemnitee) from the outset of the litigation. *Crawford v.
Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541, 561. AVA's contractual defense
(and indemnity) obligations ultimately are owed by Travelers under the
contractual liability provision of the policy.

Joe Tancredy
RE: *Daniels v. BART*
June 27, 2014
Page 4

        Finally, can you please let us know whether AVA has retained coverage
counsel and if so, who AVA has retained?  We want to be sure all parties are
engaged as necessary as we move forward.

        We ask that Travelers immediately acknowledge its duty to defend.  Since
defense costs are being incurred, we request that Travelers respond to us by June
21.  We look forward to hearing from you.

                          Very truly yours,

                          ALLEN, GLAESSNER,
                          HAZELWOOD & WERTH, LLP


                          Lori A. Sebransky

LAS:psh

cc:   Peter O. Glaessner
      Mark F. Hazelwood
      Terri Hodges
      Steve Shatz

16247.1

## Pamela Hyrn

| | |
|---|---|
| **From:** | Pamela Hyrn |
| **Sent:** | Friday, June 27, 2014 3:38 PM |
| **To:** | 'JTANCRED@travelers.com' |
| **Cc:** | 'steve.shatz@georgehills.com'; 'thodges@bart.gov'; Lori Sebransky; Peter Glaessner; Mark Hazelwood |
| **Subject:** | Daniels v. Bay Area Rapid Transit District, et al. - Insured: Anil Verma - Additional Insured: BART - Claim No.: EXQ9767 |
| **Attachments:** | Tancredy (Travelers) 6.27.14.PDF |

Dear Mr. Tancredy:

Attached please find correspondence from Ms. Sebransky in the above-referenced matter.

Should you have any questions or comments, please feel free to contact me.

Very truly yours,
Pam Hyrn

 **PAMELA S. HYRN** Secretary to Peter O. Glaessner, Steven D. Werth,
Lori A. Sebransky, Hannibal P. Odisho & Gemma L. Mondala
180 Montgomery Street, Suite 1200
San Francisco, CA 94104
phyrn@aghwlaw.com
main 415.607.2000 | fax 415.813.2045
aghwlaw.com

The information contained in this communication is confidential, is intended only for the use of the recipient named above, and is legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please resend this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

Exhibit H

 **TRAVELERS**

Joe Tancredy
Sr. Technical Specialist
Travelers Property Casualty Company of America
P.O. Box 8106
Walnut Creek, CA 94596-8106
Phone (925) 746-3983
Fax (877) 801-9679

July 10, 2014

Allen, Glaessner, Hazelwood & Werth, LLP
Ms. Lori A. Sebransky
180 Montgomery St., Suite 1200
San Francisco, CA 94104

RE:    Case Name:        <u>Amber Daniels, et al vs. Bay Area Rapid Transit District</u>, filed in
                         Alameda County Superior Court, Case No. RG14725711
       Our Insured:      Anil Verma Associates, Inc. ("AVA")
       Your Clients:     San Francisco Bay Area Rapid Transit District (BART)
       Our Claim No.:    EXQ9767
       Your File No.:    01752-00237
       Claimant:         Amber Daniels, Sarah Daniels, Estate of Laurence E. Daniels
       Date of Loss:     10/19/2013

Dear Ms. Sebransky:

In response to your correspondence dated June 27, 2014, regarding your client's tender of the above-captioned claim, there are still unanswered questions regarding the facts of the accident and how our Insured was negligent in causing or contributing to the accident.

As you are aware, OSHA's investigation of the accident alleges that BART failed to:

1)     Ensure that only qualified electrical workers were allowed to perform work or take any conducting object within an area where there is a hazard of contact with energized conductors

2)     Effectively implement a Program with respect to the training provisions, in that the employer allowed employees, who had been given a new job assignment, to perform that job while having not completed the training. Moreover, employees that were assigned to be "Train Operators" on a regional rail rapid transit system were allowed to operate trains with inadequate supervision during an abbreviated training course.

Page 2
Allen, Glaessner, Hazelwood & Werth, LLP
Ms. Lori A. Sebransky

3)     Develop and institute controls to safeguard personnel during railcar movement. The employer allowed workers to conduct work on the railway tracks where trains were travelling in excess of sixty-five (65) miles-per-hour. Employer's control method, namely the "Simple Approval" procedure, does not safeguard personnel working on tracks during railcar movement. Provisions of the "Simple Approval" procedure that fail to safeguard employees include, but are not limited to, the employees being made responsible for their own safety and specifically not being notified of trains actively entering their work area. Furthermore, the requirement of the said procedure to post one of the employees working on the tracks as "Watchperson" to warn of oncoming rail traffic was not implemented.

The OSHA Citation also states:

The employees had no warning that a train moving at more than 65 miles-per-hour was on the C1 railway track approaching the location where they were working. And neither of the two track workers was performing the duties of "Watchperson", as specified by the employer's "Simple Approval" procedure, at the time of the incident.

In review of the Complaint, the Plaintiffs state that BART negligently and carelessly employed the "Simple Approval" safety approach, which BART knew, or should have known, was a dangerous and hazardous system that failed to safeguard the personnel working on the tracks. The Plaintiffs go on to state that BART's dispatch failed to warn the train operator that there workers on the tracks, and negligently operated the train with an inexperienced operator in training while the train was in automatic mode at full speed without direct supervision. There is nothing stated in the Complaint that would indicate Anil Verma Associates or Mr. Daniels had any involvement in implementing of the "Simple Approval" process or the operation of the train that allegedly caused this accident.

In your letter, it is speculated that possibly Mr. Daniels failed to follow the "Simple Approval" safety protocol, thus, it is asserted that this speculated possibility obligates Travelers to Defend BART. To further investigate this "Simple Approval" procedure, it prompted the questions raised in my June 5, 2014 e-mail to Mark.

In regards to the "Simple Approval" procedure that BART implemented to safeguard workers on the tracks, we still have the following questions that have not been answered:

1)     Was AVA fully instructed in writing or orally on the "Simple Approval" process as well as all other safety procedures required by Bart?
2)     Was Mr. Daniels fully instructed on BART's "Simple Approval" process and required safety procedures, in writing or orally?
3)     Is there any written evidence to show that either AVA or Daniels was fully aware of all BART's safety procedures and requirements?
4)     Was the "Simple Approval" process in place at the time of the accident?

Page 3
Allen, Glaessner, Hazelwood & Werth, LLP
Ms. Lori A. Sebransky

5)      If the "Simple Approval " process was in place, did the train operator and his supervisor
        that was with him know that the men were working on the tracks?

As previously advised, in regards to the Blanket Additional Insured Endorsement, BART is an
Additional Insured under the Travelers policy, but only with respect to liability for "bodily
injury" or "property damage" caused, in whole or in part, by the acts or omissions of Anil Verma
Associates, or the acts or omissions of those acting on Anil Verma Associates' behalf. Currently,
all we have is mere speculation that Mr. Daniels knew that the "Simple Approval" procedure was
in force and that he knew what those safety requirements were. It is also speculated that Mr.
Daniels was designated as the "Watchperson" as opposed to BART's employee, Mr. Shephard.

It appears there may have been a lack of communication and/or a breakdown of BART's "Simple
Approval" safety procedures and we need more information to determine if AVA or Mr. Daniels
had any responsibility for this. Thus, we are still not in a position to accept or reject BART's
tender of the claim. We have tendered both AVA's and BART's tender of the claim to the
insurance Agency for Daniel's Engineering and are awaiting a response from the General
Liability carrier. We will await any additional information you might be able to provide
regarding the above questions.

This letter is not intended to express all the various bases upon which coverage may be denied.
The failure of Travelers to set forth any basis other than that as outlined in this letter does not
constitute a waiver by Travelers of any such defense. Should you have any questions about this
letter or know of any other documents or information which you believe Travelers has failed to
consider, which may impact our coverage opinion, please let us know at your earliest
convenience

We are required under Section 2695.7(b)(3) of the California Fair Claims Regulations to provide
this notice:

If you believe that your claim has been wrongfully denied or rejected, you have the right to have
the California Department of Insurance review this matter. The Department is located at 300 S.
Spring Street, Los Angeles, CA 90013. Their phone number is 1-800-927-4357.

If you have any questions or additional information for consideration, I may be contacted at (925)
746-3983.

Sincerely,
Travelers Property Casualty Company of America

Joe Tancredy
Sr. Technical Specialist
Phone  (925) 746-398

Exhibit I

# ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP

ATTORNEYS

180 Montgomery Street, Suite 1200
San Francisco, California 94104

Telephone (415) 697-2000
Facsimile (415) 813-2045
Direct (415) 697-3464
E-Mail: lsebransky@aghwlaw.com

Our File No.:
01752-00237.001

August 1, 2014

**VIA E-MAIL & U.S. MAIL**

Joe Tancredy
Sr. Technical Specialist
Travelers
P.O.Box 8106
Walnut Creek, CA  94596-8106

Re: *Daniels v. Bay Area Rapid Transit District*
     Your Named Insured:       Anil Verma
     Your Additional Insured:  BART
     Your Claim No.:           EXQ9767

Dear Mr. Tancredy:

   We were disappointed to receive your July 10, 2014 letter, in which Travelers again refuses to accept BART's tender of defense.  I understand that questions remain about the Simple Approval process, the instructions given to AVA, what AVA/Daniels knew about the safety procedures, and so on. But those are *liability* questions that will be answered during the course of the litigation.

   The duty to defend, however, is *immediate. Buss v. Superior Court (Transamerica Ins. Co.)* (1997) 16 Cal.4th 35, 46.  It begins at the time of tender, and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage. *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295. *Also see, Crawford v. Weather Shield Mfg. Inc.* (2008) 44 Cal.4th 541, 547 [duty to defend under contractual indemnity provisions "necessarily arises as soon as such claims are made against the promisee"].  The immediacy of the duty is what makes it so important to insureds. *Montrose,* 6 Cal.4th at 295–296 ["so far as the insured is concerned, the duty to defend may be as important as the duty to indemnify"].  The California Supreme Court explains that, "To defend meaningfully, the insurer must defend immediately." *Buss v. Superior Court,* 16 Cal.4th at 49, citing *Montrose,* 6 Cal.4th at 295.

Given the extensive nature of the insurer's duty, any doubt about whether a defense obligation exists is resolved in the insured's favor. *Montrose,* 6 Cal.4[th] at 299-300; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4[th] 1076, 1081. California courts are "consistently solicitous of insureds' expectations" that their insurers will defend them as promised. *Montrose,* 6 Cal. 4th at 295-296.

So unless Travelers can prove - right now - that there is *no possibility whatsoever* that the accident was caused, in whole or in part, by Mr. Daniels' failure to follow safety protocol (or by his or AVA's other conduct), it must accept BART's tender of defense. Travelers can protect its interests by accepting BART's defense under a reservation of rights. If the evidence adduced during litigation shows there is no potential for coverage after all, then Travelers' defense obligation can be extinguished.

As we have said before, we do not see how Travelers can prove that coverage is impossible. The Cal-OSHA report suggests that Mr. Daniels was not performing the duties of a watchperson, as required. And because Mr. Daniels had done substantial work for BART, it is certainly possible, if not probable, that he would have been familiar with the applicable safety protocol. Moreover, the "unanswered questions" raised at the bottom of page 2 of your letter themselves illustrate the possibility that AVA might have some responsibility for the accident, which would trigger Travelers' coverage. It is entirely possible, for instance, that AVA and/or Mr. Daniels were fully instructed about the Simple Approval process and other safety procedures, but failed to follow protocol [questions 1-3].

We are considering BART's legal options, but before going down that road, we ask once more that Travelers acknowledge its duty to defend. Please let us know by **August 14**. We also renew our request for a certified copy of the Travelers general liability policy. We look forward to hearing from you.

Very truly yours,

ALLEN, GLAESSNER,
HAZELWOOD & WERTH, LLP

Lori A. Sebransky

LAS:psh

cc:  Peter O. Glaessner
     Mark F. Hazelwood
     Terri Hodges
     Steve Shatz

18421.1

# Exhibit J



**TRAVELERS**

Joe Tancredy
Sr. Technical Specialist
Travelers Property Casualty Company of
America
P.O. Box 8106
Walnut Creek, CA 94596-8106
Phone (925) 746-3983
Fax (877) 801-9679

August 26, 2014

Allen, Glaessner, Hazelwood & Werth, LLP
Ms. Lori A. Sebransky
180 Montgomery St., Suite 1200
San Francisco, CA 94104

RE:  **Case Name:**      <u>Amber Daniels, et al vs. Bay Area Rapid Transit District</u>, filed in
                         Alameda County Superior Court, Case No. RG14725711
     **Our Insured:**    Anil Verma Associates, Inc. ("AVA")
     **Your Clients:**   San Francisco Bay Area Rapid Transit District (BART)
     **Our Claim No.:**  EXQ9767
     **Your File No.:**  01752-00237
     **Claimants:**      Amber Daniels, Sarah Daniels, Estate of Laurence E. Daniels
     **Date of Loss:**   10/19/2013

Dear Ms. Sebransky:

In response to your correspondence dated August 1, 2014, regarding your client's tender of the
above-captioned claim, there are still unanswered questions regarding the facts of the accident
and how our Insured was negligent in causing or contributing to the accident.

Though you acknowledge there are still unanswered questions in regards to our prior inquiry on
the Simple Approval process, safety instructions given to AVA, what AVA and Daniels knew
about the safety procedures, etc., the answers to these questions are important to evaluate
BART's coverage under our Policy.

As previously advised, in regards to the Blanket Additional Insured Endorsement, BART is an
Additional Insured under the Travelers policy, <u>but only with respect to liability</u> for "bodily
injury" or "property damage" caused, in whole or in part, by the acts or omissions of Anil Verma
Associates, or the acts or omissions of those acting on Anil Verma Associates' behalf. Currently,
all we have is mere speculation that Mr. Daniels knew that the "Simple Approval" procedure was
in force and that he knew what those safety requirements were. It is also speculated that Mr.
Daniels was designated as the "Watchperson" as opposed to BART's employee, Mr. Shephard.

Page 2
Allen, Glaessner, Hazelwood & Werth, LLP
Ms. Lori A. Sebransky

In review of the Complaint, the Plaintiffs state that BART negligently and carelessly employed the "Simple Approval" safety approach, which BART knew, or should have known, was a dangerous and hazardous system that failed to safeguard the personnel working on the tracks. The Plaintiffs go on to state that BART's dispatch failed to warn the train operator that there workers on the tracks, and negligently operated the train with an inexperienced operator in training while the train was in automatic mode at full speed without direct supervision. There is nothing stated in the Complaint that would indicate Anil Verma Associates or Mr. Daniels had any involvement in implementing of the "Simple Approval" process or the operation of the train that allegedly caused this accident.

In short, it is Travelers position that BART has not met its burden of establishing that the insuring agreement (contained within the additional insured endorsement) has been met. We have requested information from BART, repeatedly, so that we might re-examine our position, however, we have not received any substantive information to date. Until we have a chance to review the requested information, our position regarding BART's tender of defense remains the same.

This letter is not intended to express all the various bases upon which coverage may be denied. The failure of Travelers to set forth any basis other than that as outlined in this letter does not constitute a waiver by Travelers of any such defense. Should you have any questions about this letter or know of any other documents or information which you believe Travelers has failed to consider, which may impact our coverage opinion, please let us know at your earliest convenience. We will continue to await any additional information or evidence that BART may provide regarding the prior questions posed on BART's safety procedures.

If you have any questions or additional information for consideration, I may be contacted at (925) 746-3983.

Sincerely,
Travelers Property Casualty Company of America


Joe Tancredy
Sr. Technical Specialist
Phone (925) 746-398

Exhibit K

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP

ATTORNEYS

180 Montgomery Street, Suite 1200
San Francisco, California 94104

Telephone (415) 697-2000
Facsimile (415) 813-2045
Direct (415) 697-3464
E-Mail: mhazelwood@aghwlaw.com

Our File No.:
01752-50095

September 8, 2014

VIA E-MAIL & U.S. MAIL

Joe Tancredy
Sr. Technical Specialist
Travelers
P.O.Box 8106
Walnut Creek, CA  94596-8106

Re: *Daniels v. Bay Area Rapid Transit District*
    Your Named Insured:     Anil Verma
    Your Additional Insured:    BART
    Your Claim No.:       EXQ9767

Dear Mr. Tancredy:

    This letter responds to your letter of August 26, 2014 to Lori Sebransky of my office. Pursuant to your request, we provide you documentation that Mr. Daniels knew the "simple approval" procedure, and that it was in force at the time of the accident.

    Enclosed, you will find portions of the BARTD Police Department report relating to the subject accident. Specifically, we enclose a supplemental report prepared by Detective W. Sanchez. On pages six and seven of the supplemental report, you will find a confirmation that Mr. Christopher Sheppard and Laurence Daniels were operating under the "simple approval procedure." As part of the simple approval procedure, Mr. Sheppard and Mr. Daniels understood that they were to provide for their own protection, not interfere with any main line or yard operations, and to expect movement of on-rail vehicles during any time on any track in any direction. We also enclose a photocopy of the "BART Simple Approval Form" completed by Mr. Sheppard for Sheppard and Daniels' work on October 19, 2013. Please also note the summary of the statement taken from train operator, Richard Burr, who noted that when he first observed Mr. Sheppard and Mr. Daniels, both gentlemen unfortunately had their backs to the train. This means

20189.1

Re: Daniels v. BARTD
September 8, 2014
Page 2

that they were not following the simple approval procedure by having a lookout at all times.

While we continue to provide you additional information as requested, we also re-emphasize the points made in Ms. Sebransky's letters of June 27, 2014 and August 1, 2014. The duty to defend is immediate. *Buss v. Superior Court (Transamerica Ins. Co.)* (1997) 16 Cal. 4th 35, 46. Given that litigation is well underway, we simply cannot wait any longer for Travelers to provide a defense. Therefore, we request a response within the next 10 days, so as to avoid a cross-complaint for express indemnity and contribution being filed against Anil Verma.

Thank you for your anticipated courtesy and cooperation.

Very truly yours,

ALLEN, GLAESSNER,
HAZELWOOD & WERTH, LLP

Mark F. Hazelwood

MFH/vg
Enclosures

cc:   Lori Sebransky
      Terri Hodges
      Steve Shatz

20189.1

Exhibit L


**TRAVELERS**

Joe Tancredy
Sr. Technical Specialist
Travelers Property Casualty Company of America
P.O. Box 8106
Walnut Creek, CA 94596-8106
Phone (925) 746-3983
Fax (877) 801-9679

September 25, 2014

Allen, Glaessner, Hazelwood & Werth, LLP
Mr. Mark F. Hazelwood
180 Montgomery St., Suite 1200
San Francisco, CA 94104

RE:  Case Name:       <u>Amber Daniels, et al v. Bay Area Rapid Transit District</u>
     Our Insured:     Anil Verma Associates, Inc.
     Your Clients:    San Francisco Bay Area Rapid Transit District (BART)
     Our Claim No.:   EXQ9767
     Your File No.:   01752-00237
     Claimant:        Amber Daniels, et al
     Date of Loss:    10/19/2013

Dear Mr. Hazelwood:

In response to your 9/8/2014 correspondence regarding the above-captioned claim, we have further reviewed the documents and information that have been forwarded to date, which included the "Bart Simple Approval Form" and a portion of the "BART Police Department-Supplemental Report"  However, based on all the documents and information that have been provided, there has been no evidence submitted or discovered that indicated our Insured, or Mr. Daniels, was negligent in causing or contributing to the accident.

Our understanding is that the "Simple Approval" process is to be used only when trains are moving at slow speeds. This is confirmed by the wording on the Simple Approval form that states "Personnel wayside <u>not</u> (emphasis in original) requiring protection from high speed trains shall obtain a Simple Approval authorization and the person in charge shall have this form completed…"  The train here was on Automatic Train Operation (ATO) and moving at 65 MPH according to the BART Supplemental Report, despite the fact that at least some Bart personnel knew workers were present on the tracks, and where 65 mph is, by any definition, high speed.

In addition, only Mr. Sheppard signed the Simple Approval form, and Mr. Daniel's name or acknowledgement appears nowhere on the form.  There is no indication that Daniels was told any of this or informed of the Simple Approval procedures and, even if he had, this procedure should not have been used when trains are traveling at 65mph in the area. According to the wording of the form, only Sheppard was bound to follow and enforce the "Simple Approval" procedures.

Page 2
Allen, Glaessner, Hazelwood & Werth, LLP
Mr. Mark F. Hazelwood

The form indicates "2" people present on the track.  This indicates that Sheppard was not only bound by the Simple Approval procedures but was also under an obligation to see that Daniel's followed them and was in a safe position throughout the time period noted on the form.  Mr. Sheppard completed the Simple Approval form and acknowledges that he was in charge that day by completing the form.

This appears to be nothing but a failure of communication on the part of Bart.  Certain Bart personnel knew that workers were going to be on the track yet somehow failed to alert the Bart employees operating the train in the area.  Based on the above, we must stand by our prior decision to decline Bart's tender of the claim as we do not believe there is any fault on Mr. Daniel's or Anil Verma's part that caused this accident, or was in connection with their work or operations.

Sincerely,
Travelers Property Casualty Company of America

Joe Tancredy
Sr. Technical Specialist
Phone  (925) 746-3983
Fax  (877) 801-9679